STATE OF CONNECTICUT *v.* CARLOS DEJESUS
(SC 17710)
(SC 17711)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.

Argued January 11—officially released August 19, 2008

*Darcy McGraw*, special public defender, for the appellant in Docket No. SC 17710, appellee in Docket No. SC 17711 (defendant).

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Vicki Melchiorre*, senior assistant state's attorney, for the appellee in Docket No. SC 17710, appellant in Docket No. SC 17711 (state).

*Opinion*

ROGERS, C. J. This case involves two separate certified appeals. First, the state appeals from the judgment of the Appellate Court reversing the conviction of the defendant, Carlos DeJesus, for kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[1] claiming that the Appellate Court improperly concluded that the kidnapping statute is unconstitutionally void for vagueness.[2] See *State* v. *DeJesus*, 91 Conn. App. 47, 83, 97–98, 880 A.2d 910 (2005). Second, the defendant appeals from the judgment of the Appellate Court affirming his conviction of two counts of sexual assault

---

[1] General Statutes § 53a-92 provides in relevant part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[2] We granted the state's petition for certification to appeal from the judgment of the Appellate Court limited to the following issue: "Did the Appellate Court properly conclude that no reasonable person could have known that the defendant's conduct would violate the statute defining kidnapping in the first degree?" *State* v. *DeJesus*, 279 Conn. 912, 912–13, 903 A.2d 658 (2006).

in the first degree in violation of General Statutes § 53a-70 (a) (1)[3] and one count of kidnapping in the first degree in violation of § 53a-92 (a) (2) (A), claiming that, despite the codification of the common law of evidence in the Connecticut Code of Evidence (code), this court retains the authority to reconsider and reverse the liberal standard by which evidence of uncharged misconduct is admitted in sexual assault cases.[4]

We conclude that the state's appeal is governed by the principles recently articulated in *State* v. *Salamon*, 287 Conn. 509, 542, 949 A.2d 1092 (2008), wherein we determined that the crime of kidnapping requires an intent "to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit [an underlying] crime." Accordingly, the defendant is entitled to a new trial on the charge of kidnapping in the first degree wherein the jury properly is instructed on the element of intent. With respect to the defendant's appeal, we conclude that, despite the adoption of the code by the judges of the Superior Court, the appellate courts of this state retain the authority to develop and change the rules of evidence through case-by-case common-law adjudication. In light of our recent clarification of the common scheme or plan exception in *State* v. *Randolph*, 284 Conn. 328, 933 A.2d 1158 (2007), we further conclude that evidence of uncharged misconduct admitted under

---

[3] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[4] We granted the defendant's petition for certification to appeal from the judgment of the Appellate Court limited to the following issue: "Does this court, or any court, have the authority in light of the Connecticut Code of Evidence, to reconsider the rule that the introductions of prior sexual misconduct of the defendant in sexual assault cases, is viewed under a relaxed standard?" *State* v. *DeJesus*, 279 Conn. 912, 903 A.2d 658 (2006).

the liberal standard of admissibility ordinarily does not reflect the existence of a genuine plan in the defendant's mind. Nonetheless, because strong public policy reasons continue to exist to admit evidence of uncharged misconduct in sexual assault cases more liberally than in other cases, we will maintain the liberal standard, but do so as a limited exception to the prohibition on the admission of uncharged misconduct evidence in sexual assault cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior. Accordingly, we reverse in part and affirm in part the judgment of the Appellate Court.

The jury reasonably could have found the following facts, as summarized by the Appellate Court. "At all pertinent times, the defendant was employed by a supermarket chain as a customer service manager. As part of his employment duties, the defendant was responsible for hiring individuals to work at the store. In August, 2000, he hired the nineteen year old victim,[5] and she eventually assumed the duties of a bagger. She had attended special education classes while in high school and had difficulty learning new tasks. Other witnesses, including the victim's father and a police officer, also testified that the victim had limited mental abilities. The victim's immediate supervisor was someone other than the defendant, but the defendant often managed the entire store and was aware of the victim's special needs.

"The defendant sexually assaulted the victim on two separate occasions in 2000. The first assault occurred when the defendant instructed the victim to go to the payroll room, which is located in the upper level of the store, to sit in a chair, to close her eyes and to open

---

[5] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

her mouth. The defendant then ordered the victim to 'suck [on] his finger.' After she had done so, the defendant forced her to perform oral sex on him.

"The second sexual assault committed by the defendant on the victim also occurred in the upper level of the store. After telling the victim to go to a room near his office, the defendant entered and proceeded to remove the victim's pants and underwear and had her sit on a desk. The victim told the defendant that she did not want to do that, but he ignored her protests and remained silent. The defendant penetrated the victim's vagina with his penis, causing her a great deal of discomfort. She was able to move away from him, replace her clothes and leave the room. The defendant did not say anything but looked angry as she left.[6]

"The victim subsequently ended her employment at the supermarket but continued to shop at that particular location with her family. At some point in 2001, the defendant approached the victim and her father while they were shopping. In speaking with her father, the defendant indicated that the victim had been a 'good worker' and that he wanted her to resume her employment at the supermarket. The victim's father, who at that time was unaware that the defendant had sexually abused his daughter, encouraged her to return to work. She agreed and was required to attend an orientation session prior to resuming her employment.

"Toward the end of June, 2001, the victim spoke with the defendant at the supermarket. He again instructed her to wait in an empty room located in the store's upper level. The defendant entered the room and kissed

[6] "Counts three and four of the information charged the defendant with sexual assault and kidnapping stemming from his conduct that occurred in 2000. The court instructed the jury that it could convict the defendant on the basis of either incident but that it was required to agree unanimously on the same incident." *State* v. *DeJesus*, supra, 91 Conn. App. 51 n.2.

the victim on the mouth. He instructed her to sit on a chair and reached inside of her shirt, placing his hand on her stomach. He proceeded to remove her pants and underwear, locked his hands behind her head, straddled the chair she was sitting on and forced her to perform oral sex on him. That lasted for a few minutes, after which the defendant penetrated her vagina with his finger.

"The victim reported this incident to the police department, which commenced an investigation. The defendant, in an interview at the police station, initially denied having any sexual contact with the victim but then recanted and stated that any sexual activity between them was consensual." *State* v. *DeJesus*, supra, 91 Conn. App. 50–52. Thereafter, the defendant was charged with two counts of sexual assault in the first degree in violation of § 53a-70 (a) (1), and two counts of kidnapping in the first degree in violation of § 53a-92 (a) (2) (A).

During the defendant's jury trial, "[t]he state sought to introduce into evidence the testimony of N, a young woman who had worked at the same store as the victim and who alleged that she also had been sexually assaulted by the defendant. The state proffered N's testimony on the issues of intent and a common scheme or plan. The defendant objected on the grounds that the testimony was not relevant and that its probative value did not outweigh its prejudicial impact.

"The court held a hearing outside of the presence of the jury during which N testified and was cross-examined by defense counsel. At the conclusion of her testimony and after listening to argument by counsel, the court ruled that it would permit N to testify before the jury. The court stated that it would give a limiting instruction at the conclusion of N's testimony and during the charge to the jury.

"N then testified before the jury. She had been hired by the defendant in February, 2000, as a cashier and bagger. N attended special education classes as a result of her learning disability and told the defendant that she was concerned about working in a crowded store. According to N, the defendant paid 'a lot of attention' to her. The excessive attention made N feel uncomfortable.

"In April, 2000, the defendant was on the upper level of the store, and N asked him to get her a new name tag and shirt after her shift had concluded. The defendant signaled her to follow him into a dark room, and, after she arrived, he proceeded to kiss and to touch her. He then grabbed her by the arms, turned her around and pressed his penis into her. The defendant restrained N so that she could not move while he rubbed against her. At some point, the defendant stopped and N turned around. She observed the defendant masturbating and declined his invitation to touch his penis. She recalled that the entire episode, from the time she entered the dark room until the defendant left, took approximately ten minutes. Following N's testimony, the court gave the jury a limiting instruction." Id., 52–53.

The jury found the defendant guilty of all of the offenses with which he was charged, and the trial court rendered judgment in accordance with the jury's verdict. The trial court subsequently sentenced the defendant to a total effective term of imprisonment of twenty years, execution suspended after sixteen years, and ten years of special probation. Id., 52.

The defendant appealed from the judgment of the trial court to the Appellate Court, claiming, inter alia, that: (1) § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to the defendant's conduct, which consisted of restraining the victim during the course of a sexual

assault only;[7] id., 83; and (2) the trial court improperly admitted evidence of the defendant's uncharged sexual misconduct with N to establish the defendant's intent and common scheme or plan. Id., 52–65. With respect to the defendant's first claim, the Appellate Court concluded that § 53a-92 (a) (2) (A) was not unconstitutionally vague as applied to the defendant's conduct in June, 2001, because the defendant's "restraint [of the victim] was neither minor nor an essential part of the crime of sexual assault in the first degree." Id., 96. The Appellate Court concluded that the statute was unconstitutionally vague as applied to the second sexual assault in 2000, however, because the defendant had restrained the victim only to the extent necessary to accomplish the crime

[7] The defendant also claimed that the trial court improperly had: (1) denied him due process of law by providing "the jury with an incorrect statement of the common scheme or plan exception during its charge and improperly [allowing] the state to refer to N and the victim as 'borderline retarded' and 'intellectually limited' "; State v. DeJesus, supra, 91 Conn. App. 65–66; (2) "refused to conduct an in camera review of the victim's confidential records from a rape crisis center to determine if they contained any evidence concerning her testimonial capacity and ability to perceive, to recall and to relate the events at issue"; id., 70; and (3) denied the defendant's motion to suppress certain statements made to the police because these statements had been made during the course of a custodial interrogation and the defendant had not been informed of his Miranda rights. Id., 77–83; see Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The Appellate Court rejected each of these claims, concluding that: (1) the defendant's unpreserved instructional claim was not of constitutional magnitude and, therefore, the defendant could not prevail under the second prong of State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); State v. DeJesus, supra, 65–70; (2) the trial court had not abused its discretion by denying the defendant's request for an in camera review of the victim's confidential records because the defendant failed to establish "through the testimony of those persons with knowledge of the records, a factual basis from which the court could conclude that the records would reveal that, at the relevant time, the victim's testimonial capacity was affected so as to warrant further inquiry"; id., 75; and (3) the trial court properly denied the defendant's suppression motion because "as a matter of law . . . the defendant's interview . . . at the police station cannot be construed as having been custodial at any point." Id., 81. The Appellate Court's resolution of these claims is not at issue in the present appeal.

of sexual assault.[8] Id., 96–97. In light of the minimal amount of restraint imposed on the victim, the Appellate Court concluded that the defendant's kidnapping conviction on count four of the information, which stemmed from his conduct in 2000, was "absurd and unconscionable." Id., 97. The Appellate Court reversed his conviction on that count and remanded the case to the trial court with direction to render judgment of not guilty as to that count only. Id., 98.

With respect to the defendant's second claim, the Appellate Court concluded that the trial court properly had admitted evidence of the defendant's uncharged sexual misconduct with N under the intent and common scheme or plan exceptions to the prohibition on the admission of uncharged misconduct evidence because: (1) the charged crimes and uncharged misconduct had occurred within the same limited time period; id., 57, 60; (2) the charged crimes and uncharged misconduct had been perpetrated in a similar manner, in that the defendant had "used his supervisory authority to lure

---

[8] The Appellate Court noted that, "[c]ount four of the information charged the defendant with kidnapping in the first degree stemming from events that occurred in 2000. There was evidence adduced at trial concerning two sexual assaults and two kidnappings that occurred during this time period. . . . [T]he [trial] court instructed the jury that it could convict on count four as long as it agreed on the same kidnapping. Of course, the defendant is unable to clarify a general verdict, and, therefore, it is unknown specifically which 2000 events formed the basis of the conviction with respect to count four. . . . Accordingly, the defendant would be wrongly convicted if he was convicted under an alternative basis for which there was no evidence, and a conviction cannot stand unless both of the alternate bases for the conviction are constitutional. . . . A conviction must be set aside if one of the alternate grounds supporting the verdict is unconstitutional or if one is not sufficiently supported by the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus,* supra, 91 Conn. App. 95 n.18. In light of the Appellate Court's conclusion that § 53a-92 (a) (2) (A) is unconstitutionally vague as applied to the defendant's conduct during the second sexual assault in 2000, it did not determine "whether the facts concerning the first assault in 2000 could also support a kidnapping conviction." Id., 98.

the women into an isolated, empty room on the upper level of the store while they were in the store pursuant to their employment duties"; id., 61; and (3) both victims were similar in age, appearance and limited mental ability. Id., 57, 60. Although the defendant urged the Appellate Court to reconsider the liberal rule of admission for evidence of uncharged sexual misconduct under the common scheme or plan exception in sexual assault cases; see *State* v. *Merriam*, 264 Conn. 617, 661–64, 835 A.2d 895 (2003); *State* v. *Kulmac*, 230 Conn. 43, 59–63, 644 A.2d 887 (1994); the Appellate Court declined to do so, noting that "[a]s an intermediate appellate court, [it could not] reconsider and revise precedent set by [the] Supreme Court." *State* v. *DeJesus*, supra, 91 Conn. App. 60 n.5; see also id., 58 n.4. These certified appeals followed.

I

We first address the state's claim that a reasonable person would know that restraining a victim during the course of a sexual assault violates § 53a-92 (a) (2) (A) and, therefore, the Appellate Court improperly concluded that the kidnapping statute is unconstitutionally vague as applied to the second sexual assault in 2000. We conclude that the Appellate Court properly reversed the defendant's conviction, but our reasoning differs from that of the Appellate Court. We conclude that the state's appeal is governed by the statutory principles recently articulated by this court in *State* v. *Salamon*, supra, 287 Conn. 542, wherein we determined that the crime of kidnapping requires an intent "to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit [an underlying] crime." Accordingly, we conclude that the defendant is entitled to a new trial on the charge of kidnapping in the first degree wherein the jury properly is instructed on the element of intent.

We begin our analysis with the nature and scope of the state's claim on appeal. The state claims that the Appellate Court improperly concluded that the kidnapping statute is void for vagueness as applied to a restraint that is limited in duration and incidental to the crime of sexual assault. Specifically, the state contends that the Appellate Court's construction of § 53a-92 (a) (2) (A) is inconsistent with this state's long-standing jurisprudence holding that the kidnapping statute does not impose any minimal "time requirement[s] for . . . restraint, nor any distance requirement for . . . asportation"; *State* v. *Chetcuti*, 173 Conn. 165, 170, 377 A.2d 263 (1977); and encompasses conduct that is "integral or incidental" to the commission of a separate underlying crime. (Internal quotation marks omitted.) *State* v. *Vass*, 191 Conn. 604, 614, 469 A.2d 767 (1983). In *Salamon*, however, we recently reconsidered and reversed our long-standing jurisprudence holding that the crime of kidnapping encompasses restraints that are necessary or incidental to the commission of a separate underlying crime; see, e.g., *State* v. *Luurtsema*, 262 Conn. 179, 201–203, 811 A.2d 223 (2002); concluding that "[o]ur legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim." *State* v. *Salamon*, supra, 287 Conn. 542. We therefore resolve the state's claim in accordance with the statutory principles elucidated in *Salamon*.[9]

[9] The rule announced in *Salamon* applies here because the present case was pending when this court articulated a new construction of the kidnapping statutes in *Salamon. Marone* v. *Waterbury*, 244 Conn. 1, 10–11, 11 n.10, 707 A.2d 725 (1998) (citing cases recognizing long-standing presumption that rule enunciated in case applies retroactively to pending cases).

In *Salamon*, we reconsidered our prior interpretation of the kidnapping statutes, General Statutes § 53a-91 et seq. Id., 528. The female victim in *Salamon* had been assaulted by the defendant when he approached the victim from behind at a train station in Stamford late at night. Id., 515. As the victim was ascending a flight of stairs, the defendant grabbed her by the back of the neck, causing her to fall, and held her down by her hair when she attempted to get up. When the victim began to scream, the defendant punched her in the mouth and attempted to insert his fingers into her throat. Id. The victim eventually freed herself, and the defendant fled. Ultimately, the defendant was charged with kidnapping in the second degree in violation of General Statutes § 53a-94, unlawful restraint in the first degree in violation of General Statutes § 53a-95, and risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (1). Id., 512–13, 516. At trial, the defendant requested a jury instruction that, "if [the jury] found that the restraint involved in the alleged kidnapping was incidental to the defendant's assault of the victim, then it was required to find the defendant not guilty of kidnapping in the second degree." Id., 516. The trial court declined to give that instruction.

In *Salamon*, at the defendant's request, we reexamined our long-standing interpretation of the kidnapping statutes to encompass even restraints that merely were incidental to the commission of another crime, such as assault or robbery. Id., 528–48. Although the state relied on the doctrines of stare decisis and legislative acquiescence in support of its contention that we should not revisit our prior holdings, we were persuaded, after careful consideration of both doctrines, "that [they] were] not sufficiently weighty to bar reconsideration of our prior precedent interpreting the kidnapping statutes." Id., 519. In our analysis, we recognized that "all of our prior cases [had] relied on a literal application

of the language of our kidnapping statutes," and concluded that we were not bound to adhere to the literal application of the language when it would lead to "unconscionable, anomalous or bizarre results." Id., 524. Moreover, we noted that, "since 1977, when this court first rejected a claim that a kidnapping conviction could not be based on conduct involving a restraint that is merely incidental to the commission of another crime, the courts of many other states have reached a contrary conclusion in interpreting their kidnapping statutes." Id., 526–27. As a result, we determined that *Salamon* was an appropriate case to undertake "an extensive analysis of whether our kidnapping statutes warrant the broad construction that we have given them." Id., 524.

Our inquiry in *Salamon* revealed that since 1977, our case law consistently has concluded that the offense of kidnapping requires proof of the element of intent only, and "does not require proof that the victim was confined for any minimum period of time or moved any minimum distance." Id., 532. Our holdings were premised on the literal application of the statutory definitions of the terms " 'restrain,' "[10] and " 'abduct,' "[11] neither of which contain a time or distance requirement. Id., 531–32. Under this literal application, we consis-

---

[10] General Statutes § 53a-91 (1) defines the term " '[r]estrain' " as "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement."

[11] General Statutes § 53a-91 (2) defines the term " '[a]bduct' " as "to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation."

tently held that "a defendant may be convicted of kidnapping upon proof that he restrained a victim when that restraint is accompanied by the requisite intent." Id., 534. Closer examination of the statutory language in *Salamon*, however, revealed that "previous decisions . . . [had] not explored the parameters of that intent, in particular, how the 'intent to prevent [a victim's] liberation'; General Statutes § 53a-91 (2); that is, the intent necessary to establish an abduction, differs from the intent 'to interfere substantially with [a victim's] liberty'; General Statutes § 53a-91 (1); that is, the intent necessary to establish a restraint. Certainly, when an individual intends to interfere substantially with another person's liberty, he also intends to keep that person from escaping . . . [but] the point at which an intended interference with liberty crosses the line to become an intended prevention of liberation is not entirely clear." *State* v. *Salamon*, supra, 287 Conn. 534.

As we stated in *Salamon*, that "point" is particularly significant "in a case not involving the secreting of a victim in a place that he or she is unlikely to be found . . . ." Id. In such cases, "it is the intent element only that differentiates an abduction—the sine qua non of the crime of kidnapping—from a mere unlawful restraint, and the relatively minor penalties attendant to the latter offense." Id.

To resolve the ambiguity created by § 53a-91, we turned to "the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes, [and] we . . . conclude[d] the following: Our legislature, in replacing a single, broadly worded kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accom-

panying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. We clarified that our holding did not refute the long-standing rule that no minimum period of restraint or degree of movement is necessary to establish a kidnapping, but established that, when confinement or movement is merely incidental to the commission of another crime, "[t]he guiding principle is whether the [confinement or movement] was so much a part of another substantive crime that the substantive crime could not have been committed without such acts . . . ." (Internal quotation marks omitted.) Id., 546.[12]

"Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was not merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For the purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense; whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from

[12] In *State* v. *Salamon*, supra, 287 Conn. 532 n.21, we also noted that "[a] challenge to a kidnapping conviction predicated on such miniscule movement or duration of confinement remains viable on constitutional grounds under the [void for] vagueness doctrine."

summoning assistance, whether the restraint reduced the defendant's risk of detection, and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." Id., 547–48.

Applying this standard to the facts of *Salamon*, we concluded that "a juror reasonably could find that the defendant's restraint of the victim was not merely incidental to his assault of the victim. The victim testified that the defendant, after accosting her, forcibly held her down for five minutes or more. Although the defendant punched the victim once and shoved his fingers into her mouth, that conduct was very brief by contrast to the extended duration of the defendant's restraint of the victim. In light of the evidence, moreover, a juror reasonably could find that the defendant pulled the victim to the ground primarily for the purpose of restraining her, and that he struck her and put his fingers in her mouth in an effort to subdue her and to prevent her from screaming for help so that she could not escape. In such circumstances, we cannot say that the defendant's restraint of the victim necessarily was incidental to his assault of the victim. Whether the defendant's conduct constituted a kidnapping, therefore, is a factual question for determination by a properly instructed jury." Id., 549–50. Accordingly, we reversed the defendant's kidnapping conviction and remanded the case for a new trial wherein the jury properly is instructed on the element of intent. Id., 550.

Indeed, our research has revealed that the appropriate remedy for the instructional impropriety identified in *Salamon* is to reverse the defendant's kidnapping conviction and to remand the case to the trial court for a new trial. It is well established that instructional impropriety constitutes "trial error" for which the appropriate remedy is a new trial, rather than a judgment of acquittal. As the United States Supreme Court

observed in *Burks* v. *United States*, 437 U.S. 1, 15, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978), "reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished."

The decision of the United States Court of Appeals for the Fourth Circuit in *United States* v. *Ellyson*, 326 F.3d 522 (4th Cir. 2003), also is instructive on this point. In *Ellyson*, the defendant was tried and convicted of possessing child pornography in violation of 18 U.S.C. § 2252A (a) (5) (B) and (b) (2) (2002), which prohibited the possession of an image that "appears to be of a minor engaging in sexually explicit conduct . . . ." 18 U.S.C. § 2256 (8) (B) (2000); *United States* v. *Ellyson*, supra, 525. Following the defendant's conviction, the United States Supreme Court issued its decision in *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002), wherein it determined that § 2256 (8) (B) "abridges the freedom to engage in a substantial amount of lawful speech" and, therefore, "is overbroad and unconstitutional." Id., 256. In light of *Free Speech Coalition*, the Fourth Circuit Court of Appeals vacated the defendant's conviction because the jury had been instructed improperly on the definition of child pornography. *United States* v. *Ellyson*, supra, 530 ("Of course, the district court did not have the benefit of *Free Speech Coalition* at the time it issued

its instructions to the jury. Indeed, at the time of trial, the court's instructions were consistent with circuit precedent rejecting a constitutional challenge to the 'appears to be' language [of § 2256 (8) (B)].''). In *Ellyson*, the court noted that "[t]his conclusion does not end the matter because we must determine whether the government may retry [the defendant] or whether he is entitled to an outright reversal and judgment of acquittal." Id., 531–32. The court also rejected the defendant's claim that he was entitled to a judgment of acquittal because a new trial would violate the double jeopardy clause of the federal constitution. The court reasoned that, "[u]nder circuit law at the time of trial, the government presented more than sufficient evidence to support a guilty verdict against [the defendant]. Prior to *Free Speech Coalition*, the government could satisfy its burden by showing that [the defendant's] child pornography 'appear[ed] to be of a minor' under § 2256 (8) (B), and it was unnecessary for the government to offer evidence that a minor depicted in a given image was an actual child and not a computer-generated image." Id., 532. "Thus, the double jeopardy concerns that preclude the government from having a second opportunity to build a case against a defendant when it failed to do so the first time are not present here. Any insufficiency in proof was caused by the subsequent change in the law under *Free Speech Coalition*, not the government's failure to muster evidence." Id., 533; see also *United States* v. *Pearl*, 324 F.3d 1210, 1214 (10th Cir.) ("[b]ecause the government cannot be held responsible for failing to muster evidence sufficient to satisfy a standard [actual minors] which did not exist at the time of trial, and because this is trial error rather than pure insufficiency of evidence, [the defendant] may be retried without violating double jeopardy" [internal quotation marks omitted]), cert. denied, 539 U.S. 934, 123 S. Ct. 2591, 156 L. Ed. 2d 616 (2003).

We recognize that in *State* v. *Sanseverino*, 287 Conn. 608, 625, 949 A.2d 1156 (2008), we reversed the defendant's conviction of kidnapping in the first degree and remanded the case to the trial court with direction to render a judgment of acquittal, reasoning that "no reasonable jury could have convicted the defendant of a kidnapping in light of our holding in *Salamon*." Furthermore, we acknowledge that we explicitly rejected the dissent's assertion that the defendant was entitled to a new trial before a properly instructed jury, rather than a judgment of acquittal, because the state "had no knowledge when presenting its case to the jury that it was necessary to [establish that the defendant had intended to restrain the victim for a longer period of time or to a greater degree than was necessary to accomplish the underlying crime]." Id., 654 (*Zarella, J.*, dissenting). In light of the foregoing analysis, however, we are persuaded that our conclusion that there should have been a judgment of acquittal in *Sanseverino* was incorrect, and that the proper remedy in that case should have been a new trial.[13] Accordingly, our conclusion in *Sanseverino* hereby is overruled.[14]

---

[13] We note, as of the date of the release of this decision, a motion for reconsideration of our decision in *Sanseverino* was pending before this court. We will consider the merits of that motion in due course.

[14] The dissent contends that, by overruling our determination in *Sanseverino* that the appropriate remedy was a judgment of acquittal, rather than a new trial, we violate the doctrine of stare decisis. We disagree. Stare decisis "is not an end in itself. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better. . . . The flexibility and capacity of the common law is its genius for growth and adaptation. . . . Indeed, [i]f law is to have current relevance, courts must have and exert the capacity to change a rule of law when reason so requires. . . . [Thus] [t]his court . . . has recognized many times that there are exceptions to the rule of stare decisis." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 691, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). In light of the inescapable logic and persuasive reasoning of *Burks* v. *United States*, supra, 437 U.S. 15, *United States* v. *Ellyson*, supra, 326 F.3d 532–33, and *United States* v. *Pearl*, supra, 324 F.3d 1214, we are compelled to conclude that *Sanseverino* was wrongly decided.

Indeed, the dissent appears to concede that the nature of the defendant's claim in *Sanseverino* was not truly one of insufficiency of the evidence

Turning to the present case, we note that the jury was not instructed that, to find the defendant guilty of the crime of kidnapping in the first degree, it must find that the defendant had intended "to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit [the underlying] crime." *State* v. *Salamon*, supra, 287 Conn. 542. The defendant therefore could have been convicted on the basis of conduct which, under *Salamon*, does not violate the kidnapping statute. Accordingly, we conclude, on this alternate ground, that the Appellate Court properly reversed the defendant's conviction of kidnapping in the first degree.[15]

We next address the appropriate remedy. The defendant does not challenge the sufficiency of the evidence to support his kidnapping conviction under the law as it existed prior to *Salamon*. Indeed, such a claim would fail because, under *State* v. *Luurtsema*, supra, 262 Conn. 201–203, the defendant's restraint of the victim is sufficient to support a kidnapping conviction as long as it is accompanied by the requisite intent, even if such restraint is "integral or incidental to the crime of sexual assault . . . ." (Internal quotation marks omitted.) Id.,

because, as the dissent notes, the double jeopardy clause of the federal constitution would not have precluded this court from remanding that case for a new trial. Rather, the dissent claims that "we applied [the insufficiency of the evidence] framework in . . . *Sanseverino* due more to jurisprudential concerns" because "it was clear that the state could not prevail on retrial under the new rule set forth in *Salamon*." We agree with the dissent that, given the facts adduced at trial in *Sanseverino*, it was unlikely that the state would have been able to proffer sufficient additional evidence on retrial to satisfy the *Salamon* rule. Nonetheless, it is not the function of this court, as an appellate tribunal, to deprive the state of that opportunity. See *State* v. *Lawrence*, 282 Conn. 141, 156, 920 A.2d 236 (2007) (function of appellate tribunal is "to review, and not to retry, the proceedings of the trial court" [internal quotation marks omitted]).

[15] In light of the statutory principles recently articulated by this court in *Salamon*, we need not address the state's claim that the Appellate Court improperly concluded that the kidnapping statute is void for vagueness as applied to restraints that are necessary for or incidental to the commission of a separate underlying crime. See *State* v. *DeJesus*, supra, 91 Conn. App. 97.

202; see also id., 202–203 ("[T]he proper inquiry is not whether the kidnapping was incidental to [other offenses], but whether the restraint was accomplished with the requisite intent to constitute kidnapping, as well as the state of mind required for [the other offenses]. Whether the essential elements of kidnapping are proved beyond a reasonable doubt is a question for the jury. . . . The analysis, therefore, is not simply transactional. A defendant may be convicted of two crimes that derive from the same conduct as long as the state [is] able to prove, beyond a reasonable doubt, all of the essential elements of each crime." [Internal quotation marks omitted.]). Therefore, any insufficiency in proof was caused by the subsequent change in the law under *Salamon*, rather than the government's failure to muster sufficient evidence. Accordingly, the proper remedy is a new trial wherein the jury properly is instructed on the element of intent in accordance with the dictates of *Salamon*.

## II

We next address the defendant's claim that this court has the authority to reconsider the liberal standard for the admission of uncharged sexual misconduct evidence in sexual assault cases despite the adoption of the code by the judges of the Superior Court codifying the common-law rules of evidence. The defendant claims that the liberal standard of admission should be overruled because it is inadequate to demonstrate the existence of a genuine plan in the defendant's mind, and crimes of a sexual nature are neither more secretive, aberrant nor pathological than crimes of a nonsexual nature. We agree with the defendant that the adoption of the code did not divest this court of its inherent common-law adjudicative authority to develop and change the rules of evidence on a case-by-case basis. We further agree with the defendant that, in light of our recent clarification of the nature and scope of the

common scheme or plan exception in *State* v. *Randolph*, supra, 284 Conn. 328, evidence of uncharged misconduct admitted under the liberal standard ordinarily does not reflect the existence of a genuine plan in the defendant's mind. Nonetheless, given the highly secretive, aberrant and frequently compulsive nature of sex crimes, we conclude that the admission of uncharged misconduct evidence under the liberal standard is warranted and, therefore, we adopt this standard as a limited exception to § 4-5 (a) of the code, which prohibits the admission of "[e]vidence of other crimes, wrongs or acts of a person . . . to prove the bad character or criminal tendencies of that person."

Before addressing the merits of the defendant's claim, we review our jurisprudence regarding the admissibility of evidence of uncharged misconduct. "As a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of

discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . .

"The standard by which the admissibility of evidence of uncharged misconduct is measured generally will depend on two factors: the purpose for which the evidence is offered, and the type of crime with which the defendant has been charged. For example, when a defendant is charged with a sex crime and evidence of uncharged sexual misconduct is offered to establish that the defendant had a common scheme or plan to engage in sex crimes, the admissibility of the proffered evidence is evaluated pursuant to a liberal standard." (Citations omitted; internal quotation marks omitted.) *State* v. *Randolph*, supra, 284 Conn. 340–41. Thus, in sexual assault cases "[e]vidence of prior sex offenses committed with persons other than the prosecuting witness is admissible to show a common design or plan [when] the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 631, 930 A.2d 628 (2007).

"In cases that do not involve sex crimes . . . however, we apply a more stringent standard to determine whether evidence of uncharged misconduct is admissible to establish a common scheme or plan." *State* v. *Randolph*, supra, 284 Conn. 341. Uncharged misconduct evidence is admissible in nonsex crime cases "only if *it supports a permissive inference that both crimes were related to an overall goal in the defendant's mind.*" (Emphasis added; internal quotation marks omitted.) Id., 356.

With this background in mind, we turn first to the predicate question of whether the code codified the

foregoing common-law standards of admissibility for uncharged misconduct evidence in sex crime versus nonsex crime cases. The proper construction of the code presents us with a question of law over which our review is plenary. See, e.g., *State* v. *Whitford*, 260 Conn. 610, 640, 799 A.2d 1034 (2002). In construing the code, we apply well established principles of statutory interpretation. See id. We first consider the text and accompanying commentary of the section of the code at issue, and its relationship to other sections.[16] "If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the [code] shall not be considered." (Internal quotation marks omitted.) *State* v. *John F.M.*, 285 Conn. 528, 546, 940 A.2d 755 (2008).

Subsection (a) of § 4-5 of the code provides that "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person." Subsection (b) of § 4-5 of the code provides, however, that "[e]vidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a),

---

[16] As we previously have observed, the code "cannot be properly understood without reference to the accompanying [c]ommentary. The [c]ommentary provides the necessary context for the text of the [c]ode, and the text of the [c]ode expresses in general terms the rules of evidence that the cases cited in the [c]ommentary have established. . . . Additionally, the [j]udges took an unusual step when they formally adopted the [c]ode. Unlike other situations, in which the [j]udges, when voting on rules, are guided by but do not formally adopt the commentary submitted by the [r]ules [c]ommittee that normally accompanies proposed rule changes, in adopting the [c]ode the [j]udges formally adopted the [c]ommentary as well. This is the first time that the [j]udges have done so. Thus, the [c]ode must be read together with its [c]ommentary in order for it to be fully and properly understood." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 60, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); see also *Daley* v. *McClintock*, 267 Conn. 399, 408, 838 A.2d 972 (2004); D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210, 212 (1999).

such as to prove intent, identity, malice, motive, *common plan or scheme*, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Emphasis added.) The code does not articulate a particular standard or standards to be used in ascertaining whether uncharged misconduct evidence is probative of the existence of a common scheme or plan. Section 4-5 must be construed, however, in conjunction with § 1-2 (a) of the code, which provides that one of "[t]he purposes of the [c]ode [is] to adopt Connecticut case law regarding the rules of evidence as rules of court . . . ." Cf. *In re William D.*, 284 Conn. 305, 313, 933 A.2d 1147 (2007) ("[T]he legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." [Internal quotation marks omitted.]). The official commentary to § 1-2 (a) of the code explains that "the [c]ode was intended to maintain the status quo, i.e., preserve the common-law rules of evidence as they existed prior to adoption of the [c]ode, [and] its adoption is not intended to modify any prior common-law interpretation of those rules." Consistent with the stated purpose of the code, we conclude that § 4-5 codified the common-law jurisprudence of this state concerning the admission of uncharged misconduct evidence under the common scheme or plan exception, including the liberal standard by which such evidence is admitted in sex crime cases and the stringent standard by which such evidence is admitted in nonsex crime cases. See *State* v. *Pierre*, 277 Conn. 42, 60, 890 A.2d 474 (§ 8-5 [1] [C] of code codified common-

law jurisprudence concerning rule allowing admission of prior inconsistent statements for substantive purposes under certain circumstances), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); *State* v. *Whitford,* supra, 260 Conn. 638 (§ 4-4 of code codified common-law jurisprudence concerning character evidence); *Harlan* v. *Norwalk Anesthesiology, P.C.,* 75 Conn. App. 600, 606, 816 A.2d 719 (§ 8-3 [8] of code codified common-law jurisprudence concerning admission of statements in learned treatises), cert. denied, 264 Conn. 911, 826 A.2d 1155 (2003).

Having concluded that the liberal standard for the admission of uncharged sexual misconduct evidence in sex crime cases has been codified in the code, we next address whether we have the authority to reconsider this standard. As previously explained, one purpose of the code, as stated in the commentary to § 1-2 (a), is to codify the common law and certain identified statutory rules of evidence as rules of court and to place them "into a readily accessible body of rules to which the legal profession conveniently may refer." Section 1-2 (a) of the code provides that a second stated purpose is "*to promote the growth and development of the law of evidence through interpretation of the* [c]*ode and through judicial rule making* to the end that the truth may be ascertained and proceedings justly determined." (Emphasis added.) Although it is clear that the judges of the Superior Court intended the law of evidence to grow and develop in the future through "interpretation of the [c]ode" and through "judicial rule making," the meaning of these two terms in § 1-2 (a) is unclear.

We begin our analysis with the term interpretation. On the one hand, because the process of interpretation commonly is understood to mean to explain or to construe; American Heritage Dictionary of the English Language (3d Ed. 1992); it could be argued that this term was intended to limit the common-law authority of the

courts to explaining and construing the code in a manner similar to that in which they explain and construe statutes enacted by the legislature. See, e.g., *State* v. *Sawyer*, 279 Conn. 331, 373–74, 904 A.2d 101 (2006) (*Borden, J.*, dissenting and concurring). On the other hand, because "interpretation" is intended "to promote the growth and development of the law of evidence," and the terms "growth" and "development" both denote change, evolution and progress, it appears that the judges of the Superior Court may have intended the term to be construed broadly as descriptive of the common-law adjudicative function pursuant to which evidentiary law historically has grown and developed, rather than as a prescriptive limitation on that function. The commentary to § 1-2 (a) bolsters the latter interpretation by stating that "[c]*ase-by-case adjudication is integral to the growth and development of evidentiary law and,* thus, future definition of the [c]ode will be effected primarily through interpretation of the [c]ode and through judicial rule making." (Emphasis added.) The emphasis that the commentary places on the importance of "[c]ase-by-case adjudication" in the growth and development of evidentiary law, a phrase synonymous with the development of legal principles through the traditional method of case-by-case common-law adjudication, supports a broad, rather than a narrow, construction of the term.

Likewise, the meaning of the term "judicial rule making" in § 1-2 (a) is equally unclear. Although the term reasonably may be construed to refer to codified rules of court adopted by vote of the judges of the Superior Court, the commentary to § 1-2 (a) indicates that the term should be construed broadly to include all evidentiary law developed by the judicial branch, regardless of whether it derives from an administrative or an adjudicative source. For example, the commentary to § 1-2 provides that "[b]ecause the [c]ode was intended to

maintain the status quo, i.e., preserve the *common-law rules of evidence* as they existed prior to adoption of the [c]ode, its adoption is not intended to modify any prior common-law interpretation of *those rules*." (Emphasis added.) Because the commentary to § 1-2 refers to evidentiary law developed via case-by-case common-law adjudication as "rules of evidence," it appears that the judges of the Superior Court intended the term "judicial rule making" to include evidentiary law developed through case-by-case common-law adjudication. At the very least, it is unclear from § 1-2 (a) and its accompanying commentary whether the judges of the Superior Court intended to abrogate the authority of the appellate courts to develop and change the law of evidence via case-by-case common-law adjudication and, accordingly, we turn to the history and purpose of the code to resolve this ambiguity.[17]

---

[17] Subsection (b) of § 1-2 of the code, entitled "[s]aving clause," also supports a broad construction of subsection (a). Subsection (b) of § 1-2 of the code provides: "Where the [c]ode does not prescribe a rule governing the admissibility of evidence, the court shall be governed by the principles of the common law as they may be interpreted in the light of reason and experience, except as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book. The provisions of the [c]ode shall not be construed as precluding any court from recognizing other evidentiary rules not inconsistent with such provisions." The commentary to § 1-2 (b) of the code explains that "[s]ubsection (b) addresses the situation in which courts are faced with evidentiary issues not expressly covered by the [c]ode. Although the [c]ode will address most evidentiary matters, it cannot possibly address every evidentiary issue that *might arise during trial*. Subsection (b) sets forth the standard by which courts are to be guided in *such instances*.

"Precisely because it cannot address every evidentiary issue, the [c]ode is not intended to be the exclusive set of rules governing the admissibility of evidence. Thus, subsection (b) makes clear that a court is not precluded from recognizing other evidentiary rules not inconsistent with the [c]ode's provisions." (Emphasis added.)

First, subsection (b) of § 1-2 governs "evidentiary issue[s] that might arise *during trial*" and, therefore, is applicable exclusively to the Superior Courts, rather than to the Appellate Court or to this court. (Emphasis added.) Conn. Code Evid. § 1-2 (b), commentary. As § 1-1 (b) of the code specifies, "[t]he [c]ode applies to all proceedings in the superior court in which facts in dispute are found, except as otherwise provided by the [c]ode, the General Statutes or the Practice Book." Second, subsection (b) of § 1-2 clarifies that,

Prior to the adoption of the code, "the law of evidence applied in Connecticut courts was found [solely] in decisions and rules of the court and in enactments of the legislature." C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) p. xlix. Because both attorneys and judges lacked a concise and authoritative resource summarizing the applicable rules of evidence, "[d]isputes about evidentiary rules [contributed] to time consuming arguments both at the trial court level and on appeals." Biennial Report of the Connecticut Judicial Department: July 1, 1982–June 30, 1984, p. 57. To ameliorate this problem, former Chief Justice Ellen A. Peters suggested in the 1984 biennial report of the judicial department that "it would be of great benefit to judges and practitioners if the General Assembly, after a thorough study of the principles of evidence, enacted a code of evidence." Id.

"By letter dated October 24, 1991, the co-chairmen of the Judiciary Committee of the General Assembly requested that the Connecticut Law Revision Commission (commission), study 'the feasibility of the legislative enactment of an evidence code' and that the study 'include a draft bill for an evidence code.' "[18] C. Tait &

despite the adoption of the code, the Superior Court retains the authority to promulgate rules of evidence in the absence of a prevailing common-law rule codified in the code and, as such, it simply preserves the long-standing constitutional and common-law adjudicative function of the Superior Court vis-à-vis the law of evidence. See, e.g., *American Oil Co.* v. *Valenti*, 179 Conn. 349, 356, 426 A.2d 305 (1979) ("[t]he admissibility of evidence generated by computers" was issue of first impression for trial court subject to appellate review); *State* v. *Vaughn*, 171 Conn. 454, 459, 370 A.2d 1002 (1976) ("whether evidence as to the mental capacity of a confessor at the time of the giving of the confession is admissible to be weighed by the jury" was issue of first impression for trial court subject to appellate review); *Evans* v. *Warden*, 29 Conn. App. 274, 279–81, 613 A.2d 327 (1992) (whether expert testimony required to establish ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984], was matter of first impression for habeas court subject to appellate review).

[18] The commission is a part of the legislative branch and is composed of representatives from the General Assembly, the judiciary, members of the bar and the faculty of accredited law schools within the state. See General Statutes §§ 2-85 and 2-86. The duties of the commission include, but are not

E. Prescott, supra, § 1.1.2, p. 6. The foreword to the code explains that "[then] Supreme Court Justice David M. Borden was asked to chair [the] committee of the [commission] charged with drafting a proposed code of evidence for Connecticut. The members of [the] drafting committee included: Professor Colin C. Tait of the University of Connecticut School of Law; Supreme Court Justice Joette Katz; Appellate Court Judge Paul M. Foti; Superior Court Judges Julia L. Aurigemma, Samuel Freed and Joseph Q. Koletsky; attorneys Robert B. Adelman, Jeffrey Apuzzo, Joseph G. Bruckmann, William Dow III, David Elliot, Susann E. Gill, Donald R. Holtman, Houston Putnam Lowry, Jane S. Scholl, and Eric W. Wiechmann; Law Revision Commission members Jon P. FitzGerald, [State] Representative Arthur J. O'Neill, Superior Court Judge Elliot N. Solomon, and [State] Senator Thomas F. Upson; and [commission] senior attorney Jo A. Roberts and [commission] staff attorney Eric M. Levine.

"The drafting committee completed its work in September, 1997. After receiving public comment, the drafting committee submitted its work product to the . . . [c]ommission, which voted to adopt the proposed code and commentary in December, 1997. Thereafter, the proposed code and commentary were submitted to the Judiciary Committee of the General Assembly for consideration during the 1998 legislative session. Before commencement of the session, however, certain members of the General Assembly had suggested that, for various reasons, a code of evidence should be adopted, if at all, by the judges of the Superior Court pursuant to their rule-making authority rather than by legislation. Thus, the Judiciary Committee urged then Supreme Court Chief Justice Robert J. Callahan to have the

limited to, studying and recommending proposed changes to the law of this state. See General Statutes § 2-87.

judges of the Superior Court consider adopting the proposed code as rules of court."[19] "Their thought, with which the Rules Committee of the Superior Court ultimately agreed, was that it would be easier to amend the [c]ode from time to time, as the need arose, by rule rather than legislation, and that adopting the [c]ode as a set of rules of court rather than as legislation would insulate such changes from the political arena." D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210, 211 (1999).

As the foreword to the code explains, "[i]n response, Chief Justice Callahan appointed a committee to con-

---

[19] "By letter dated March 3, 1998, the then co-chairs of the Judiciary Committee wrote to Chief Justice . . . Callahan, as follows:

"Dear Justice Callahan,

"As I am sure you are aware, since 1993 a drafting committee of the . . . [c]ommission has been preparing a code of evidence to codify existing Connecticut case law. The drafting committee was chaired by Associate Justice . . . Borden and included a highly distinguished panel of Connecticut legal scholars and practitioners, including Justice . . . Katz, Judges . . . Aurigemma . . . Freed, and . . . Koletsky, and Professor . . . Tait, co-author of Handbook of Connecticut Evidence. The drafting committee completed its work in December 1997 and the proposed code has now been approved for promulgation by the . . . [c]ommission.

"As [c]ochairmen of the [j]udiciary [c]ommittee, we believe that the proposed code accurately encompasses Connecticut's rules of evidence in a form that will be most useful to litigating attorneys and presiding judges. We also believe that the code would more appropriately be promulgated as rules of court rather than as legislation of the Connecticut General Assembly. The code reflects existing court-made law and must, in the future, remain responsive to judicial concerns. We are, therefore, submitting the proposed code for consideration and possible adoption of the Judicial Department.

"Because adoption of an appropriate code, whether by rule of court or by legislation, is of vital importance, we have a continuing interest in any action that is taken with respect to this proposal. Would you, therefore, kindly advise us prior to the 1999 legislative session of any action that the Judicial Department may be taking or intending to take with respect to the code at that time? We are, of course, available to discuss this matter further. . . .

"Sincerely,

"Senator Donald E. Williams, Jr.

"Representative Michael P. Lawlor

"Cochairmen, Connecticut Judiciary Committee . . . ." C. Tait & E. Prescott, supra, § 1.1.3, pp. 8–9.

sider and review the proposed code and its commentary for adoption by the judges of the Superior Court. This committee was chaired by Justice Katz and included Appellate Court Judge Barry R. Schaller, Superior Court Judges Aurigemma, Thomas A. Bishop, Thomas J. Corradino, Freed, John F. Kavanewsky, Jr., Koletsky, and William B. Rush, Professor Tait, and attorneys Roberts and Levine. This committee reviewed the proposed code and commentary from June, 1998, until September, 1998, made changes to various parts thereof and then submitted its final work product to the Rules Committee for approval. The Rules Committee unanimously approved the proposed code and commentary. Thereafter, the proposed code and commentary were subject to a public hearing in June, 1999, and finally were adopted by the judges on June 28, 1999.

"An oversight committee was created by the judges of the Superior Court when they adopted the [c]ode, for the purpose of monitoring the development of the [c]ode and making recommendations for future revision and clarification. The current membership of the committee includes: Justice Katz (chair), Superior Court Judges Bishop, Corradino, Beverly J. Hodgson, Kavanewsky, Koletsky, and Michael R. Sheldon, attorneys Adelman, Bruckmann, Gill, Jack G. Steigelfest, Wiechmann, and Levine . . . and Professor Tait. The oversight committee convened in October, 1999, and recommended minor changes to the [c]ode and commentary based primarily on recent developments in the law. Those recommended changes were approved by the Rules Committee in October, 1999, then by the judges of the Superior Court in November, 1999, and ultimately were incorporated into the final version of the [c]ode," which became effective on January 1, 2000.

The foregoing history reflects that the code was intended to provide the bench and the bar with a concise and authoritative restatement of the state's common

law and identified statutory rules of evidence so that disputes over the application of evidentiary rules could be resolved quickly and efficiently. See D. Borden, supra, 73 Conn. B.J. 212 ("The rationale for having a [code] is that it will be easier and more efficient for all of the relevant actors in the litigation process—judges and lawyers—to have a code, stated in concise and familiar black letter form, to which to refer. It will be printed in a separate paperback volume, like the new Practice Book format, that every judge will have with him or her on the bench, and each practitioner will be able to bring to court with him or her. Thus, everyone will be on the same page, to coin a phrase." [Internal quotation marks omitted.]); J. Turner, "Uniform or Straightjacketed Justice?" 26 Conn. L. Trib. No. 3, January 17, 2000, p. 10 (The author quoted Superior Court Judge John J. Langenbach: "There are no losers with the new code . . . . It's helpful to me and the attorneys . . . . You can have a five-minute argument and discussion, as opposed to those that go on for a long time." [Internal quotation marks omitted.]).

The foregoing history does not support the conclusion, however, that the code was intended to divest *this court* of its inherent authority to change and develop the law of evidence through case-by-case common-law adjudication. The transcript of the June 28, 1999 annual meeting of the judges of the Superior Court, at which the code was adopted, indicates that Justice Borden explained the purpose of the code as follows: "the rationale behind the [c]ode is, that it will be more efficient for all in the litigation process to have a [c]ode stated in a concise and familiar form to which to refer." There was *no discussion* of the effect, if any, that adoption of the code would have upon this court's common-law adjudicative authority to change and develop evidentiary law on a case-by-case basis, an inherent authority that it has enjoyed since the seventeenth century.

Indeed, the transcript of the annual meeting reveals that the sole reference to the manner in which adoption of the code would affect the future development of evidentiary law in this state was made in connection with the creation of the Code of Evidence Oversight Committee (committee), the proposed purpose of which was to "make periodic recommendations for revision and clarification" of the code. Although the judges of the Superior Court voted to approve the creation of the committee, which is composed of judges, members of the bar and law school faculty, the intended scope of the committee's authority to recommend revisions and clarifications of the code is unclear. It is unclear, for example, whether the judges intended for the committee to recommend substantive revisions to the code, such as overruling well established common-law evidentiary rules developed by this court, or whether the judges intended for the recommendations of the committee to be limited in scope, such as filling in gaps in evidentiary law and updating the code to reflect changes in evidentiary law developed by this court through the traditional common-law method of case-by-case adjudication.

In the absence of *any discussion* at the meeting of the judges of the Superior Court concerning the impact that adoption of the code would have on the future development of evidentiary law, it is illogical to conclude that, by adopting the code for the purposes of ease and convenience, the judges intended to divest this court of its long-standing inherent common-law adjudicative authority over evidentiary law. Cf. *State* v. *Skakel*, 276 Conn. 633, 779, 888 A.2d 985 (2006) (*Katz, J.*, concurring) ("[i]t simply runs counter to reason to conclude that the legislature intended to impose, for the first time in the state's history, a statute of limitations on all murders except those committed under the five limited circumstances constituting capital felonies—

rendering all class A felony murders subject to a five year statute of limitations—without a discussion or any expression of opposition"), cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006); *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 244, 558 A.2d 986 (1989) ("[a] major change in legislative policy, we believe, would not have occurred without some sort of opposition or at least discussion in the legislature" [internal quotation marks omitted]). Stated simply, we believe that such a radical departure from the method by which evidentiary law has grown and developed over the past 200 years would have generated at least a minimal amount of discussion or opposition among the judges of the Superior Court. The silence of the record on this point therefore speaks volumes.[20]

In light of the ambiguous language of the code, the dearth of extratextual evidence indicating the intent of the judges of the Superior Court,[21] and the rule of strict

---

[20] The dissent states that "it is well-known that, as chair of both the evidence code drafting committee and the Practice Book rules committee, Justice Borden spent many hours at judges' association meetings explaining the code prior to his official presentation. Thus, his statements at the official meeting reasonably should be viewed as a summation, not a comprehensive discussion of all of the ramifications of adoption of the code." First, such information hardly can be characterized as "well-known," given that there is no public record of Justice Borden's appearance at any judges' association meetings. Second, divesting this court of its inherent common-law and constitutional adjudicative authority over evidentiary law, an authority which this court has enjoyed since its inception, is not a minor or picayune detail. One would assume that, at a minimum, such a sweeping consequence would merit a brief mention in Justice Borden's summation concerning the purpose and impact of the code.

[21] Anecdotal extratextual evidence reflects that the judges of the Superior Court, all of whom voted to adopt the code, may have had conflicting understandings of the impact that adoption of the code would have on the future development of evidentiary law. Shortly after the code became effective, several attorneys expressed concern that the code will "[freeze] the common law" and "slow the growth of evidentiary law . . . ." J. Turner, supra, 26 Conn. L. Trib. 10. Although "both attorneys and judges" expressed their views at that time that "judges no longer will be free to develop the law on a case-by-case basis using the common law," then Supreme Court Justice Borden opined that "the benefits [of the code] outweigh the costs."

construction applicable to rules promulgated in deroga-
tion of the common law,[22] we conclude that the code
was not intended to divest this court of its inherent
authority to change and develop the rules of evidence
through case-by-case common-law adjudication.[23] Simi-

Id.; see also General Statutes § 51-198 (a) (Justices of Supreme Court also
are judges of Superior Court). Judge Langenbach, however, expressed his
view that, "[a]ttorneys worried about the code's impact should relax . . .
because the code is only a guide for judges and attorneys in interpreting
the law. . . . [It is] a very good guideline. [It is] very helpful. [It is] a good,
quick reference *but our Supreme Court can make changes.*" (Emphasis
added.) J. Turner, supra, 26 Conn. L. Trib. 10. This conflicting evidence
supports our conclusion that the judges of the Superior Court did not express
a clear and plain intent to divest this court of its inherent common-law
adjudicative authority over evidentiary law by adopting the code.

[22] "[W]hen a statute is in derogation of common law . . . it should receive
a strict construction and is not to be extended, modified, repealed or enlarged
in its scope by the mechanics of [statutory] construction. . . . In determin-
ing whether or not a statute abrogates or modifies a common law rule the
construction must be strict, and the operation of a statute in derogation of
the common law is to be limited to matters clearly brought within its scope.
. . . Although the legislature may eliminate a common law right by statute,
the presumption that the legislature does not have such a purpose can be
overcome only if the legislative intent is clearly and plainly expressed. . . .
The rule that statutes in derogation of the common law are strictly construed
can be seen to serve the same policy of continuity and stability in the legal
system as the doctrine of stare decisis in relation to case law." (Internal
quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 426–27, 927 A.2d
843 (2007).

[23] We recognize that, in *State* v. *Sawyer*, supra, 279 Conn. 331–32 n.1, we
stated in dicta and without analysis that, "since 2000, the year in which the
[code] was adopted, the authority to change the rules of evidence lies
with the judges of the Superior Court in the discharge of their rule-making
function. Of course, prior to that date, changes to substantive evidentiary
rules were accomplished by our courts in the exercise of their common-
law authority. To the extent that our evidentiary rules may be deemed to
implicate substantive rights, we believe that it is unclear whether those
rules properly are the subject of judicial rule making rather than the subject
of common-law adjudication. Because that question raises an issue on which
we did not request briefing by the parties, however, we leave it for another
day." Because our statement in *Sawyer* was dicta, it is not binding precedent
and, therefore, does not dictate the outcome of the present appeal. See,
e.g., *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control,* 270
Conn. 778, 810, 855 A.2d 174 (2004). To the extent that we indicated in
*Sawyer*, however, that "the authority to change the rules of evidence lies

larly, we conclude that the judges of the Superior Court did not intend for the committee to recommend substantive changes to the common-law evidentiary rules codified in the code, but, rather, intended for the committee simply to recommend revisions reflecting common-law developments in evidentiary law, clarifications of the code to resolve ambiguities and additions to the code in the absence of governing common-law rules. Stated simply, we conclude that the code was not intended to displace, supplant or supersede common-law evidentiary rules or their development via common-law adjudication, but, rather, simply was intended to function as a comprehensive and authoritative restatement of evidentiary law for the ease and convenience of the legal community.[24]

Moreover, our construction of the code is consistent with our duty to interpret statutes in a manner that avoids placing them in constitutional jeopardy; see, e.g., *State* v. *Metz*, 230 Conn. 400, 422–23, 645 A.2d 965

with the judges of the Superior Court in the discharge of their rule-making function," rather than in the appellate courts of this state "in the exercise of their common-law [adjudicative] authority," our conclusion hereby is overruled. *State* v. *Sawyer*, supra, 332 n.1.

[24] Because the code merely restated the prevailing common-law evidentiary rules, which the judges of the Superior Court already were bound to apply, and was intended to expedite and streamline judicial proceedings by serving as a shorthand reference to those rules, the code clearly was intended to be binding authority in the Superior Court. Section 1-1 (b) of the code specifically states that "[t]he [c]ode applies to all proceedings in the superior court in which facts in dispute are found, except as otherwise provided by the [c]ode, the General Statutes or the Practice Book." The code therefore differs fundamentally from a treatise or handbook, which has persuasive value only. The question presented in this appeal, however, is not whether the code is binding authority in the Superior Court, but, rather, whether it is binding authority in *this court* such that we are precluded from reconsidering our own prior precedent codified in the code. For the reasons explained in the body of this opinion, we conclude that the judges of the Superior Court did not intend their adoption of the code to divest this court of its inherent authority to change and develop the law of evidence via case-by-case common-law adjudication.

(1994); *State* v. *Floyd*, 217 Conn. 73, 88, 584 A.2d 1157 (1991); because it is questionable whether the judges of the Superior Court have the authority under article fifth, § 1, of the state constitution to codify a code of evidence that strips the appellate courts of their common-law adjudicative function.[25]

Article fifth, § 1, of the constitution of Connecticut, as amended by article twenty, § 1, of the amendments provides: "The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law." "It is especially significant that unlike the judicial articles of most state constitutions and that of the United States constitution (article III), the powers and jurisdiction of the two courts [originally] specifically named in the Connecticut constitution (the Supreme and Superior Courts) are not specified. The reason is

---

[25] The dissent repeatedly analogizes the evidentiary rules codified in the code to statutes promulgated by the legislature and maintains that this court's authority to modify or overrule the code necessarily is commensurate with its authority to modify or overrule a statute. The dissent's analogy is inapt, however. First, this court's authority to modify or overrule a statute is limited by the separation of powers provisions of the state and federal constitutions. See, e.g., *State* v. *Courchesne*, 262 Conn. 537, 580, 816 A.2d 562 (2003) (under *separation of powers provisions of state and federal constitutions* "the task of the legislative branch is to draft and enact statutes, and the task of the judicial branch is to interpret and apply them in the context of specific cases"). Because the present case involves the allocation of authority within a single branch of government, rather than the division of authority between two or more branches of government, however, the limitations imposed by those provisions are inapplicable. Second, in claiming that the code is inviolate simply because it is a code, the dissent engages in a tautological exercise that presupposes the answer to the question with which we are presented, namely, in enacting the code, did the judges of the Superior Court intend to divest this court of its inherent authority to change and develop the law of evidence through case-by-case common-law adjudication? Because we answer this predicate question in the negative, our analysis necessarily ends where the dissent's analysis begins.

obvious. The 1818 constitution neither created nor provided for the creation of a new judicial system of new courts. Rather, it adopted and gave permanence in the constitution to the existence of the Supreme Court as the state's highest court of appellate jurisdiction and to the Superior Court as the trial court of general jurisdiction."[26] *Szarwak* v. *Warden*, 167 Conn. 10, 32, 355 A.2d 49 (1974); see also *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 127, 32 A.2d 547 (1943) ("[t]here can be no doubt that it was the intent of the [1818] constitution that [the Superior Court] should continue, with the essential characteristics it had previously possessed"); *Styles* v. *Tyler*, 64 Conn. 432, 449, 30 A. 165 (1894) ("[t]he [c]onstitution of 1818 must be read in connection with [the] peculiar development and existing condition of our judicature, and in view of the special defects it was adopted to remedy").

Accordingly, under article fifth, § 1, the Superior Court is a court of general jurisdiction with ultimate authority over the trial of causes, whereas the Supreme Court is a court of limited appellate jurisdiction with ultimate authority over the correction of errors of law. See, e.g., *State* v. *Nardini*, 187 Conn. 109, 126, 445 A.2d

---

[26] Article fifth, § 1, as codified in the state constitution of 1818 provided that: "The judicial power of the state shall be vested in a supreme court of errors, a superior court, and such inferior courts as the general assembly shall, from time to time, ordain and establish: the powers and jurisdiction of which courts shall be defined by law." "The 1965 constitution changed this provision by deleting the words 'of errors' in the title of the Supreme Court, by changing the word 'inferior' to 'lower' in defining what courts could be established by the General Assembly, and by replacing the colon after 'establish' with a period and the word 'which' by the word 'these.' " *Szarwak* v. *Warden*, 167 Conn. 10, 29, 355 A.2d 49 (1974). These changes were technical in nature and were not intended to alter, or in any way materially change, the jurisdiction or composition of the "constitutional courts," the Supreme Court and the Superior Court. Id., 34–36; see also *Adams* v. *Rubinow*, 157 Conn. 150, 156, 251 A.2d 49 (1968). In 1982, article fifth, § 1, was amended by article twenty, § 1, of the amendments, which created a third constitutional court, the Appellate Court.

304 (1982) ("[t]his court as a constitutional appellate court is limited to resolving errors of law . . . and the legislature is precluded from conferring upon it discretionary factual authority" [citation omitted]); *Dudley* v. *Deming*, 34 Conn. 169, 174 (1867) ("It was the intention of the framers of the constitution that the Supreme Court of Errors should be a court for the correction of errors *in law*. The language used clearly imports this, and such has ever been the understanding of the legislature, of the courts, and of the people of the state." [Emphasis in original.]); *Styles* v. *Tyler*, supra, 64 Conn. 450 ("The 'Superior Court' is a 'Superior Court of Judicature over this State' with a supreme jurisdiction original and appellate over the trial of causes not committed to the jurisdiction of inferior courts. The 'Supreme Court of Errors' is not a supreme court for all purposes, but a supreme court only for the correction of errors in law . . . .").

Under the common law of this state prior to 1818, as under the common law of England, the ultimate authority over the rules and standards governing the admissibility of evidence rested with the highest court of the state. See, e.g., *Chapman* v. *Chapman*, 2 Conn. 347–50, 349 (1817) (trial court improperly admitted hearsay evidence); *Townsend* v. *Bush*, 1 Conn. 260 (1814) (trial court improperly excluded testimony of competent witness); *Phelps* v. *Yeomans*, 2 Day (Conn.) 227 (1806) (trial court properly excluded evidence in action for ejectment); see also Z. Swift, A Digest of the Law of Evidence in Civil and Criminal Cases and a Treatise on Bills of Exchange, and Promissory Notes (1810), p. viii. ("decisions of [c]ourts of dernier resort in this [s]tate" are "binding authority"). Although the Superior Court possessed broad discretion in determining the admissibility of evidence under the facts and circumstances of each individual case, this discretion necessarily was constrained by the law of evidence

developed by this court, which the Superior Court was required to apply. See, e.g., *Townsend* v. *Bush*, supra, 270 ("The question whether a party to a negotiable instrument, who is divested of his interest, is a competent witness to [show] it void in its creation, now comes for the first time before this [c]ourt for decision. We are [unshackled] by any precedent, and are at liberty to decide it on the principle."); see also *Jolly, Inc.* v. *Zoning Board of Appeals*, 237 Conn. 184, 195, 676 A.2d 831 (1996) ("[i]t is axiomatic that a trial court is bound by Supreme Court precedent"). As we recently explained in *State* v. *Saucier*, 283 Conn. 207, 219, 926 A.2d 633 (2007), "only after a trial court has made the legal determination" regarding the admissibility of evidence, "is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought."[27] See also 1 J. Wigmore, Evidence (Tillers Rev. 1983) § 16, p. 751 ("discretion in the strict sense is by our law not conceded to the trial judge on points of evidence" because "[t]he whole spirit of our law requires the observance of precedents"); see also id., § 16, p. 754 ("Finality as to the tenor of the law is in our system never conceded to the trial judge. The very constitution of courts of appeal is of itself a demonstration.").

Because this court had final and binding authority over the law of evidence prior to 1818, and because the common-law authority of the Supreme Court and the Superior Court was codified in article fifth, § 1, of the constitution of 1818, we question whether the judges of the Superior Court have the constitutional authority

---

[27] Nothing in this opinion should be construed to restrict the trial court's broad discretion to admit or exclude evidence "if premised on a correct view of the law . . . ." *State* v. *Saucier*, supra, 283 Conn. 218. We conclude only that, under article fifth, § 1, of the state constitution, it is the province of this court, rather than the Superior Court, ultimately to determine what the correct view of the law is.

to adopt a code of evidence that is inconsistent with the legal principles promulgated by this court, or to divest this court of its power to develop and change the law of evidence via case-by-case adjudication. See *Walkinshaw* v. *O'Brien*, supra, 130 Conn. 127 ("[t]here can be no doubt that it was the intent of the [1818] constitution that [the Superior Court] should continue, with the essential characteristics it had previously possessed"); *Styles* v. *Tyler*, supra, 64 Conn. 451 ("[t]here is no escape from the conclusion that the [c]onstitution vested in this court a portion of the judicial power, that it specified the power so vested, and that the power so specified is a supreme and final jurisdiction for the correction of errors in law"). We therefore decline to construe the code in such a potentially unconstitutional manner, and conclude that the evidentiary rules articulated therein are subject to change, modification, alteration or amendment by this court in the exercise of its constitutional and common-law adjudicative authority.[28] To reiterate, we conclude that the code neither is, nor was intended to be, anything more than a concise, authoritative and, as the commentary to § 1-2 (a) of the code describes it, "readily accessible body of rules to which the legal profession conveniently may refer."[29]

[28] Likewise, we question whether the judges of the Superior Court have the constitutional authority to adopt a code of evidence that is inconsistent with the legal principles promulgated by the Appellate Court, to the extent that such principles are consistent with the decisions of this court, or to divest the Appellate Court of its power to develop and change the law of evidence via case-by-case adjudication. Accordingly, we conclude that the evidentiary rules delineated in the code are subject to change, modification, alteration or amendment by the Appellate Court in the exercise of its constitutional and common-law adjudicative authority, to the extent that such a change, modification, alteration or amendment is not inconsistent with the prior decisions of this court. See *Hopkins* v. *Commissioner of Correction*, 95 Conn. App. 670, 672, 899 A.2d 632 ("[a]s an intermediate appellate court," the Appellate Court is "bound by Supreme Court precedent and [is] unable to modify it"), cert. denied, 279 Conn. 911, 902 A.2d 1071 (2006).

[29] The dissent speculates that "the result in this case may motivate the legislature to follow through on previously contemplated action to bring the rules of evidence under the supervision of that body, which the majority

Our conclusion on this point is predicated on the unique procedural and factual history of the code and, as such, should not be construed to extend to the rules of practice codified in the Practice Book. Unlike evidentiary law, over which this court has exercised final and binding adjudicative authority since its inception more than 200 years ago, our research has revealed that, prior to 1818, the judges of the Superior Court had the authority to adopt rules governing pleading, practice and procedure in the trial court, known as "regulae generales."[30] Regulae generales, like the rules of practice, simply govern the manner in which a trial progresses and, as such, are intended to ensure the uniform, predictable and efficient trial of causes. By contrast, the rules of evidence govern the quality and type of evidence presented to the trier of fact and, as such, their purpose is to ensure the reliability, dependability and integrity of the trier's verdict. As § 1-2 (a) of the code states: "The purposes of the [c]ode are to adopt Connecticut case law regarding rules of evidence as rules of court and to promote the growth and development of the law of evidence through interpretation of

acknowledges has authority to adopt rules of evidence that would bind this court." We see no reason why the legislature would seek to preempt the code, which was duly adopted by the judges of the Superior Court and is binding authority in that court. Indeed, in March, 1998, it was the then cochairmen of the Connecticut Judiciary Committee, Donald E. Williams, Jr. and Michael P. Lawlor, who noted that "the code would more appropriately be promulgated as rules of court rather than as legislation of the Connecticut General Assembly. The code reflects existing court-made law and must, in the future, remain responsive to judicial concerns." Thus, our decision today comports with the intent of the legislature, as well as the intent of the judges of the Superior Court.

[30] See 3 Day (Conn.) 28–29 (1808) (adopting rules pertaining to jury instructions, bills of exceptions and motions for new trial); 4 Day (Conn.) 119 (1809) (adopting rules pertaining to attorneys seeking admission to practice law and specifying that motion for new trial must state facts on which motion is grounded); 5 Day (Conn.) 180 (1811) (ordering certain limitations to rule established in June, 1809, regarding admission of attorneys to practice of law).

the [c]ode and through judicial rule making *to the end that the truth may be ascertained and proceedings justly determined.*" (Emphasis added.) Because the rules of evidence facilitate the court's core judicial truth-seeking function, they necessarily are, and always have been, subject to the oversight and supervision of this court both under the common law and under article fifth, § 1, of the state constitution.[31]

Having concluded that we have the authority to modify the common-law rules of evidence codified in the code, we next address whether we should exercise our authority under the circumstances of the present case. The defendant claims that the liberal standard by which evidence of uncharged misconduct is admitted in sexual assault cases under the common scheme or plan exception should be reconsidered and rejected because it fails to establish the existence of a genuine plan in the defendant's mind. Additionally, the defendant claims that evidence of uncharged misconduct should not be admitted more liberally in sex crime cases than in non-sex crime cases because crimes of a sexual nature are neither more secretive, aberrant nor compulsive than crimes of a nonsexual nature. In light of this court's recent clarification of the nature and scope of the common scheme or plan exception in *State* v. *Randolph*, supra, 284 Conn. 328, we conclude that evidence of uncharged misconduct admitted under the liberal standard ordinarily does not reflect the existence of a genuine common scheme or plan in the defendant's mind.

---

[31] We recognize, however, that "the rules of evidence . . . have never in this state been regarded as exclusively within the judicial domain. Over a period of many years, the legislature has enacted various statutes modifying the rules of evidence prevailing at common law . . . . These changes have been accepted by our courts and have never been challenged as violating the principle of separation of powers." *State* v. *James*, 211 Conn. 555, 560, 560 A.2d 426 (1989); see also *State* v. *Kulmac*, supra, 230 Conn. 52 ("[t]he rules pertaining to the admissibility of evidence in Connecticut are subject to the exercise of both judicial and legislative authority").

Nonetheless, we recognize that crimes of a sexual nature are unique and distinct from crimes of a nonsexual nature because they often are "committed surreptitiously, in the absence of any neutral witnesses" and exhibit an "unusually aberrant and pathological nature . . . ." *State* v. *Merriam*, supra, 264 Conn. 669–70. Accordingly, we conclude that evidence of uncharged misconduct properly may be admitted in sex crime cases under the liberal standard, provided its probative value outweighs its prejudicial effect, to establish that the defendant had a tendency or a propensity to engage in certain aberrant and compulsive sexual behavior. We therefore adopt the liberal standard of admission of evidence of uncharged misconduct in sex crime cases as a limited exception to § 4-5 (a) of the code, which prohibits the admission of "[e]vidence of other crimes, wrongs or acts of a person . . . to prove the bad character or criminal tendencies of that person."

We begin our analysis with the general purpose and scope of the common scheme or plan exception, as recently clarified in *State* v. *Randolph*, supra, 284 Conn. 342. "Evidence of uncharged misconduct, although inadmissible to prove a defendant's bad character or propensity to engage in criminal behavior, is admissible [t]o prove the existence of a larger plan, scheme, or conspiracy, of which the crime on trial is a part. . . . *To prove the existence of a common scheme or plan, each crime must be an integral part of an overarching plan explicitly conceived and executed by the defendant or his confederates.* . . . Evidence of such a plan is relevant to the charged crime because it bears on the defendant's motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute." (Citations omitted; emphasis added; internal quotation marks omitted.) Id.

In *Randolph*, we identified two categories of cases in which evidence of uncharged misconduct properly

may be admitted in *nonsex* crime cases to prove the existence of a common scheme or plan. "In the first category, which is composed of true common scheme or plan cases, the nature of the uncharged misconduct and the charged crime, or the existence of connecting evidence, reveal a genuine connection between the crimes in the defendant's mind. . . . As Professor Edward J. Imwinkelried explains in his treatise entitled Uncharged Misconduct Evidence: The [uncharged] act can be probative of a true plan even when it is dissimilar to the charged crime. There need not be exact correspondence between all crimes involved in the plan. The defendant's burglary of a pawn shop can be used to show the defendant's plan to obtain weapons for a robbery. The defendant's theft of a car can be employed to show the defendant's plan to use the car as a getaway vehicle in a kidnapping or robbery. The defendant's theft of a uniform is evidence of the defendant's plan to masquerade as a guard in order to rob an armored car. The dissimilarity between the charged and uncharged crimes does not negate the value of the uncharged crime as evidence of the existence of the plan including the charged crime." (Citation omitted; internal quotation marks omitted.) Id., 343–45, quoting 1 E. Imwinkelried, Uncharged Misconduct Evidence (Rev. Ed. 1999) § 3:22, p. 118.

"In the second category, which consists of signature cases, this court concluded that evidence of uncharged misconduct was admissible to establish the existence of a common scheme or plan because the factual characteristics shared by the charged and uncharged crimes were sufficiently distinctive and unique as to be like a signature and, therefore, it logically could be inferred that if the defendant is guilty of one [crime] he must be guilty of the other." (Internal quotation marks omitted.) *State* v. *Randolph*, supra, 284 Conn. 347. In *Randolph*, we took the opportunity to explain "why we employ

the 'signature test,' which is probative of the identity of the defendant as the perpetrator of the crime charged, to ascertain the existence of a common scheme or plan." Id., 350; see, e.g., *State* v. *Ibraimov*, 187 Conn. 348, 354, 446 A.2d 382 (1982). "The signature test is pertinent to the common scheme or plan inquiry . . . when the state seeks to establish the existence of an overall plan in the defendant's mind based *solely* on the similarities shared by the charged and uncharged crimes. This is because, when evidence of uncharged misconduct is sufficiently similar to the charged crime so as to rise to the level of a signature, modus operandi, or logo, it also is likely to exhibit such a concurrence of common features . . . [as] naturally to be explained as caused by a general plan of which [the charged and uncharged crimes] are the individual manifestations. . . . Stated another way, when the charged and uncharged crimes exhibit the same modus operandi, it is likely that both crimes had been committed in furtherance of an overall plan or scheme in the defendant's mind. It is the existence of this permissive inference that an overall plan existed that explains our use of the signature test in the second category of cases." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Randolph*, supra, 352.

We cautioned, however, that "[a]lthough this permissive inference may arise in some, if not many [signature] cases . . . it will not arise in *all* cases. As the Washington Court of Appeals aptly observed, [s]omething more than the doing of similar acts is required in evidencing design, as the object is not merely to negative an innocent intent, but to prove the existence of *a definite project*, directed toward the completion of the crime in question. . . . Thus, when seeking to admit evidence pursuant to the common scheme or plan exception, it is not enough to show mere similarity between the [charged and uncharged] crimes . . . because [s]tand-

ing alone, a series of similar acts does not establish the existence of a true plan. A series of similar robberies could be the result of separate decisions to rob. . . . Accordingly, to establish the existence of a true plan in the defendant's mind based *solely* on the marked similarities shared by the charged and uncharged crimes, the state must produce sufficient evidence to: (1) establish the existence of a signature, modus operandi, or logo; *and* (2) support a permissive inference that both crimes were related to an overall goal in the defendant's mind." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 354–55.

It is clear that, pursuant to *Randolph*, the touchstone of the common scheme or plan exception is the existence of an overall scheme or plan in the defendant's mind that encompasses the commission of both the charged and uncharged crimes. Thus, "it is not enough to show mere similarity between the [charged and uncharged] crimes . . . because [s]tanding alone, a series of similar acts does not establish the existence of a true plan." (Citation omitted; internal quotation marks omitted.) Id., 355.

With these principles in mind, we turn to the liberal standard by which evidence of uncharged misconduct is admitted to establish the existence of a common scheme or plan in *sex crime* cases. It is well established that, in such cases, "[t]here is a greater liberality . . . in admitting evidence of other criminal acts to show a common scheme, pattern or design . . . ." (Internal quotation marks omitted.) *State* v. *Sawyer*, supra, 279 Conn. 349. Evidence of uncharged misconduct is admissible "if the offense is proximate in time, *similar* to the offense charged, and committed with persons *similar* to the prosecuting witness." (Emphasis added; internal quotation marks omitted.) Id.; see, e.g., *State* v. *Jacobson*, supra, 283 Conn. 633 (trial court properly admitted uncharged misconduct evidence to prove

common scheme or plan in relevant part because of "important similarities" between defendant's relationship and conduct with victims); *State* v. *McKenzie-Adams*, 281 Conn. 486, 525, 915 A.2d 822 (trial court properly admitted uncharged misconduct evidence to prove common scheme or plan because victims similarly were situated and "defendant's sexual misconduct with [the victims] was sufficiently similar"), cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007); *State* v. *Ellis*, 270 Conn. 337, 358, 852 A.2d 676 (2004) (trial court improperly admitted evidence of uncharged misconduct under common scheme or plan exception because "there were few similarities" between defendant's abuse of victims and relationship with victims); *State* v. *James G.*, 268 Conn. 382, 393, 844 A.2d 810 (2004) (trial court properly admitted evidence of uncharged misconduct under common scheme or plan exception in relevant part because "defendant's sexual abuse of [the victim] was similar to the offense charged" and was "committed upon [a person] similar to the prosecuting witness" [internal quotation marks omitted]). It is apparent that, under this liberal standard, it is the similarity shared by the charged and uncharged crimes, rather than the existence of a genuine plan in the defendant's mind, that is the focus of the court's inquiry. Moreover, under the liberal standard, the similarities shared by the charged and the uncharged crimes need not be "so unusual and distinctive as to be like a signature"; (internal quotation marks omitted) *State* v. *Merriam*, supra, 264 Conn. 666; and, consequently, need not "exhibit such a concurrence of common features [as] naturally to be explained as caused by a general plan of which [the charged and uncharged crimes] are the individual manifestations." *State* v. *Randolph*, supra, 284 Conn. 352; id. (in nonsex crime cases, evidence of uncharged misconduct only is sufficiently similar to prove common scheme or plan if it rises to level of signature, modus operandi or logo).

Because the liberal standard does not focus on the existence of an overall scheme or plan in the defendant's mind that encompasses the commission of the charged and uncharged crimes, but instead focuses on the similarity of the charged and uncharged crimes, we now acknowledge that evidence admitted under this standard ordinarily does not fall within the "true" common scheme or plan exception. See, e.g., *State* v. *Whittaker*, 138 N.H. 524, 528, 642 A.2d 936 (1994) ("five-year-old sexual assault committed in a somewhat similar manner on another person, does not constitute evidence of a plan to commit an assault on the victim here"); see also 1 E. Imwinkelried, supra, § 4:13, p. 47 (Criticizing "jurisdictions [that] allow the prosecutor to introduce evidence of the defendant's other crimes similar *to* the charged crimes; these *courts treat a show-*ing of similarity as sufficient evidence of the existence of a plan. The courts' tendency to do so has been especially pronounced in sex offense prosecutions."); C. Tait & E. Prescott, supra, § 4.19.13, p. 170 (Criticizing liberal rule because "the prosecution need not offer any proof that the defendant had any scheme or plan that might conceivably tie the uncharged misconduct with the charged misconduct. Isolated, unrelated misconduct is sufficient if sexual in nature. However, if the misconduct charged is not sexual but merely violent in nature, the rule does not apply and prior misconduct is not admissible unless rationally part of a common plan or scheme.").

Nonetheless, we recognize that strong public policy reasons continue to exist to admit evidence of uncharged misconduct more liberally in sexual assault cases than in other criminal cases. As we observed in *State* v. *Merriam*, supra, 264 Conn. 669–71, "[f]irst, in sex crime cases generally, and in child molestation cases in particular, the offense often is committed surreptitiously, in the absence of any neutral witnesses.

Consequently, courts allow prosecutorial authorities greater latitude in using prior misconduct evidence to bolster the credibility of the complaining witness and to aid in the obvious difficulty of proof. See, e.g., *United States* v. *Castillo*, 140 F.3d 874, 883 (10th Cir. 1998); *People* v. *Covert*, 249 Cal. App. 2d 81, 88, 57 Cal. Rptr. 220 (1967); *People* v. *Donoho*, [204 Ill. 2d 159, 177–78, 788 N.E.2d 707 (2003)]; *Commonwealth* v. *King*, 387 Mass. 464, 472, 441 N.E.2d 248 (1982); *State* v. *Forbes*, 161 Vt. 327, 331, 640 A.2d 13 (1993); *Daniel* v. *State*, 923 P.2d 728, 735 (Wyo. 1996). Second, because of the unusually aberrant and pathological nature of the crime of child molestation, prior acts of similar misconduct, as opposed to other types of misconduct, are deemed to be highly probative because they tend to establish a necessary motive or explanation for an otherwise inexplicably horrible crime; see, e.g., *Ward* v. *State*, 236 Ark. 878, 883, 370 S.W.2d 425 (1963); *Acuna* v. *State*, 332 Md. 65, 75, 629 A.2d 1233 (1993); *State* v. *Forbes*, supra, 331; see also 140 Cong. Rec. 24,799 (1994), remarks of Senator Robert Dole in support of adoption of rules 413 through 415 of the Federal Rules of Evidence[32] ('[i]n child molestation cases, for example, a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant—a sexual or sado-sexual interest in children—that simply does not exist in ordinary people'); and assist the jury in assessing the probability that a defendant has been falsely accused of such shocking

[32] Rule 413 (a) of the Federal Rules of Evidence provides: "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant."

Rule 414 (a) of the Federal Rules of Evidence provides: "In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant."

behavior. See, e.g., *State* v. *Forbes*, supra, 332–33; see also 137 Cong. Rec. 6033 (1991) (United States Department of Justice summary of § 801 of proposed Comprehensive Violent Crime Control Act of 1991, which incorporated proposed rules 413 through 415 of Federal Rules of Evidence) ('[i]t is inherently improbable that a person whose prior acts show that he is in fact a rapist or child molester would have the bad luck to be later hit with a false accusation of committing the same type of crime or that a person would fortuitously be subject to multiple false accusations by a number of different victims')." As this court previously has recognized, "when human conduct involves sexual misconduct, people tend to act in generally consistent patterns of behavior, and . . . it is unlikely (although, of course, not impossible) that the same person will be falsely accused by a number of different victims." *State* v. *Sawyer*, supra, 279 Conn. 383.

We conclude that these public policy considerations militate in favor of recognizing a *limited* exception to the prohibition on the admission of uncharged misconduct evidence in *sex crime* cases to prove that the defendant had a propensity to engage in aberrant and compulsive criminal sexual behavior.[33] We therefore

---

[33] The defendant claims, however, that "many heinous crimes take place out of sight" and that "the use of special rules of evidence for sexual assault victims is a form of paternalism that only serves to perpetuate sexist stereotypes that a woman's testimony alone is an insufficient basis for a sexual assault conviction." The defendant fails to cite any authority or to provide any analysis in support of this claim and, therefore, we decline to review it. See *State* v. *T.R.D.*, 286 Conn. 191, 213–14 n.18, 942 A.2d 1000 (2008) ("We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." [Internal quotation marks omitted.]).

The defendant further claims that evidence of uncharged misconduct should not be admitted more liberally in sex crime cases because "mass

join the federal courts, as well as a multitude of our sister states, that recognize a similar propensity exception in sexual assault cases. See, e.g., *State* v. *Roscoe*, 184 Ariz. 484, 491, 910 P.2d 635 (en banc) ("Arizona courts have recognized another specific exception to the general rule: other bad acts involving 'sexual aberration' are admissible to show the defendant's propensity to commit a similar crime"), cert. denied, 519 U.S. 854, 117 S. Ct. 150, 136 L. Ed. 2d 96 (1996); *Hamm* v. *State*, 365 Ark. 647, 661, 232 S.W.3d 463 (2006) (Hannah, C. J., dissenting) ("This [c]ourt has recognized a 'pedophile exception' to rule 404 [b], where the court has approved allowing evidence of similar acts with the same or other children when it is helpful in showing a proclivity for a specific act with a person or class of persons with whom the defendant has an intimate relationship. . . . The rationale for recognizing this exception is that such evidence helps to prove the depraved sexual instinct of the accused." [Citation omitted.]); *State* v. *Tobin*, 602

hysteria" concerning "would-be child predators [has] resulted in innocent persons unjustly accused, convicted and spending years in prison." In support of this claim, the defendant relies on *State* v. *Michaels*, 264 N.J. Super. 579, 616–35, 625 A.2d 489 (App. Div. 1993), aff'd, 136 N.J. 299, 642 A.2d 1372 (1994), wherein the Appellate Division of the Superior Court of New Jersey reversed the defendant's conviction of 115 counts of sexual assault because the child victims had been questioned in a coercive, leading and suggestive manner. We conclude that the defendant's reliance on *Michaels* is misplaced because the propriety of admitting evidence of uncharged misconduct was not at issue in that case. Moreover, evidence of uncharged misconduct only is admissible "once all other requirements [for admissibility] have been satisfied—relevancy, materiality, and probative value outweighs prejudice— [and] the trial court . . . determine[s] that there is sufficient evidence for the jury to find that the defendant committed the prior act." *State* v. *Aaron L.*, 272 Conn. 798, 827, 865 A.2d 1135 (2005). In a case such as *Michaels*, wherein it was undisputed that the victims' testimony had been coerced by "extremely leading and/or suggestive questions"; *State* v. *Michaels*, supra, 621; evidence of uncharged misconduct properly would be excluded either because its prejudicial effect outweighs its probative value, or because it is insufficient to establish that the defendant committed the prior act. Accordingly, we conclude that "adequate protection against unfair prejudice . . . is afforded by the existing structures of our rules of evidence." *State* v. *Aaron L.*, supra, 824.

A.2d 528, 531 (R.I. 1992) ("[i]n cases involving sexual assault, this court [has] expanded [the] list of exceptions [to the general prohibition against admission of uncharged misconduct] to allow evidence of prior acts to show the defendant's 'lewd disposition or . . . intent' "); *State* v. *Edward Charles L.*, 183 W. Va. 641, 651, 398 S.E.2d 123 (1990) ("collateral acts or crimes may be introduced in cases involving child sexual assault or sexual abuse victims to show the perpetrator had a lustful disposition towards the victim, a lustful disposition to children generally, or a lustful disposition to specific other children, provided such acts occurred reasonably close in time to the incident[s] giving rise to the indictment"); Fed. R. Evid. §§ 413, 414; Alaska R. Evid. § 404 (b) (West 2007); Ariz. R. Evid. § 404 (c) (West 2007); Cal. Evid. Code § 1108 (Deering 2004); 725 Ill. Comp. Stat. Ann. § 5/115-7.3 (West 2002); Ind. Code Ann. § 35-37-4-15 (Michie 1998); Iowa Code Ann. § 701.11 (West Sup. 2008); La. Code Evid. Ann. art. 412.2 (2006); Tex. Code Crim. Proc. Ann. art. 38.37 (Vernon 2005); see also *State* v. *Reyes*, 744 N.W.2d 95, 101 (Iowa 2008) ("[a]bout half the states have developed a 'lustful disposition' or 'depraved sexual instinct' exception which allows evidence of prior sexual misconduct involving children to be admitted into evidence"); *People* v. *Donoho*, supra, 204 Ill. 2d 175 (noting that "courts in [twenty-five] additional states have broadened the exceptions to the ban on other-crimes evidence in sexual offense cases").[34]

We caution, however, that "our approach does not vest trial courts with carte blanche to allow the state to introduce any prior sexual misconduct evidence against an accused in sex crime cases." *State* v. *Mer-*

[34] We clarify that the exception we adopt today, like the liberal standard pursuant to which uncharged misconduct evidence formerly was admitted under the common scheme or plan exception, applies to *all* sexual misconduct, regardless of the age of the victim.

*riam,* supra, 264 Conn. 671. First, evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that the defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she is charged. Relevancy is established by satisfying the liberal standard pursuant to which evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct is relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: "(1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness."[35] (Internal quotation marks omitted.) *State* v. *McKenzie-Adams,* supra, 281 Conn. 522; see also *State* v. *Romero,* 269 Conn. 481, 498, 849 A.2d 760 (2004) ("[w]e have indicated that this inquiry should focus upon each of the three factors, as a single factor will rarely be dispositive").

Second, evidence of uncharged misconduct is admissible only if its probative value outweighs "the prejudicial effect that invariably flows from its admission." *State* v. *Merriam,* supra, 264 Conn. 671; cf. *United States* v. *LeMay,* 260 F.3d 1018, 1026 (9th Cir. 2001) (evidence of uncharged misconduct admitted under rule 414 of Federal Rules of Evidence subject to probative versus prejudicial balancing under rule 403 of Federal Rules of Evidence), cert. denied, 534 U.S. 1166, 122 S. Ct. 1181, 152 L. Ed. 2d 124 (2002). In balancing the

---

[35] The scope and contours of the propensity exception to the rule prohibiting the admission of uncharged misconduct that we adopt in this opinion therefore are rooted in this state's unique jurisprudence concerning the admission of uncharged misconduct evidence in sex crime cases, and must be construed accordingly. Consequently, we do not anticipate that our decision today will open the floodgates to the admission of uncharged misconduct evidence that previously was inadmissible under the common scheme or plan exception.

probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, "to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity." *United States* v. *Benais*, 460 F.3d 1059, 1063 (8th Cir. 2006).

Lastly, to minimize the risk of undue prejudice to the defendant, the admission of evidence of uncharged sexual misconduct under the limited propensity exception adopted herein must be accompanied by an appropriate cautionary instruction to the jury.[36]

Turning to the facts of the present case, we conclude that, although evidence of the defendant's uncharged misconduct with N was inadmissible to prove the existence of a "true" common scheme or plan in the defendant's mind, it was admissible to prove that the defendant had a propensity or a tendency to sexually assault young women of limited mental ability with whom he worked and over whom he had supervisory

---

[36] The precise content of such an instruction is beyond the scope of the present appeal. We note, however, that the following instruction regarding the admission of evidence of uncharged misconduct under rule 413 of the Federal Rules of Evidence; see footnote 32 of this opinion; has been approved by the Tenth Circuit Court of Appeals: "In a criminal case in which the defendant is [charged with a crime exhibiting aberrant and compulsive criminal sexual behavior], evidence of the defendant's commission of another offense or offenses . . . is admissible and may be considered for its bearing on any matter to which it is relevant. However, evidence of a prior offense on its own is not sufficient to prove the defendant guilty of the crimes charged in the [information]. Bear in mind as you consider this evidence [that] at all times, the government has the burden of proving that the defendant committed each of the elements of the offense charged in the [information]. I remind you that the defendant is not on trial for any act, conduct, or offense not charged in the [information]." (Internal quotation marks omitted.) *United States* v. *McHorse*, 179 F.3d 889, 903 (10th Cir.), cert. denied, 528 U.S. 944, 120 S. Ct. 358, 145 L. Ed. 2d 280 (1999); see also 1 L. Sand, J. Siffert & W. Loughlin et al., Modern Federal Jury Instructions-Criminal (Matthew Bender 2007) § 5-27.

authority. As the Appellate Court properly determined, the defendant's misconduct with N was proximate in time to the charged crime because both offenses occurred in 2000 and 2001. *State* v. *DeJesus*, supra, 91 Conn. App. 60. Additionally, "the similarities between the assault on the victim and the assault on N were sufficient to warrant the introduction into evidence of the uncharged misconduct. The women were similar in age and appearance. Both suffered from a mental disability and had a difficult time learning new skills. The defendant had hired both the victim and N and was aware of their mental limitations. The defendant's assaults of the two women occurred in a similar manner as well. He used his supervisory authority to lure the women into an isolated, empty room on the upper level of the store while they were in the store pursuant to their employment duties. He then proceeded to assault them."[37] Id., 60–61.

Because the uncharged misconduct evidence was admitted pursuant to the common scheme or plan

[37] The trial court minimized the risk of undue prejudice to the defendant by issuing the following cautionary instruction to the jury: "Remember, I told you that certain evidence might be admitted for one purpose but not another. This evidence has been admitted; first, to demonstrate or show a characteristic method or pattern in the commission of criminal acts; and second, on the issue of the defendant's intent. The evidence of alleged prior misconduct by the defendant toward [N] is not part of the offense charged in this case. It is for you and you alone, ladies and gentlemen, to evaluate the testimony in this case, all of the testimony, including this testimony and to determine whether you credit it in whole, in part, or not at all. You are expressly prohibited from using this evidence that you have just heard of prior alleged misconduct as evidence of the bad character of the defendant or as evidence of a tendency to commit criminal acts in general or as proof that he committed the acts charged in this case for which he is being prosecuted. The weight, if any, that you choose to give to this evidence is up to you. That is your job as jurors, to evaluate the evidence.

"If you find this evidence of prior alleged misconduct credible you may consider it for the sole and limited purpose of assisting you in determining whether the defendant has engaged in a characteristic method or pattern in the commission of criminal acts of which the charged conduct is a part and on the issue of the defendant's intent."

exception, rather than the propensity exception, we must address the issue of harm.[38] The defendant claims that the admission of this evidence was harmful solely because of the risk that the jury would use the evidence to infer that the defendant had a propensity or a tendency to commit the crime of sexual assault. As we have explained in the body of this opinion, however, this is the precise purpose for which the jury properly could have considered the evidence. Accordingly, we conclude that the evidentiary impropriety was harmless.

In sum, evidence of uncharged sexual misconduct properly may be admitted in sex crime cases to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive criminal sexual behavior if: (1) the trial court finds that such evidence is relevant to the charged crime in that it is not too remote in time, is similar to the offense charged and is committed upon persons similar to the prosecuting witness; and (2) the trial court concludes that the probative value of such evidence outweighs its prejudicial effect. In assessing the relevancy of such evidence, and in balancing its probative value against its prejudicial

---

[38] "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . As we recently have noted, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [W]hether [the improper admission of evidence] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative . . . the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . Because the present case involves the improper admission of uncharged misconduct evidence, the most relevant factors to be considered are the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact." (Citations omitted; internal quotation marks omitted.) *State* v. *Randolph,* supra, 284 Conn. 363–64.

effect, the trial court should be guided by this court's prior precedent construing the scope and contours of the liberal standard pursuant to which evidence of uncharged misconduct previously was admitted under the common scheme or plan exception. Lastly, prior to admitting evidence of uncharged sexual misconduct under the propensity exception adopted herein, the trial court must provide the jury with an appropriate cautionary instruction regarding the proper use of such evidence. See footnote 36 of this opinion.

The judgment of the Appellate Court is reversed with respect to the direction to render judgment of not guilty of kidnapping in the first degree under count four of the information and the case is remanded to that court with direction to remand the case to the trial court for a new trial on that count; the judgment is affirmed in all other respects.

In this opinion NORCOTT and VERTEFEUILLE, Js., concurred.

PALMER, J., concurring. I agree with, and join, part I of the majority opinion concerning the application of the principles articulated in *State* v. *Salamon*, 287 Conn. 509, 942 A.2d 1092 (2008), to the present case. I also agree with that portion of part II of the majority opinion dealing with the standard of admissibility of uncharged sexual misconduct evidence in sexual assault cases. Although I agree with the threshold determination of the majority in part II of its opinion that this court retains the authority to change or modify the law of evidence as embodied in the Connecticut Code of Evidence (code), I reach that result by a somewhat different route than the majority. I write separately primarily for that reason.

I

Before addressing part II of the majority opinion, however, I note briefly that, although I join the majority in concluding that the defendant in *State* v. *Sansever-ino*, 287 Conn. 608, 949 A.2d 1156 (2008), is not entitled to a judgment of acquittal, I also believe it is extremely unlikely that, because of the factual scenario presented by that case, the state will be able to adduce evidence sufficient to support a conviction of kidnapping in light of the factors that this court recently announced in *State* v. *Salamon*, supra, 287 Conn. 548. Nevertheless, as the majority has explained, the defendant in *Sansever-erino* was entitled to a reversal of his conviction not because of evidentiary insufficiency but, rather, because he did not receive an instruction of the kind mandated by *Salamon*.[1] Consequently, contrary to this court's determination in *Sanseverino* barring the state from seeking to retry the defendant in that case for the offense of kidnapping, the state has the right to decide whether to attempt to seek a conviction for that offense. As I have indicated, unless there is evidence, not adduced at the first trial, that would support a finding of kidnapping, as that offense has been construed in *Salamon*, the state will be unable to obtain a kidnapping conviction. Indeed, it must be presumed that, if the state lacks such evidence, it will not seek to retry the defendant for kidnapping. That decision, however, rests with the state, subject to appropriate oversight by the trial court. Consequently, no matter how apparent it may seem, on the basis of the record of the first trial, that the state cannot establish the crime of kidnapping, the appropriate order in *Sanseverino* is a reversal of

---

[1] It bears emphasis that the jury instruction on kidnapping that the trial court gave in *Sanseverino* was perfectly correct under then binding precedent of this court. We concluded that the defendant in *Sanseverino* was entitled to a reversal of his kidnapping conviction only because of this court's interpretation of the kidnapping statute in *Salamon*, which this court decided on the same day that it decided *Sanseverino*.

the defendant's conviction and a remand for a new trial, rather than a judgment of acquittal.[2]

## II

In concluding that this court continues to have the ultimate responsibility for determining the law of evidence through common-law adjudication, despite the promulgation of the code by the judges of the Superior Court, the majority concludes that the language of the code is ambiguous with respect to whether the judges of the Superior Court intended to oust this court from

[2] The dissenting justice asserts that it is unfair to the defendant in *Sanseverino* and the defendant in the present case to allow the state the *opportunity* to retry them. I do not share the dissenting justice's view. First, the defendant in *Sanseverino* and the defendant in the present case received the benefit of our holding in *Salamon* even though neither defendant raised the claim concerning the kidnapping statute that we addressed in *Salamon*. They benefit from our holding in *Salamon* only because their appeals happened to be pending when this court decided *Salamon*. Second, and more importantly, by permitting the state to determine whether to seek a retrial in *Sanseverino* and in the present case, we do not place the defendants in those cases in unwarranted jeopardy. Rather, as I have indicated, we must presume that if, in light of our decision in *Salamon*, the state does not believe that it has sufficient evidence to retry one or both of those defendants for kidnapping, then the state will not do so. Under the circumstances, however, it simply is not our responsibility to make that decision for the state.

I also strongly disagree with the dissenting justice's criticism of our decision on stare decisis grounds. *Sanseverino* was decided less than two months ago, and, consequently, there cannot have been any material reliance on it. Cf., e.g., *Conway* v. *Wilton*, 238 Conn. 653, 658, 680 A.2d 242 (1996) (explaining that doctrine of stare decisis is justified because, inter alia, it "allows for predictability in the ordering of conduct" by "giv[ing] stability and continuity to our case law"). Indeed, the dissenting justice acknowledges, as she must, that stare decisis is hardly applicable when, as in *Sanseverino*, a motion for reconsideration of our decision in that case is pending. Moreover, it is far better for this court to acknowledge and to correct an error promptly than to refuse to do so based on rigid adherence to flawed precedent. See id., 659. Thus, to the extent that this court's decision in the present case serves to clarify that our decision in *Salamon* rejecting the defendant's claim of entitlement to a judgment of acquittal ultimately was not fact bound, despite certain language in *Salamon* that might suggest a contrary conclusion; see *State* v. *Salamon*, supra, 287 Conn. 548–50; that clarification is entirely appropriate.

its historical role with respect to the law of evidence. In essence, the majority reviews one of the stated purposes of the code, namely, "to promote the growth and development of the law of evidence through interpretation of the [c]ode and through judicial rule making to the end that the truth may be ascertained and proceedings justly determined"; Conn. Code Evid. § 1-2 (a); and concludes that the terms "interpretation" and "judicial rule making" are ambiguous.[3] The majority then turns to extratextual considerations, including the history and purpose of the code, and concludes that the code "was not intended to displace, supplant or supersede common-law evidentiary rules or their development via common-law adjudication, but, rather, simply was intended to function as a comprehensive and authoritative restatement of evidentiary law for the ease and convenience of the legal community." The majority also recognizes that, under the code, the judges of the Superior Court, upon recommendation of the evidence code oversight committee, are authorized to adopt revisions to the code "reflecting common-law developments in evidentiary law, clarifications [to] the code to resolve ambiguities and additions to the code in the absence of governing common-law rules."

Although I agree with the majority's conclusion regarding the overall scope of the code, I am not persuaded that the terms "interpretation" and "judicial rule making," as used in § 1-2 (a) of the code, are "ambigu-

---

[3] In the majority's view, the word "interpretation," as used in § 1-2 (a) of the code, is ambiguous because the judges of the Superior Court reasonably may have intended it "to be construed broadly as descriptive of the common-law adjudicative function pursuant to which evidentiary law historically has grown and developed" and not merely limited to the construction or explanation of the code. The majority also concludes that the term "judicial rule making" is ambiguous because such rule making reasonably may be construed to mean case-by-case, common-law adjudication rather than the promulgation of court rules by the judges of the Superior Court acting as a group.

ous" in any meaningful sense of that term. As I see it, the code identifies two ways in which it is to be modified: through the construction of the terms of the code, and through the rule-making authority of the judges of the Superior Court, acting as a body. For the reasons that follow, however, I also conclude that the judges of the Superior Court, in promulgating the code, were not attempting to strip the Supreme Court of its traditional common-law role regarding the growth and development of the law of evidence.[4] In other words, although the code prescribes the manner in which it may be modified *by the judges of the Superior Court*, it does not purport to occupy the field by displacing the *Supreme Court* as the ultimate authority with respect to the law of evidence. Read in this light, the purpose of the code, as set forth in § 1-2 (a), is plain and perfectly reasonable: the judges of the Superior Court shall interpret the code, and may modify the code via the exercise of their rule-making function, to clarify its terms or to fill in gaps that may exist in the code. Nothing in the code, however, purports to limit the traditional power of the Supreme Court concerning this state's evidentiary law.

I read the code in this manner because I do not believe that the judges of the Superior Court have the power to supplant the Supreme Court as the judicial body ultimately responsible for determining the law of evidence. The Supreme Court has exercised its common-law authority in this realm since the court was created centuries ago, prior to the adoption of the constitution of 1818. Because the Supreme Court is a constitutional court, there can be no doubt that its common-law

---

[4] I likewise do not believe that the judges of the Superior Court intended to limit the authority of the Appellate Court in regard to that court's common-law adjudicative function vis-à-vis the law of evidence. I refer only to the Supreme Court, however, for ease of reference, and because the common-law role of the Supreme Court with respect to the rules of evidence dates back more than 200 years; by contrast, the similar role of the Appellate Court dates back only to its creation in 1983.

authority, including its common-law authority over the law of evidence, is constitutionally rooted. In light of that fact, I cannot see how the judges of the Superior Court possess the power to divest this state's highest court of a significant measure of that authority.

Such a conclusion also would be inconsistent with this court's inherent supervisory authority over the administration of justice.[5] Of course, this authority encompasses the power to exercise supervision and control of proceedings on appeal. See, e.g., Practice Book § 60-2 ("[t]he supervision and control of the proceedings on appeal shall be in the court having appellate jurisdiction from the time the appeal is filed, or earlier, if appropriate"); Practice Book § 60-3 (authorizing court to "suspend the requirements or provisions of any of these rules [of practice] in a particular case on motion of a party or on its own motion"). This court's inherent supervisory authority, however, clearly transcends the authority to manage cases on appeal. It extends to the supervision of the manner in which proceedings are conducted in our trial courts. Thus, although this court exercises its supervisory authority sparingly; e.g., *State* v. *Smith*, 275 Conn. 205, 241, 881 A.2d 160 (2005); it nevertheless has "adopted rules intended to guide lower courts in the administration of justice in all aspects of the criminal process"; (internal quotation marks omitted) *State* v. *Valedon*, 261 Conn. 381, 386, 802 A.2d 836

---

[5] As this court repeatedly has stated, both the Supreme Court and the Appellate Court "possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . [The Supreme Court] ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it believes] is preferable as a matter of policy." (Citation omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 577–78, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

(2002); and in the civil arena, as well. See, e.g., *Roth* v. *Weston*, 259 Conn. 202, 231–32, 789 A.2d 431 (2002) (exercising supervisory authority to establish burden of proof in nonparent visitation cases); *Ireland* v. *Ireland*, 246 Conn. 413, 429, 432–33, 717 A.2d 676 (1998) (exercising supervisory authority to adopt factors to be considered in determining best interests of child in cases involving parental relocation); *Bennett* v. *Automobile Ins. Co. of Hartford*, 230 Conn. 795, 806, 646 A.2d 806 (1994) (exercising supervisory authority to direct that, in cases involving insurance disputes, insurers raise certain issues of policy limitation by way of special defense). Moreover, the importance with which this court views its supervisory authority is reflected in the fact that, on at least one occasion, the court has prohibited the parties' waiver of the procedure imposed under that authority; see *State* v. *Patterson*, 230 Conn. 385, 400, 645 A.2d 535 (1994) ("[W]e now decide under our supervisory power that henceforth the trial judge must continuously be present to oversee voir dire in a criminal case. Because this requirement is imposed by this court pursuant to its supervisory powers, the requirement cannot be waived by either party in future criminal cases."); even though constitutional rights may be waived.

I do not believe that the judges of the Superior Court have the power to trump this court's inherent supervisory authority over the administration of justice in the trial courts, the exercise of which generally is reserved for matters of the greatest seriousness that implicate the fairness and integrity of the judicial system as a whole. See footnote 5 of this opinion. Indeed, if the judges of the Superior Court have that power, then this court does not truly possess supervisory authority over the trial courts at all, because those courts would be free to override this court's assertion of its authority. I therefore am unwilling to conclude that this court

possesses supervisory power over our trial courts only to the extent that those courts acquiesce in our exercise of that power—a result that would so limit the authority of this court over the administration of justice in the trial courts as to render that role advisory rather than supervisory.[6]

Supervisory authority over the administration of justice is inherent in appellate courts generally, including, of course, the United States Supreme Court. Thus, as that court stated in *McNabb* v. *United States*, 318 U.S. 332, 63 S. Ct. 608, 87 L. Ed. 819 (1943), "[t]he principles governing the admissibility of evidence in federal criminal trials have not been restricted . . . to those derived solely from the [United States] [c]onstitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts . . . th[e] [United States Supreme] Court has, from the very beginning of its history, formulated rules of evidence to be applied in federal criminal prosecutions. . . . And in formulating such rules of evidence for federal criminal trials the [c]ourt has been guided by considerations of justice not limited to the strict canons of evidentiary relevance." (Citations omitted.) Id., 341. The United States Supreme Court recently reiterated this principle, stating: "The law . . . is clear. Th[e] [United States Supreme] Court has supervisory authority over the federal courts, and [it] may use that authority to prescribe rules of evidence and procedure that are binding in those tribunals."[7] *Dickerson* v. *United States*, 530

---

[6] Indeed, I have found no federal or sister state precedent that supports such a division of authority as between a high court and a subordinate court.

[7] Although the authority of the United States Supreme Court in this regard is superior to that of the lower federal courts, "Congress retains the ultimate authority to modify or set aside any judicially created rules of evidence and procedure that are not required by the [United States] [c]onstitution." *Dickerson* v. *United States*, 530 U.S. 428, 437, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). This court has observed that, in this state, "the rules of evidence . . . have never . . . been regarded as exclusively within the judicial domain. Over a period of years, the legislature has enacted various statutes modifying the rules of evidence prevailing at common law . . . . These

U.S. 428, 437, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). In this state, as well, the ultimate authority to determine the law of evidence has resided in this court since its inception, and no persuasive reason has been proffered to support the contention that the judges of the Superior Court have the power to assert that authority for themselves.[8] Consequently, it cannot be presumed that the judges of the Superior Court purported to do so when they adopted the code in 2000. Indeed, I agree with the majority that, if the judges of the Superior Court had purported to accomplish such a radical—and constitutionally suspect—change, it is extremely unlikely that they would have done so without any public discussion of it in advance of the adoption of the code. Moreover, the fact that the code was presented to the judges of the Superior Court for their approval on the basis that it was merely a compilation of the existing common law of evidence strongly supports the conclusion that the Superior Court judges treated the code as representing the status quo, and not as creating a dramatically new and different set of procedures for determining the law of evidence in this state.

It may be argued that the judges of the Superior Court have asserted a similar authority by virtue of

changes have been accepted by our courts and have never been challenged as violating the principle of separation of powers." *State* v. *James*, 211 Conn. 555, 560, 560 A.2d 426 (1989).

[8] General Statutes § 51-14 (a), which provides in relevant part that the judges of the Supreme Court, the Appellate Court and the Superior Court "shall adopt and promulgate and may from time to time modify or repeal rules and forms regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules," is not to the contrary. Section 51-14 (a) codifies the inherent authority of the various courts; see, e.g., *In re Dattilo*, 136 Conn. 488, 493, 72 A.2d 50 (1950) ("[e]ven lacking statutory authority, it would be well within the inherent power of the judges of the Superior Court to make rules which would bring about an orderly, expeditious and just determination of the issues"); and says nothing about the relative authority of one such court vis-à-vis another.

their promulgation of the rules of procedure contained in the Practice Book (rules of practice). It is not apparent to me, however, that those rules are binding on this court *as a matter of law*.[9] Although, for prudential reasons, it is very unlikely that this court would see fit to alter a rule of practice in the exercise of its supervisory

[9] The dissenting justice cites to several cases in which this court has indicated that it lacks authority to change or modify rules of practice adopted by the judges of the Superior Court. See *Oakley* v. *Commission on Human Rights & Opportunities*, 237 Conn. 28, 30, 675 A.2d 851 (1996) ("[d]espite [the] legitimacy [of the concern raised by the certified question], the concern is one that cannot be addressed through the process of appellate review but requires a change in the appropriate provisions either of the General Statutes or of the Practice Book"); *State* v. *Johnson*, 228 Conn. 59, 61, 634 A.2d 293 (1993) ("[a]lthough a clarifying amendment [to] the rules of practice to address the problem illuminated . . . might well be desirable, this court does not sit as the [r]ules [c]ommittee of the Superior Court"); *State* v. *Jennings*, 216 Conn. 647, 665 n.11, 583 A.2d 915 (1990) ("We do not sit to decide the utility or need for written instructions in the Connecticut courts. To the extent that the defendant seeks such a decision, his request is more properly directed to the [r]ules [c]ommittee of the Superior Court."); *Kupstis* v. *Michaud*, 215 Conn. 435, 437, 576 A.2d 152 (1990) ("[t]he problem illuminated by this litigation calls for a change in the rules of practice that this court cannot enact"). I acknowledge that language in these cases would appear to support the contention that this court lacks the ultimate authority to modify a rule of practice adopted by the judges of the Superior Court. Upon closer analysis, however, these cases are not persuasive authority for that proposition. Three of the four decisions, *Oakley, Johnson* and *Kupstis*, were summary, per curiam opinions consisting of one to two pages each, and none contains any analysis of the relative authority of this court and the Superior Court concerning the adoption of the rules of practice. At most, these decisions reflect the court's understandable reluctance to override rules of practice adopted by the judges of the Superior Court. In *Jennings*, the fourth case, this court rejected the claim of the defendant, Gerald Jennings, that the trial court had violated his constitutional rights in declining to provide the jury with a written copy of the court's jury instructions. See *State* v. *Jennings*, supra, 664–65. In response to Jennings' assertion that other state and federal courts had utilized written jury instructions and that the practice had received favorable review and comment, we observed that his policy argument was "more properly directed" to the rules committee of the Superior Court. Id., 665 n.11. Significantly, Jennings did not request that this court invoke its supervisory authority. Although I express no view on the merits of written jury instructions, I have no doubt that this court has the authority, under its supervisory power, to require that written instructions be provided to the jury. *Jennings*, therefore, is inapposite.

authority, I do not believe that this court lacks the power to do so. Indeed, once again, this is the position that the United States Supreme Court has taken concerning the relative authority of that court and the lower federal courts with respect to the promulgation of rules of procedure. Although "a district court has discretion to adopt local rules that are necessary to carry out the conduct of its business . . . [the United States Supreme Court] may exercise its inherent supervisory power to ensure that these local rules are consistent with the principles of right and justice." (Citations omitted; internal quotation marks omitted.) *Frazier* v. *Heebe*, 482 U.S. 641, 645, 107 S. Ct. 2607, 96 L. Ed. 2d 557 (1987) (invoking supervisory authority to invalidate certain residency requirements contained in local rules of United States District Court for Eastern District of Louisiana).[10] I therefore view the rules of practice in the same way that I view the code, namely, as a set of rules adopted by the judges of the Superior Court that govern the manner in which cases are to proceed in our trial courts. Under its common-law adjudicative authority, however, this court is the final arbiter of any dispute between the parties regarding the interpretation of those rules. Similarly, this court, by virtue of its inherent authority as the state's highest court, ultimately retains the power—however infrequently it may choose to invoke it—to establish the rules that govern the administration of justice in the courts of this state.[11]

---

[10] Thus, contrary to the assertion of the dissenting justice, the United States Supreme Court expressly has held that it possesses inherent power to invalidate an otherwise lawful rule of procedure adopted by the judges of the United States District Court under their inherent rule-making authority. See *Frazier* v. *Heebe*, supra, 482 U.S. 645.

[11] As Justice Zarella underscores in his concurrence, the history of our rules of practice and the history of our law of evidence are not identical. I do not view the former, however, including the 1807 legislative delegation of rule-making authority to our courts as they were constituted prior to 1818; see General Statutes (1808 Rev.) tit. 42, c. 15, § 2 (1808 statute); as demonstrating that the Supreme Court is subordinate to the Superior Court with respect to that authority. To the contrary, from 1808 until the adoption of the 1818 constitution, the judges of the Supreme Court of Errors and the judges of the Superior Court were one and the same, and, therefore, distinctions between them regarding their relative authority over the administration of justice were of little practical significance. More importantly,

For the foregoing reasons, I conclude that the judges of the Superior Court did not undertake to adopt an evidence code that purported to usurp this court's historical and constitutionally based authority over the law of evidence. I therefore agree with the majority's determination in part II of this opinion that this court retains such authority following the adoption of the code.[12] Accordingly, I concur in the result that the majority reaches in part II of its opinion.

ZARELLA, J., with whom SULLIVAN, J., joins, concurring. I concur in the result that the majority reaches in part I of its opinion that the defendant is entitled to a new trial on the charge of kidnapping in the first degree on the basis of an improper jury instruction. See *State* v. *Sanseverino*, 287 Conn. 608, 649–50, 949 A.2d 1156

as Justice Zarella also notes, the 1808 statute is, at most, ambiguous with respect to the division of authority, if any, between the judges of the Supreme Court of Errors and the judges of the Superior Court. Soon after the constitution was adopted in 1818, however, the legislature directed the Supreme Court of Errors to promulgate rules applicable to the Superior Court. See General Statutes (1821 Rev.) tit. 21, § 5 ("[t]he supreme court of errors [is] hereby empowered to institute such rules of practice, for the regulation of said court, and of the superior courts, in the several counties, as shall be deemed most conducive to the administration of justice"); see also Public Acts 1847, c. 2, § 1 (providing that Supreme Court of Errors shall "revise the rules of practice" as it "deem[s] necessary"). This legislative recognition of the division of authority between the Supreme Court of Errors and the Superior Court with respect to rules of practice, so soon after the constitution was adopted, is strong, if not conclusive, evidence that the former, and not the latter, always retained ultimate authority over those rules. In light of the foregoing provisions, and in the absence of any countervailing historical basis for limiting the inherent power that this court possesses as the state's highest court, I see no persuasive reason for concluding that that authority is subordinate to the authority of the judges of the Superior Court. Although the present case does not necessarily require this court to decide whether the Supreme Court or the Superior Court possesses ultimate authority over the rules of practice, I address the issue because it is so closely related to the issue of whether the Supreme Court or the Superior Court ultimately is responsible for determining the law of evidence in this state.

[12] The dissenting justice states that, "[s]adly, the result in this case may motivate the legislature to follow through on previously contemplated action to bring the rules of evidence under the supervision of that body . . . ." The dissenting justice provides no explanation for this concern, and I know of none. In accordance with the preference of the legislature, the judicial branch itself has promulgated an evidence code that is subject to regular review and revision. See Foreword to Connecticut Code of Evidence (2000) p. iii. The legislature having deferred to the judicial branch with respect to this endeavor, I cannot imagine why the legislature now would see fit to reverse course. In any event, the decision of this court in the present case

(2008) (*Zarella, J.*, dissenting). I also agree with the majority's conclusions in part II with respect to this court's authority to change or modify the law of evidence and the admissibility of uncharged misconduct evidence in sexual assault cases. I write separately for two reasons.

First, I maintain my position that the direction that this court has taken recently with respect to our law of kidnapping is not supported by the clear statutory language defining that crime and other restraint-based offenses. See *State* v. *Salamon*, 287 Conn. 509, 576, 949 A.2d 1092 (2008) (*Zarella, J.*, concurring in part and dissenting in part). Therefore, I would remand the case for a new trial so that the jury may be instructed properly on the crime of kidnapping in accordance with the conclusions articulated in my concurring and dissenting opinion in *Salamon*. I remain optimistic that the legislature will take action to resolve the numerous questions created by this court's recent kidnapping jurisprudence.

Second, with respect to the analysis in part II of the majority opinion, which resolves the question that we certified as to whether this court or any court has authority to change or modify a rule of evidence in the Connecticut Code of Evidence (code), I see no reason to interpret the language of the code to resolve this particular issue. Rather, I conclude that the authority of this court to review evidentiary rulings by the Superior Court existed at common law and was incorporated into the 1818 constitution. Furthermore, I suggest that the majority's resolution of this question places too much emphasis on determining the intent of the Superior Court judges, thereby indicating that possession of such an intent could be dispositive of our inquiry. This emphasis, coupled with the majority's repeated reference to this court's "inherent" and "constitutional" authority, creates unnecessary ambiguity as to the

cannot rest on the unsubstantiated concern that the legislature nevertheless may elect to do so.

actual scope of the Superior Court's authority over the law of evidence.

The majority devotes significant attention to determining whether the language expressing the purpose of the code is clear and unambiguous and to the question of "whether the judges of the Superior Court *intended* to abrogate the authority of the appellate courts to develop and change the law of evidence via case-by-case common-law adjudication . . . ." (Emphasis added.) After recounting the history of the adoption of the code and its purpose, the majority observes that that "history does not support the conclusion . . . that the code was intended to divest *this court* of its inherent authority to change and develop the law of evidence through case-by-case common-law adjudication." (Emphasis in original.) I suggest that this analysis unnecessarily clouds a simple fact. Regardless of the intent of the Superior Court judges, I conclude, like Justice Palmer, that the judges of the Superior Court do not possess authority under our constitution to divest this court of its inherent authority to change and develop the law of evidence. See p. 485 of Justice Palmer's concurring opinion ("the ultimate authority to determine the law of evidence has resided in this court since its inception, and no persuasive reason has been proffered to support the contention that the judges of the Superior Court have the power to assert that authority for themselves").

It is unnecessary for me to repeat the historical underpinnings of my conclusion because they are well documented in the majority opinion. The majority accurately observes that, "[u]nder the common law of this state prior to 1818, as under the common law of England, the ultimate authority over the rules and standards governing the admissibility of evidence rested with the highest court of the state." After accurately noting that "this court had final and binding authority over the

law of evidence prior to 1818, and [noting that this] common-law authority of the Supreme Court and the Superior Court was codified in article fifth, § 1, of the constitution of 1818," the majority stops short of concluding that the judges of the Superior Court have no authority under our constitution to alter this relationship. Rather, the majority simply asserts that it "question[s] whether the judges of the Superior Court have the constitutional authority to adopt a code of evidence that is inconsistent with the legal principles promulgated by this court, or to divest this court of its power to develop and change the law of evidence via case-by-case adjudication." I am puzzled by the majority's failure to declare that the lack of constitutional authority is clear. On the one hand, the majority expresses its opinion that the Superior Court's authority is questionable but, on the other hand, asserts that, "under article fifth, § 1, of the state constitution, it is the province of this court, *rather than the Superior Court*, ultimately to determine what the correct view of the law is." (Emphasis added.) Footnote 27 of the majority opinion. Such vacillation, in my opinion, creates unnecessary confusion as to the division of authority within the judicial branch under the state constitution.

Additionally, I depart from the views of Justices Katz and Palmer that the code properly can be analogized to our rules of practice. Justice Palmer, in his concurring opinion, suggests that he would conclude that this court has ultimate authority over the rules of practice as well as evidence law by virtue of its inherent supervisory powers. See p. 487 of Justice Palmer's concurring opinion (likening code of evidence to rules of practice and asserting that this court is final arbiter of disputes over provisions in code and rules of practice). Likewise, Justice Katz, in her dissenting opinion, states that there is "no principled rationale" for treating the rules of practice and the code of evidence differently. Further-

more, Justice Katz insists that "[t]he judges of the Superior Court . . . adopted the code in the exercise of their heretofore unquestioned rule-making authority in matters of procedure." These positions are clearly in conflict with one another, however, as both are premised on a failure to recognize the different evolution of the rules of practice and evidentiary law.

My research, as well as that conducted by the majority, reveals that the genesis of the rules of practice differs from the development of our evidentiary law over time and that the authority of the Superior Court with respect to each is separate and distinct. The majority correctly observes that, "[u]nlike evidentiary law, over which this court has exercised final and binding adjudicative authority *since its inception* more than 200 years ago . . . prior to 1818, the judges of the Superior Court had the authority to adopt rules governing pleading, practice and procedure . . . ."

Significantly, in 1807, the General Assembly passed a law that was codified in 1808 and that provided: "And be it further enacted, That the judges of the superior court, *when constituting a supreme court of errors, or met for any purpose,* be, and they hereby are empowered, to institute such rules of practice for the regulation of the said court of errors, and of the superior court in the respective circuits, as shall be deemed most conducive to the administration of justice." (Emphasis added.) General Statutes (1808 Rev.) tit. 42, c. 15, § 2 (1808 statute). The 1808 statute remained in effect through 1818, and the adoption of our state constitution. In contrast to this delegation of rule-making authority by the General Assembly in 1807, no similar statutory history exists regarding evidentiary law. Rather, from the time of the Connecticut colony's adoption of the common law of England until 2000, when the code first was adopted, our evidence law was consistently a product of common-law adjudication subject to the appellate

authority initially of the General Assembly and, since 1784, of the Supreme Court of Errors and the Supreme Court. By treating our laws of evidence as akin to rules of practice, my colleagues fail to credit these historically significant differences in the origins of each body of rules, as well as the importance of these differences in determining the judicial body with ultimate authority.

A side effect of this appears to be Justice Palmer's conclusion that this court has authority to change, modify or enact a rule of practice, a conclusion that I suggest is premature in light of the language of the 1808 statute and the fact that the present case does not present a challenge to this court's authority over the rules of practice. Unlike the clear constitutional authority of this court to be the final and binding arbiter over evidence law, the 1808 statute presents an ambiguity as to what court possesses the final authority over the rules of practice. At a minimum, the 1808 statute makes it clear that the authority to enact rules of practice was vested in the judges of the Superior Court serving in some capacity, and, ultimately, this authority was incorporated into the state constitution in 1818.

I suggest, however, that the 1808 statute does not unambiguously resolve a dispute that could arise with respect to whether the judges of the Superior Court or the Supreme Court have final authority over the rules of practice applicable to trial courts. At the time that the 1808 statute was passed, and after the constitution was adopted in 1818, the judges of the Superior Court sat not only as trial judges but also as the judges of the Supreme Court of Errors. Therefore, the rules promulgated by the Superior Court pursuant to the 1808 statute could have been promulgated in their capacity as trial judges or in their capacity as appellate judges. See *Kinsella* v. *Jaekle*, 192 Conn. 704, 716, 475 A.2d 243 (1984) (1806 act "mandated that only judges of the Superior Court would . . . serve on the Supreme Court

of Errors"). Also, the reference in the 1808 statute to "or met for any purpose" could be construed broadly to encompass the authority of the Superior Court judges to promulgate rules of practice generally, regardless of whether they were sitting as judges of the Supreme Court of Errors. Although I admit these questions as to our history are fascinating, I reiterate that resolution of the ambiguities they present is for another day.

KATZ, J., dissenting. The Connecticut Code of Evidence (code) is a judicial codification of general rules of prospective application. These rules are the functional equivalent of laws. The judges of the Superior Court, a title that the justices of this court and the judges of the Appellate Court also hold, adopted the code in the exercise of their heretofore unquestioned rule-making authority in matters of procedure. Nonetheless, the majority[1] concludes that, "despite the adoption of the code by the judges of the Superior Court, the appellate courts of this state retain the authority to develop and *change* the rules of evidence through case-by-case common-law adjudication." (Emphasis added.) In one fell swoop, the majority has eviscerated the force of the code and crowned itself the "evidentiary monarch"; C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 1.3.2, p. 19; entitled to make changes to the code at will. In my view, it is the exclusive purview of the evidence code oversight committee, the rules committee of the Superior Court, and ultimately the judges of the Superior Court to make changes to the code.[2]

---

[1] Although part II of Chief Justice Rogers' opinion addressing the effect of the code garnered only a plurality of this court, I refer to her plurality opinion on that issue as the majority for the sake of consistency throughout this dissenting opinion.

[2] Although I conclude that this court lacks the authority to overrule our case law setting forth a more liberal standard for the admission of prior bad acts in sex crime cases once that case law was codified into the code, I reiterate my view that we should not have adopted this rule in the first instance. See *State* v. *Merriam*, 264 Conn. 617, 679–88, 835 A.2d 895 (2003) (*Katz, J.*, dissenting); *State* v. *Kulmac*, 230 Conn. 43, 79–88, 644 A.2d 887

I also disagree with the majority's conclusion that this case should be remanded for a new trial on the kidnapping charge and that *State* v. *Sanseverino*, 287 Conn. 608, 949 A.2d 1156 (2008), should be overruled to achieve the majority's intended outcome. In so concluding, the majority has failed to apply the analytical framework in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), which dictates directing a judgment of acquittal on the kidnapping charge for the defendant, Carlos DeJesus, in light of the evidence presented to the jury in this case. Accordingly, I respectfully dissent.

I

The majority posits four reasons why this court is not constrained in its ability to overrule or modify a rule of evidence despite the fact that the judges of the Superior Court have codified that rule into the code: (1) "Although it is clear [from the stated purpose of the code under § 1.2 (a)] that the judges of the Superior Court intended the law of evidence to grow and develop in the future through 'interpretation of the [c]ode' and through 'judicial rule making,' the meaning of these two terms . . . is unclear"; (2) the history of the code only "reflects that [it] was intended to provide the bench and the bar with a concise and authoritative restatement of the state's common law and identified statutory rules of evidence"; (3) there is no express evidence in the text of the code or its history to "support the conclusion . . . that the code was intended to divest this court of its inherent authority to change and develop the law of

(1994) (*Katz, J.*, dissenting). Moreover, I find it troubling that the majority essentially has rationalized maintaining a rule permitting admission of prior sex crimes evidence on the basis of facts particular to pedophiles. It is little comfort that this court finally has abandoned the legal fiction that this evidence is not being used for propensity purposes. See *State* v. *Merriam*, supra, 682–83 (*Katz, J.*, dissenting) (criticizing liberal admission of prior sex crimes evidence under guise of common scheme when evidence was in actuality being used as propensity evidence); *State* v. *Kulmac*, supra, 83 (*Katz, J.*, dissenting) (same).

evidence through case-by-case common-law adjudication"; and (4) the majority's construction "is consistent with our duty to interpret statutes in a manner that avoids placing them in constitutional jeopardy . . . because it is questionable whether the judges of the Superior Court have the authority under article fifth, § 1, of the state constitution to codify a code of evidence that strips the appellate courts of their common-law adjudicative function." (Citations omitted.) In my view, these reasons are unsupported and untenable.

The issue of whether this court has authority to overrule or modify a rule it had prescribed in an adjudication after the judges of the Superior Court subsequently have adopted that rule as part of the code was addressed extensively in Justice Borden's concurring and dissenting opinion in *State* v. *Sawyer*, 279 Conn. 331, 374, 904 A.2d 101 (2006).[3] Therefore, I need not set forth at great length the history, rationale, scope and method of adoption of the code, as those subjects have been well documented. See generally D. Borden, "The New Code of Evidence: A (Very) Brief Introduction and Overview," 73 Conn. B.J. 210 (1999). Suffice it to say that, what began as a cooperative effort among the judiciary, the legislature and the bar, under the aegis of the law

---

[3] I also made the following observations with respect to that issue in my concurring opinion in *State* v. *Sawyer*, supra, 279 Conn. 363–64: "The majority appears to recognize that, since the adoption of the [c]ode, the authority to change these rules lies solely with the judges of the Superior Court in the exercise of their judicial rule-making function. Nonetheless, the majority questions, but leaves to another day, whether, to the extent that evidentiary rules may 'implicate substantive rights,' those rules properly may be the subject of such judicial rule making, as opposed to common-law adjudication. In my view, for the reasons that follow, the answer to this question is clear and straightforward and we should not suggest otherwise to the trial judges who are charged with the daily application of the [c]ode. The [c]ode governs where it speaks, and the courts' common-law rule-making authority governs either where the [c]ode does not speak or where the [c]ode requires interpretation. See Conn. Code Evid. § 1-2." See footnote 11 of this dissenting opinion and the related text for discussion of the majority opinion in *Sawyer*.

revision commission and initially contemplated as a legislative enactment to be followed by a joint judicial and legislative oversight committee; see id., 210–11; ultimately became, at the urging of legislative leaders, *a set of judicial rules of court,* adopted *pursuant to the rule-making authority of the judges,* in order to insulate subsequent changes from the political arena. Id., 211. In other words, rather than adopting the code itself, as a set of statutes much like the Penal Code; see General Statutes, tit. 53a; the legislative committee charged with oversight of this subject, in accordance with General Statutes § 51-14,[4] submitted the code to

[4] General Statutes (Sup. 2008) § 51-14 provides: "(a) The judges of the Supreme Court, the judges of the Appellate Court, and the judges of the Superior Court shall adopt and promulgate and may from time to time modify or repeal rules and forms regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules, for the purpose of simplifying proceedings in the courts and of promoting the speedy and efficient determination of litigation upon its merits. The rules of the Appellate Court shall be as consistent as feasible with the rules of the Supreme Court to promote uniformity in the procedure for the taking of appeals and may dispense, so far as justice to the parties will permit while affording a fair review, with the necessity of printing of records and briefs. Such rules shall not abridge, enlarge or modify any substantive right or the jurisdiction of any of the courts. Subject to the provisions of subsection (b) of this section, such rules shall become effective on such date as the judges specify but not in any event until sixty days after such promulgation.

"(b) All statutes relating to pleading, practice and procedure in existence on July 1, 1957, shall be deemed to be rules of court and shall remain in effect as such only until modified, superseded or suspended by rules adopted and promulgated by the judges of the Supreme Court or the Superior Court pursuant to the provisions of this section. The Chief Justice shall report any such rules to the General Assembly for study at the beginning of each regular session. Such rules shall be referred by the speaker of the House or by the president of the Senate to the judiciary committee for its consideration and such committee shall schedule hearings thereon. Any rule or any part thereof disapproved by the General Assembly by resolution shall be void and of no effect and a copy of such resolution shall thereafter be published once in the Connecticut Law Journal.

"(c) The judges or a committee of their number shall hold public hearings, of which reasonable notice shall be given in the Connecticut Law Journal and otherwise as they deem proper, upon any proposed new rule or any change in an existing rule that is to come before said judges for action, and

former Chief Justice Callahan, as head of the judicial branch, for consideration and adoption. In accordance with that request, Chief Justice Callahan appointed a committee to consider and revise the proposed code and commentary for adoption by the judges of the Superior Court. The decision to adopt our case law, without modification, was determined to be the best course of action as a matter of expediency, not as a matter of deference. See C. Tait & E. Prescott, supra, § 1.2.2, p. 7.

It is undisputed that the code was intended to codify, and thus embody, the law of evidence in our state as it existed in our case law at the time of the adoption of the code. The purposes of the code, as set forth in § 1-2 (a), are "to adopt Connecticut case law regarding rules of evidence as rules of court and to promote the growth and development of the law of evidence through interpretation of the [c]ode and through judicial rule making to the end that the truth may be ascertained and proceedings justly determined." With respect to the first of the two purposes, the commentary explains that the intent "was to place common-law rules of evidence and certain identified statutory rules of evidence into a readily accessible body of rules to which the legal profession conveniently may refer." Conn. Code Evid. § 1-2 (a), commentary.

---

each such proposed new rule or change in an existing rule shall be published in the Connecticut Law Journal as a part of such notice. A public hearing shall be held at least once a year, of which reasonable notice shall likewise be given, at which any member of the bar or layman may bring to the attention of the judges any new rule or change in an existing rule that he deems desirable.

"(d) Upon the taking effect of such rules adopted and promulgated by the judges of the Supreme Court pursuant to the provisions of this section, all provisions of rules theretofore promulgated by the judges of the Superior Court shall be deemed to be repealed."

I note that minor technical changes, not relevant to this appeal, were made to § 51-14 subsequent to the time the legislative committee submitted the code for consideration and adoption. For purposes of convenience, however, I refer to the present revision of the statute.

It is significant that the compilation of rules was not designated a *handbook* of evidence, which would have accomplished this general purpose but not constitute binding law. Indeed, there was no need for a nonbinding compilation of the rules of evidence, as there already was such a source then available to the bar, which was updated regularly to reflect changes to the case law and on which our courts frequently relied at the time the process for adoption of the code was initiated.[5] See C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988), preface, p. xxxv ("[t]he purpose of this [h]andbook is to reduce this substantial body of material [found in common case law, statutes and constitutional provisions] to a concise statement of the law in a form readily accessible to judges, lawyers and students"). Thus, for the judges of the Superior Court merely to have intended to reduce the substantial body of material to something that was handy to use, but had no binding effect, the six years spent by the two drafting committees (one instituted by the legislature

---

[5] See, e.g., *State* v. *Rinaldi,* 220 Conn. 345, 359, 599 A.2d 1 (1991) (citing to C. Tait & J. LaPlante, Handbook of Connecticut Evidence [2d Ed. 1988]); *State* v. *Jeffrey,* 220 Conn. 698, 710, 601 A.2d 993 (1991) (same), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); *State* v. *Famiglietti,* 219 Conn. 605, 612, 595 A.2d 306 (1991) (same); *Dunham* v. *Dunham,* 217 Conn. 24, 32–33, 584 A.2d 445 (1991) (same); *State* v. *Alvarez,* 216 Conn. 301, 310–11, 579 A.2d 515 (1990) (same); *State* v. *Robinson,* 213 Conn. 243, 258, 567 A.2d 1173 (1989) (same), overruled on other grounds by *State* v. *Colon,* 257 Conn. 587, 778 A.2d 875 (2001); *State* v. *James,* 211 Conn. 555, 571–72, 560 A.2d 426 (1989) (same); *State* v. *Brown,* 22 Conn. App. 521, 523, 577 A.2d 1120, cert. denied, 216 Conn. 825, 582 A.2d 204 (1990) (same); *Streicher* v. *Resch,* 20 Conn. App. 714, 717, 570 A.2d 230 (1990) (same); *State* v. *Person,* 20 Conn. App. 115, 124, 564 A.2d 626 (1989) (same), aff'd, 215 Conn. 653, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991); *Schultz* v. *Barker,* 15 Conn. App. 696, 702, 546 A.2d 324 (1988) (same); *Zadroga* v. *Commissioner of Motor Vehicles,* 42 Conn. Sup. 1, 8, 597 A.2d 848 (1991) (same); *Blue Cross & Blue Shield of Connecticut, Inc.* v. *DiMartino,* Superior Court, judicial district of New Haven, Docket No. 300642 (July 2, 1991) (same); *Security Connecticut Life Ins. Co.* v. *Bajorski,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 387879 (June 26, 1991) (6 C.S.C.R. 682) (same).

and the other instituted by the judicial branch at the legislature's behest) would have been a waste of time and resources.[6]

Rather, there was a need for an authoritative, binding statement of rules. Thus, a "code" of evidence was created, analogous to the Federal Rules of Evidence. See Conn. Code Evid. § 1-2 (a), commentary.[7] A code, however, unlike a handbook, "is the functional equivalent of legislation, namely, a set of generalized rules of prospective application not arising out of a particular case or controversy to be determined under the court's adjudicatory powers." C. Tait & E. Prescott, supra, § 1.2.2, p. 13; see, e.g., Code of Judicial Conduct; Uniform Commercial Code, General Statutes, tit. 42a; State Building Code, General Statutes § 29-252; Fire Safety Code, General Statutes § 29-292; Public Health Code, General Statutes § 19a-36. Indeed, the codification of certain statutory rules of evidence along side the common-law rules; see Conn. Code Evid. § 1-2 (a), commentary; evidences this intended effect.

---

[6] In that same regard, the formal process undertaken for the code's adoption, wherein the proposed code was submitted for approval to the rules committee of the judges of the Superior Court, subjected to a public hearing and thereafter submitted to a vote by judges of the Superior Court; see C. Tait & E. Prescott, supra, § 1.1.4; would seem entirely unnecessary if the intent was to create nothing more than a nonbinding restatement of the law in the form of a handbook.

[7] "Although the [c]ode follows the general format and sometimes the language of the Federal Rules of Evidence, the [c]ode does not adopt the Federal Rules of Evidence or cases interpreting those rules. Cf. *State* v. [*Vilalastra*], 207 Conn. 35, 39–40, 540 A.2d 42 (1988) (Federal Rules of Evidence influential in shaping Connecticut evidentiary rules, but not binding).

"Unlike the Federal Rules of Evidence, which govern both the admissibility of evidence at trial and issues concerning the court's role in administering and controlling the trial process, the [c]ode was developed with the intention that it would address issues concerning the admissibility of evidence and competency of witnesses, leaving trial management issues to common law, the Practice Book and the discretion of the court." Conn. Code Evid. § 1-2 (a), commentary.

The language of § 1-2 (a), therefore, makes clear that (1) the code adopted the existing case law *as rules of court,* and (2) the two methods of growth and development in the law of evidence were to be through interpretation of the code and judicial rule making. See id. ("[b]ecause the [c]ode was intended to maintain the status quo, i.e., preserve the common-law rules of evidence as they existed prior to adoption of the [c]ode, its adoption is not intended to modify any prior common-law interpretation of those rules"); id. ("[c]ase-by-case adjudication is integral to the growth and development of evidentiary law and, thus, future definition of the [c]ode will be effected primarily through interpretation of the [c]ode and through judicial rule making").

The first identified method of growth—interpretation—readily can be understood in accordance with its commonly understood meaning as applied in scores of cases. " '[I]nterpret' " is defined as "[t]o construe; to seek out the meaning of language"; Black's Law Dictionary (6th Ed. 1990); " 'interpretation' " is defined as "[t]he art or process of discovering and ascertaining the meaning of a statute, will, contract, or other written document . . . ." Id. When a court interprets, it cannot change the inherent meaning of words or supply additional terms to change the meaning of the provision at issue. See *Testa* v. *Geressy,* 286 Conn. 291, 308, 943 A.2d 1075 (2008) ("[t]he process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case" [internal quotation marks omitted]); *Lucarelli* v. *State,* 16 Conn. App. 65, 70, 546 A.2d 940 (1988) ("[c]ourts must interpret statutes as they are written . . . and cannot, by judicial construction, read into them provisions which are not clearly stated" [citations omitted]). Thus, the code recognizes that the law of evidence will grow by way of construction of ambiguities and gaps in the

rules. Case-by-case adjudication necessarily is one means by which that interpretation may occur.

The second method of growth identified under § 1-2 (a) is by way of "judicial rule making." Rule making is a term generally associated with the exercise of a legislative type function, typically a process whereby a body prescribes a general rule of prospective effect unconnected to a particular party or matter.[8] See *Petrowski* v. *Norwich Free Academy*, 2 Conn. App. 551, 556–57, 481 A.2d 1096 (1984) ("[it is particularly important to note that [the case discussed] did not involve a public body acting in a quasi-judicial capacity, but, rather, one in a legislative or rulemaking capacity since the procedure or formula used by the authority applied equally to all those to be assessed"), rev'd on other grounds, 199 Conn. 231, 506 A.2d 139 (1986). "*Judicial* rule making" consistently has been used by our courts to describe the legislative type function exercised by the judicial branch when it adopts rules of practice and procedure. See, e.g., *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 286, 914 A.2d 996 (2007) (citing case that discusses Practice Book provision and noting that "subject matter jurisdic-

---

[8] See, e.g., General Statutes § 22-203aa (addressing rule-making authority of Northeast Interstate Dairy Compact Commission); General Statutes § 46b-151h (addressing rule-making authority of Interstate Commission for Juveniles); General Statutes § 51-81c (addressing rule-making authority of judges of the Superior Court for use of interest earned on attorneys' clients' funds accounts); General Statutes § 54-133 (addressing rule-making authority of Interstate Commission for Adult Offender Supervision); see also *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 432, 815 A.2d 94 (2003) ("[w]e previously have not determined whether a commissioner's policy directive, which contains an interpretation not adopted pursuant to formal rule-making or adjudicatory procedures, is entitled to deference"); *Furhman* v. *Dept. of Transportation*, 33 Conn. App. 775, 782 n.6, 638 A.2d 1091 (1994) (addressing "rule-making provisions of the Uniform Administrative Procedure Act" under General Statutes § 4-168); *Vincenzo* v. *Warden*, 26 Conn. App. 132, 143–44, 599 A.2d 31 (1991) (discussing parole board's failure to adhere to rule-making procedures).

tion is, with certain constitutional exceptions . . . a matter of statute, not judicial rule making"); *State* v. *Sawyer*, supra, 279 Conn. 331–32 n.1 ("[W]e acknowledge that, since 2000, the year in which the [code] was adopted, the authority to change the rules of evidence lies with the judges of the Superior Court in the discharge of their rule-making function. . . . To the extent that our evidentiary rules may be deemed to implicate substantive rights, we believe that it is unclear whether those rules properly are the subject of judicial rule making rather than the subject of common-law adjudication."); *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 577 n.20, 715 A.2d 46 (1998) (stating when discussing effect of rules of practice that "[w]e have indicated that subject matter jurisdiction is, with certain constitutional exceptions not applicable here, a matter of statute, not judicial rule making"); *Pamela B.* v. *Ment*, 244 Conn. 296, 307, 327, 709 A.2d 1089 (1998) (stating in response to defendants' claim that relief sought by plaintiff from defendant chief court administrator "would supersede the rule-making power of the judges of the Superior Court" that "we are unconvinced that the plaintiff's first claim for relief necessarily would result in or be tantamount to an impermissible encroaching by [the defendant chief court administrator] upon judicial rule-making authority"); *State* v. *Murray*, 225 Conn. 355, 356, 623 A.2d 60 ("[t]he issue in this appeal is whether Practice Book § 986 [4] is a valid exercise of the judicial rule-making authority, or whether, as the trial court held, § 986 [4] is unconstitutional because it violates the separation of powers between the legislative and judicial branches"), cert. denied, 510 U.S. 821, 114 S. Ct. 78, 126 L. Ed. 2d 46 (1993); *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 242–43, 472 A.2d 9 (1984) (stating when considering whether rules committee was subject to Freedom of Information

Act that, "[i]n determining the proper scope of judicial rule-making, three classes of concerns may be identified: concerns that go to substantive rules, concerns that go to procedural rules, and concerns that go to administrative rules"); *State* v. *Clemente*, 166 Conn. 501, 532, 353 A.2d 723 (1974) ("[t]he history of legislative authorization for judicial rule-making, the legislature's authority to make procedural rules and its relation to the court's inherent rule-making ability were discussed in *In re Appeal of Dattilo*, 136 Conn. 488, 492, 494, 72 A.2d 50 [1950], in which it was indicated that the statute in question was within both the legislative power and the court's inherent rule-making ability"); *Burton* v. *Planning Commission*, 13 Conn. App. 400, 405, 536 A.2d 995 (1988) ("We do not read the language, '[a]t the hearing,' in General Statutes § 8-28 [b] to mean that the Practice Book rules providing for such a hearing must be ignored. Indeed, were we to do so we would be required to confront a constitutional question of the separation of powers between the legislature and the judiciary because of the possibility of a 'legislative intrusion on the judicial rule-making function.' "), aff'd, 209 Conn. 609, 553 A.2d 161 (1989); see also *Norwalk Street Ry. Co.'s Appeal*, 69 Conn. 576, 595, 37 A. 1080 (1897) ("means of a legislative nature must be used by courts in establishing necessary rules of practice").

The authority reserved to the courts in their adjudicative capacity as a result of the conferral of rule-making authority on the judges of the Superior Court expressly is addressed in the saving clause set forth in § 1-2 (b) of the code. Because, "[w]ith codification, the courts are, in general, confined to interpreting and applying the [c]ode, and changes require action by the codifying entity, in this case, the Judges of the Superior Court"; *State* v. *Sawyer*, supra, 279 Conn. 374 (*Borden, J.*, concurring and dissenting); this provision was added to the code to temper this necessary loss of flexibility that

previously was part of the common-law process. Id. The saving clause expressly and unambiguously provides: *"Where the [c]ode does not prescribe a rule* governing the admissibility of evidence, the court shall be governed by the principles of the common law as they may be interpreted in the light of reason and experience, except as otherwise required by the constitution of the United States, the constitution of this state, the General Statutes or the Practice Book. The provisions of the [c]ode shall not be construed as precluding *any* court from recognizing other evidentiary rules *not inconsistent* with such provisions." (Emphasis added.) Conn. Code Evid. § 1-2 (b). As was explained by the chair of the drafting committee when the code first was introduced: "This provision is patterned after the analogous provision of the Penal Code. See . . . General Statutes § 53a-4.[9] It will provide some degree of flexibility and common law creativity on the part of a court that is confronted with an evidentiary question *that is not covered, either explicitly or implicitly, by the [c]ode.*" (Emphasis added.) D. Borden, supra, p. 215. "Thus, this section of the [c]ode provides the courts with our full panoply of traditional powers in interpreting the [c]ode and our full common-law powers in fashioning new rules of evidence for instances that are *not covered by the* [c]ode either explicitly or implicitly." (Emphasis added.) *State* v. *Sawyer*, supra, 374 *(Borden, J.,* concurring and dissenting). As seems abundantly clear from the express language of § 1-2 (b), where the code *does*

[9] General Statutes § 53a-4 provides: "The provisions of this chapter shall not be construed as precluding any court from recognizing other principles of criminal liability or other defenses not inconsistent with such provisions." See also Commission to Revise the Criminal Statutes, Penal Code Comments, Conn. Gen. Stat. Ann. (West 2007) § 53a-4, comments, p. 324 ("The purpose of this saving clause is to make clear that the provisions of [General Statutes §§] 53a-5 to 53a-23, which define the principles of criminal liability and defenses, are not necessarily exclusive. A court is not precluded by [§§] 53a-5 to 53a-23 from recognizing other such principles and defenses not inconsistent therewith.").

cover a rule of evidence, the courts cannot overrule or modify that rule, as such an action would be inconsistent with the code provision, unless some statutory or constitutional conflict arises. Indeed, this court previously has acknowledged that it cannot construe the code to effectuate a substantive change to the common-law rules codified therein. See *State* v. *Whitford*, 260 Conn. 610, 639–40, 799 A.2d 1034 (2002) (The court stated, when rejecting the defendant's interpretation of a code provision that was not in accordance with the common-law rule adopted as a rule of court: "In propounding his argument regarding § 4-5 (c) of the code [addressing character evidence], the defendant ignores that portion of § 1-2 of the code and its commentary, previously cited, which indicates that the code was intended only to codify the common law. If, as the defendant suggests, we were to read § 4-5 (c) as permitting introduction of evidence regarding a victim's specific violent acts, we would be interpreting the code in a manner that would effectuate a substantive change in the law. Because such a result would be contrary to the express intention of the code's drafters, we reject it.").

It is also significant that, in order to execute effectively the judicial rule-making power, the judges of the Superior Court, when adopting the code, created an evidence code oversight committee. The stated purpose of that committee is " 'to monitor the operations of the [code] as it is implemented in practice, and to make periodic recommendations for revision and clarification to the [r]ules [c]ommittee of the Superior Court.' " D. Borden, supra, p. 216. In so doing, the judges decided to treat the code as a component to, and a corollary of, the rules of practice, as proposed rules of evidence cannot be submitted for adoption by the judges of the Superior Court unless they are approved by the rules committee that oversees the rules of practice.

It is well understood that, pursuant to the legislative delegation of authority under § 51-14 (a); see footnote 4 of this dissenting opinion; the judges of the Superior Court are "empowered to adopt and promulgate rules regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules, for the purpose of simplifying proceedings in the courts and of promoting the speedy and efficient determination of litigation upon its merits." (Internal quotation marks omitted.) *Steadwell* v. *Warden*, 186 Conn. 153, 162, 439 A.2d 1078 (1982). This court previously has "recognize[d] that the rules of practice and the codes adopted by the judges of the Superior Court have the force of law." *Mozzochi* v. *Beck*, 204 Conn. 490, 501 n.7, 529 A.2d 171 (1987); accord *Noble* v. *Marshall*, 23 Conn. App. 227, 231, 579 A.2d 594 (1990) ("[t]he rules that have been adopted by the judges of the Superior Court have the force of law"); see also *State* v. *McCahill*, 265 Conn. 437, 446, 828 A.2d 1235 (2003) ("our rules of statutory construction apply with equal force to interpretations of the rules of practice"); *State* v. *Strickland*, 42 Conn. App. 768, 780 n.8, 682 A.2d 521 (1996) ("[t]he rules of practice are designed to regulate pleading, practice and procedure; see General Statutes § 51-14 [a]; and are to be construed in accordance with our rules of statutory construction"), rev'd on other grounds, 243 Conn. 339, 703 A.2d 109 (1997). Certainly, it could not be suggested that, other than interpreting statutes or striking them as unconstitutional, this court could amend or disregard a statute. Accordingly, this court has recognized that the appellate courts are not free to amend, disregard or overrule rules of practice "because that authority is vested in the judges of the Superior Court. See General Statutes § 51-14 (a); cf. *Kupstis* v. *Michaud*, 215 Conn. 435, 437, 576 A.2d 152 (1990) (observing that '[t]he problem illuminated by [the] litigation [in that case] call[ed]

for a change in the rules of practice that this court [could not] enact')." *Weinstein* v. *Weinstein*, 275 Conn. 671, 736, 882 A.2d 53 (2005) (*Zarella, J.*, dissenting); accord *Oakley* v. *Commission on Human Rights & Opportunities*, 237 Conn. 28, 30, 675 A.2d 851 (1996) ("[d]espite [the] legitimacy [of the concern raised by the certified question], the concern is one that cannot be addressed through the process of appellate review but requires a change in the appropriate provisions either of the General Statutes or of the Practice Book"); *State* v. *Johnson*, 228 Conn. 59, 61–62, 634 A.2d 293 (1993) ("[a]lthough a clarifying amendment of the rules of practice to address the problem illuminated by this case might well be desirable, this court does not sit as the [r]ules [c]ommittee of the Superior Court"); *State* v. *Jennings*, 216 Conn. 647, 665 n.11, 583 A.2d 915 (1990) ("We do not sit to decide the utility or need for written instructions in the Connecticut courts. To the extent that the defendant seeks such a decision, his request is more properly directed to the [r]ules [c]ommittee of the Superior Court."). Thus, just as this court has recognized on numerous occasions that this court lacks authority to make changes to the rules of practice, there is no principled rationale for treating the code rules any differently.[10] The majority's attempt to distinguish the two by virtue of the fact that the rules of evidence "facilitate the court's core judicial truth-seeking function" is undermined by this court's previous recognition

---

[10] The process by which rules of practice are adopted is identical to the process for rules of evidence, except that the latter process commences in the evidence code oversight committee. See *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, supra, 192 Conn. 237 ("The [r]ules [c]ommittee is a body composed of judges of the Superior Court. Its function is to consider proposed changes in the rules of practice for the Superior Court, and to recommend amendments to the Practice Book, which may be adopted by vote of the Superior Court judges. Once proposed Practice Book amendments have been approved by the [r]ules [c]ommittee, they are published in the Connecticut Law Journal, and are subject to public comment before their adoption by the judges.").

that rules of practice are essential to that same function; see *State* v. *Robinson*, 230 Conn. 591, 598, 646 A.2d 118 (1994) (explaining in reference to then Practice Book § 876 [now § 42-36], that "[t]he right to have witnesses sequestered is an important right that facilitates the truth seeking and fact-finding functions of a trial"); *State* v. *Whitaker*, 202 Conn. 259, 266, 520 A.2d 1018 (1987) (recognizing in context of then Practice Book §§ 756 through 768 [now §§ 40-17 through 40-25], which address, inter alia, defenses of mental disease or defect and alibi, that "some degree of mutual discovery is essential to the truth-seeking process"); and there are numerous rules of practice that undoubtedly are essential to that function; see, e.g., Practice Book §§ 13-22 through 13-24 (use of admissions); Practice Book § 25-32 (mandatory disclosure in family matters); Practice Book § 13-31 (use of depositions at trial); Practice Book §§ 16-1 through 16-38 (setting forth, inter alia, rules governing matters that jury may consider and jury deliberations). Indeed, the opinion of the court in *State* v. *Sawyer*, supra, 279 Conn. 331 n.1, joined by every member of the majority in this case except Chief Justice Rogers, who had not yet been appointed to this court, expressly "acknowledge[d] that, since 2000, the year in which the [code] was adopted, the authority to change the rules of evidence lies with the judges of the Superior Court in the discharge of their rule-making function."[11]

---

[11] The majority in *Sawyer* questioned only whether the code constrains this court's ability to reconsider a "substantive" rule of evidence that this court had adopted in a case, but clearly conceded that such a constraint would operate if a rule was what it deemed "procedural." The majority's attempt in this case to distance itself from that acknowledgment by relegating it to dictum appears to be result oriented, given the fact that we had requested and received comprehensive supplemental briefs on this very issue and two justices on this court had written vigorous challenges to the majority opinion directed specifically at these statements. Thus, although the statement was dicta in the sense that it was not essential to the holding in that case, it is disingenuous to imply that the *Sawyer* majority's statement was made without deliberate reflection. Indeed, prior to *Sawyer*, two members of the majority in the present case had joined or written opinions stating that this court has no authority to change rules of practice, as such

See also *State* v. *Whitford*, supra, 260 Conn. 639–40 (rejecting interpretation that would make substantive change to code "[b]ecause such a result would be contrary to the express intention of the code's drafters").

From the foregoing textual analysis, I agree with Justice Borden that "the following conclusions could not be more clear. First, the [c]ode has adopted—codified—our law of evidence as it existed in our case law at the time of the [c]ode's adoption. Second, if a matter is covered by the [c]ode, this court cannot change the rule; that function is for the evidence code oversight committee, the rules committee of the Superior Court, and ultimately for the judges of the Superior Court. This court may, of course, as may any court, interpret the [c]ode, as applied to any set of facts in a given case."[12] *State* v. *Sawyer*, supra, 279 Conn. 375 (*Borden, J.*, concurring and dissenting). Additionally, when the code is silent, *in the context of their adjudicative function*, the courts have at their disposal our full common-

authority is vested exclusively in the judges of the Superior Court. See *Weinstein* v. *Weinstein*, supra, 275 Conn. 736 (*Zarella, J.*, dissenting); *Oakley* v. *Commission on Human Rights & Opportunities*, supra, 237 Conn. 30 (per curiam opinion that included *Norcott, J.*).

[12] The same conclusion was articulated by Professor Colin Tait of the University of Connecticut School of Law, who has served continuously as a member of the various committees responsible for the code, first as a member of the legislatively appointed drafting committee, then as a member of the committee formed by Chief Justice Callahan as head of the judicial branch to consider and review the proposed code, and finally as a member of the evidence oversight committee: "Development of evidentiary rules not contained in the [c]ode, viz. the common law, could be accomplished through judicial decisions, or by judicial rule-making. [Conn. Code Evid.] § 1-2 (a). If a judicial decision is subsequently codified in the [c]ode, the ensuing rule can be changed only by a change in [the] [c]ode itself by the rule-making process. Moreover, to promote the development of the law of evidence, the [c]ode can be amended to change the existing common law found in judicial decisions that are deemed archaic, obsolete, unwise, or not in accord with modern legal thinking or jurisprudence. To that end, the [c]ode could, by the rule-making process, effectively negate a Supreme Court decision that is deemed to impede the development of the law of evidence." C. Tait & E. Prescott, supra, § 1.3.1, p.17.

law powers in fashioning new rules of evidence. See, e.g., *Monti* v. *Wenkert*, 287 Conn. 101, 125–26, 947 A.2d 261 (2008) (setting forth rule regarding disclosure and admissibility of verdict contingent settlement agreements, but limiting use of such evidence to be consistent with § 4-8 [a] of code).

The majority's textual analysis dismisses as irrelevant the clear language in § 1-2 (b) that precludes "any court" from acting in its common-law adjudicative capacity to modify or overrule code provisions except when a conflict arises between a provision of the code and a provision of the state constitution, federal constitution, General Statutes or rules of practice. Their rationale for so doing, relegated to a footnote of their opinion, is nothing short of extraordinary. They posit that, because the commentary to the code provides that it governs "evidentiary issue[s] that might arise *during trial*"; (emphasis added) Conn. Code Evid. § 1-2 (b), commentary; the saving clause is, therefore, "applicable exclusively to the Superior Courts, rather than to the Appellate Court or to this court." See footnote 17 of the majority opinion. This reasoning begs the question—are not the only evidentiary issues that an appellate court examines ones that arise during a trial? Evidentiary rulings are made in the trial court in the first instance. Our appellate courts have no authority to render advisory opinions unconnected to a contested issue that has arisen in the course of a trial court proceeding. *Packer* v. *Board of Education*, 246 Conn. 89, 122–23, 717 A.2d 117 (1998) (*Berdon, J.*, concurring); see *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 263–64, 927 A.2d 811 (2007). Thus, the commentary's acknowledgment of the context in which evidentiary issues will arise in the first instance does not render the saving clause inapplicable to appellate courts. See Conn. Code Evid. § 1-2 (b) and commentary (referring, respectively, to "any court" and "courts" in plural).

After ignoring the clear mandate of § 1-2 (b) that clearly answers the question before us, the majority then concludes that the language in § 1-2 (a) designating "interpretation" and "judicial rule making" as the methods for further development of the law of evidence is at least ambiguous as to the question before us in light of two references in the commentary. Specifically, the majority concludes that, because the commentary provides that "[c]*ase-by-case adjudication* is integral to the growth and development of evidentiary law"; (emphasis added) Conn. Code Evid. § 1-2 (a), commentary; we should read the term "interpretation" broadly, presumably so broadly that it means to allow appellate courts to modify the code. The majority inexplicably rejects the common and universally applied meaning of interpretation, which would limit the court's authority to explaining or construing a provision in the code, to find an ambiguity where there is none.

The majority also reasons that, "[b]ecause the commentary to § 1-2 refers to evidentiary law developed via case-by-case common-law adjudication as 'rules of evidence,' it appears that the judges of the Superior Court intended the term 'judicial rule making' to include evidentiary law developed through case-by-case common-law adjudication." Although the commentary refers to "rules" of evidence developed through common-law adjudication, I am at a loss to imagine what else the commentary would or indeed *could* label such tenets. The generic term "rules" is not synonymous with the legal term of art "judicial rule making," which, as the cases previously cited indicate, is used to describe the legislative type function exercised by the judicial branch when making procedural rules.[13] Judicial rule

[13] Numerous courts have acknowledged that judicial rule making is essentially a legislative act. See, e.g., *Supreme Court of Virginia* v. *Consumers Union of the United States, Inc.*, 446 U.S. 719, 731, 734, 100 S. Ct. 1967, 64 L. Ed. 2d 641 (1980) (concluding that, when Virginia Supreme Court adopted state bar code, it was acting in rule making, not adjudicatory capacity, and therefore was acting in legislative capacity that entitled it to legislative

making involves a "formal procedural process with its attendant time constraints and expository limitations." C. Tait & E. Prescott, supra, § 1.6.2, p. 24. A single trial court judge can set forth a "rule" in a given case, but "[n]o single judge may usurp th[e] [rule-making] power from the entire judiciary. Orderly procedure and due process in the administration of justice requires the uniform application of the rules of practice properly adopted by the authorized body." *Park City Hospital* v. *Commission on Hospitals & Health Care*, 14 Conn. App. 413, 423, 542 A.2d 326 (1988) (*Bieluch, J.*, dissenting), aff'd, 210 Conn. 697, 556 A.2d 602 (1989). Indeed, "[i]f judges, acting in their adjudicatory capacity, were free to expand, contract, or otherwise alter the rules they promulgated in their own [Code of Judicial Conduct, it] would cease to function as a code, with a code's attendant attributes of completeness, ease of access, and authoritativeness." C. Tait & E. Prescott, supra, § 1.7.2, p. 27.

Therefore, the majority ignores both the well understood meaning of "interpretation" and "judicial rule making" as well as the *express* limitation that new rules of evidence through common-law adjudication only may be fashioned in instances that are *not covered by the code* either explicitly or implicitly; Conn. Code Evid. § 1-2 (b); to reach its conclusion that the code is silent on the court's ability to change the rules of evidence through case-by-case common-law adjudication. Buoyed by their manufactured ambiguities, the majority turns to the discussion at the judges' meeting at which

immunity); *Abick* v. *Michigan*, 803 F.2d 874, 877–78 (6th Cir. 1986) (holding that justices of Michigan Supreme Court "[act] in their legislative capacity" in promulgating court rules of practice and procedure); *State* v. *Cameron*, 113 P.3d 687, 694 (Alaska App. 2005) (characterizing Alaska Supreme Court's constitutional authority to adopt court rules as legislative function), rev'd on other grounds, 171 P.3d 1154 (Alaska 2007); *Pasqua* v. *Council*, 186 N.J. 127, 152, 892 A.2d 663 (2006) ("[t]he promulgation of a court rule is a legislative act").

the code was adopted for express evidence regarding the effect that adoption of the code would have upon this court's authority to change evidentiary law on a case-by-case basis. Although I acknowledge that the minutes of that meeting do not reflect the express statement in Justice Borden's presentation to that group that I am sure both he and I regret in hindsight, that silence is hardly dispositive.

First, it is well-known that, as chair of both the evidence code drafting committee and the rules committee of the Superior Court, Justice Borden sent a lengthly letter in advance of and thereafter spent many hours at a judges' association meeting explaining the code prior to his official presentation. Thus, his statements at the official meeting reasonably should be viewed as a summation, not a comprehensive discussion of all of the ramifications of adoption of the code. Second, and of greater significance, the majority improperly assumes that the judges of the Superior Court, many of whom had served on either the evidence code drafting committee or the rules committee had no understanding or appreciation of what it means to adopt a *code*, as opposed to a handbook; failed to understand the meaning of the saving clause setting forth the scope of the courts' authority with respect to the code; and had no knowledge of our case law recognizing similar constraints on the courts' authority with respect to the rules of practice. Because these facts are evident, however, I assume that, despite Justice Borden's failure to *spell it out* for them, the judges of the Superior Court were aware that they would have plenary power over both the rules of practice and the code, thus relieving the appellate courts of authority to change such rules. Indeed, had it not then been clear, one would have expected some response to Justice Borden's law review article, published prior to the effective date of the code, explaining that the saving clause of the code was modeled on the saving clause of the Penal Code; see footnote

9 of this dissenting opinion and accompanying text; the latter of which judges clearly understood to limit the appellate courts' authority to change common-law crimes or defenses previously set forth in case law and codified into the Penal Code. See *Valeriano* v. *Bronson*, 209 Conn. 75, 92–95, 546 A.2d 1380 (1988) (recognizing that, if court had adopted common-law "year and a day rule," rule was abrogated by Penal Code and saving clause of that code would preclude court from readopting that rule); see also *State* v. *Guess*, 244 Conn. 761, 778–79, 715 A.2d 643 (1998) (determining that rule being considered was not inconsistent with Penal Code and therefore court not barred from adopting rule under saving clause); *State* v. *Walton*, 227 Conn. 32, 44–45, 630 A.2d 990 (1993) (same).

I also question the majority's reliance on anecdotal evidence. The fact that any one trial judge, no matter how senior or well respected, did not appreciate the full import of his or her vote does not mean that the code is not what it expressly purports to be. Indeed, given that this court generally accords special weight to statements of intent by legislators who sponsor or draft a bill at issue; *Cotto* v. *United Technologies Corp.*, 251 Conn. 1, 9 n.6, 738 A.2d 623 (1999); *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 760 n.14, 601 A.2d 1005 (1992), aff'd, 226 Conn. 191, 627 A.2d 407 (1993); *State* v. *Guckian*, 27 Conn. App. 225, 237, 605 A.2d 874 (1992); one would think that the interpretations offered by Justice Borden, as chair of the committee charged with drafting the code, and by Professor Colin Tait, as one of the original members of the drafting committee; see footnote 12 of this dissenting opinion; would carry greater weight. Indeed, if anecdotal evidence were persuasive, I would point the majority to a letter in the files for the evidence code oversight committee from Justice Borden to me in my capacity as chair of that committee, dated a few weeks after the effective date

of the code. That letter not only reflects that the text of the code clearly conveyed that the code foreclosed the majority's conclusion in this case that "the appellate courts of this state retain the authority to . . . change the rules of evidence through case-by-case common-law adjudication," it further indicates, as reflected in questions posed to Justice Borden, that it was clear that the code first would have to be amended before the appellate courts would have authority to change a rule under the code.[14]

If all else fails, the majority relies on the maxim of statutory construction that we construe statutes, whenever possible, to avoid constitutional infirmities; *Denardo* v. *Bergamo*, 272 Conn. 500, 506 n.6, 863 A.2d 686 (2005); to conclude that this court *must* retain authority to change the rules of evidence through case-

---

[14] The letter from Justice Borden, dated January 26, 2000, provided: "As I indicated in our recent conversation, an intriguing suggestion was made to me by one of the [a]ssistant [s]tate's [a]ttorneys when I addressed their [a]ppellate [u]nit recently regarding the [code]. The suggestion is that the [c]ode be amended to provide that the Supreme Court be empowered, in the context of a specific case, to amend or overrule any specific provision in the [c]ode, in a kind of common law manner, if reason, experience and policy persuade the [c]ourt to do so.

"The principal argument for it is that it provides one more way to preserve the kind of common law flexibility in advancing and modernizing the law of evidence that the [c]ode, by virtue of being a [c]ode, has reduced. It would also give parties the incentive, in the context of specific cases, to argue for a change in the law of evidence that they probably would not have under a [c]ode.

"I recognize that this would be an unusual provision, and can be viewed as inconsistent with the entire notion of having a [c]ode. Nonetheless, I think that it is at least [worth] exploring, and request that your committee (of which, as I understand it, you are the Czarina) consider it.

"Some of the questions that occur to me are: Are there any other judicially created evidence codes that have such a provision? Is it wise as a matter of policy? If the court were to do so, what mechanism would be employed to provide for subsequent amendment of the [c]ode to conform it to the Supreme Court decision—the [c]ourt itself formulating it, or the [e]vidence [c]ode [o]versight [c]ommittee suggesting a formulation for submission to the [r]ules [c]ommittee, and then to the [j]udges? These are just some of the questions—I'm sure your [c]ommittee will think of, and answer, others."

by-case common-law adjudication. Specifically, the majority posits that "*it is questionable* whether the judges of the Superior Court have the authority under article fifth, § 1, of the state constitution to codify a code of evidence that strips the appellate courts of their common-law adjudicative function." (Emphasis added.) Although the aforementioned maxim is a reliable tool of statutory construction, it should not be invoked when there is no real constitutional threat. The majority has failed to demonstrate that such a threat exists.

The numerous cases, previously discussed, in which this court has held that the appellate courts have no authority to change rules of practice, as that authority is vested exclusively in the judges of the Superior Court, squarely repudiate the notion that the binding effect of the code violates the constitution. The process by which those rules are adopted is identical to the process by which the rules under the code were adopted. If the binding effect of the code is unconstitutional, so too is the binding effect of the Practice Book. This court has considered constitutional challenges regarding separation of powers concerns via legislative intrusion into the court's authority to adopt rules of practice, without ever suggesting that the procedure within the judicial branch itself may be constitutionally suspect. See *Bleau* v. *Ward*, 221 Conn. 331, 603 A.2d 1147 (1992); *Mitchell* v. *Mitchell*, 194 Conn. 312, 481 A.2d 31 (1984); *Steadwell* v. *Warden*, supra, 186 Conn. 153; *State* v. *Clemente*, 166 Conn. 501, 353 A.2d 723 (1974); see also *Fishman* v. *Middlesex Mutual Assurance Co.*, 4 Conn. App. 339, 494 A.2d 606, certs. denied, 197 Conn. 806, 807, 499 A.2d 57 (1985).

To the extent that our cases have recognized inherent rule-making authority independent of statutory or constitutional grant, this court has recognized that such authority is not vested exclusively in the Supreme Court and never has suggested that the lower courts' inherent

authority is subservient to this court's adjudicatory authority. See, e.g., *Massameno* v. *Statewide Grievance Committee*, 234 Conn. 539, 553–54, 663 A.2d 317 (1995) ("The Superior Court possesses inherent authority to regulate attorney conduct and to discipline the members of the bar. . . . The judiciary has the power to admit attorneys to practice and to disbar them . . . to fix the qualifications of those to be admitted . . . and to define what constitutes the practice of law. . . . In the exercise of its disciplinary power, the Superior Court has adopted the Code of Professional Responsibility." [Citations omitted; internal quotation marks omitted.]); *State* v. *Sanabria*, 192 Conn. 671, 691–92 n.16, 474 A.2d 760 (1984) ("The judicial *branch* has inherent authority to make rules of administration, practice, and procedure with regard to its functions. . . . If the judges of the Superior Court had adopted Practice Book procedures for probable cause hearings before the enactment of [No. 83-210 of the 1983 Public Acts], the constitutional grand jury provision would have taken effect at that time. . . . [I]f both the General Assembly and the judges of the Superior Court failed to establish procedures, thereby leaving the constitutional provision in limbo for an unreasonable period, this court could have imposed such procedures in order to effectuate the amendment. Because the legislature did act within a reasonable period, it was not necessary for us to do so." [Citations omitted; emphasis added.]); *State* v. *King*, 187 Conn. 292, 297, 445 A.2d 901 (1982) ("[C]ourts have an inherent power, independent of statutory authorization, to prescribe rules to regulate their proceedings and facilitate the administration of justice as they deem necessary. . . . It was in the exercise of this power that the judges of the Superior Court adopted [the rule of practice relating to disclosure of presentence investigation reports] as part of a major revision of the rules of criminal procedure." [Citation omitted;

internal quotation marks omitted.]); see also *In re Appeal of Dattilo*, supra, 136 Conn. 492 ("[T]he statutes now give the judges of the Superior Court authority not only to make rules to carry out the provisions of the Practice Act [of 1879] but also, in the words of [Public Acts 1855, c. 26, §§ 9, 13], to 'make all necessary and proper rules, not contrary to law, for the trial of causes and other proceedings in said [S]uperior [C]ourt.' Even if this were not so, it was within the power of the judges to make the particular rule in question. Apart from legislative authority, courts acting in the exercise of common-law powers have an inherent right to make rules governing procedure in them.").

The majority also seems to overlook the circumstances leading to the adoption of the code and the effect of § 51-14. Former Chief Justice Peters, as head of the entire judicial branch, requested that the legislature adopt a code of evidence. Had the legislature acceded to that request, this court could not assert that its adjudicatory authority unconstitutionally had been abridged because it no longer could change common-law rules codified by the legislature.[15] The court would be limited

---

[15] This court previously has indicated that the legislature has the authority to enact statutes regulating the admission of evidence that would be binding on our courts, including the Supreme Court. See *Johnson County Savings Bank v. Walker*, 79 Conn. 348, 351–52, 65 A. 132 (1906) (Holding with regard to a provision of the Negotiable Instruments Act: "[It] introduces no evidence immaterial to the issue, and excludes none which is material. It simply regulates the manner of introducing relevant evidence, and its enactment was fully within the power of the legislative department, notwithstanding its application may, as in this case, vary the ordinary rule of procedure that it is for him who alleges a fact to prove it, and not for him who denies the allegation to disprove it."); see also *Cooper v. Cavallaro*, 2 Conn. App. 622, 627, 481 A.2d 101 (1984) ("Our legislature has passed more than a few statutes which create presumptions and affect the rules of evidence. A statute which generates a presumption, thereby shifting the burden of proof, is not an unconstitutional invasion of the legislature into the judicial sphere.").

Moreover, in light of the fact that the request to adopt a code of evidence was initiated by the judicial branch, this court could not thereafter complain that the binding effect of the code violates the separation of powers provision

to its traditional common-law adjudicatory function of interpreting those rules, even if we determined that the reasons first leading us to adopt the rules no longer are sound.[16] The chairs of the judiciary committee, however, chose to leave the adoption of the code to the judicial branch. To the extent that a formal delegation of authority to the judicial branch would have been required, none was necessary, as the legislature previously had executed a delegation by way of § 51-14. See footnote 4 of this dissenting opinion.

It is conceivable that Chief Justice Callahan, as then head of the judicial branch, could have initiated a rule-making process governed exclusively by the Supreme Court. The fact that he initiated a process governed by the judges of the Superior Court, however, is entirely

of the constitution. Conn. Const., amend. XVIII; see generally *State* v. *McCahill*, 261 Conn. 492, 505–506, 811 A.2d 667 (2002) (addressing separation of powers). Indeed, the majority's admission that "the rules of evidence . . . have never in this state been regarded as exclusively within the judicial domain"; *State* v. *James*, 211 Conn. 555, 560, 560 A.2d 426 (1989); belies their contention that only this court can be the final arbiter of rules of evidence.

[16] For example, one provision in the code that has its roots in the common law is the constancy of accusation rule in § 6-11 (c). See *State* v. *Troupe*, 237 Conn. 284, 297, 677 A.2d 917 (1996) ("This court expressly adopted the fresh complaint doctrine in *State* v. *De Wolf*, 8 Conn. 93, 100 [1830], in which we stated that 'on an indictment for rape . . . such evidence is received to shew constancy in the declarations of the witness. If a female testifies, that such an outrage has been committed on her person, an enquiry is, at once, suggested, why it was not communicated to her female friends.' "). The constancy of accusation rule has continued to generate controversy as to whether the policy considerations that led to the adoption of the rule still apply; indeed, the evidence code oversight committee currently is considering amendments to that rule. Had the legislature chosen to adopt the proposed code presented to it in 1997, which included the constancy of accusation rule, this court would not be free to disregard the statute and overrule our prior precedent, even if we viewed that rule to be outdated. Indeed, it was in recognition of the legislature's authority that § 1-2 (b) of the code provides in relevant part that "[w]here the code does not prescribe a rule governing the admissibility of evidence, the court shall be governed by the principles of the common law as they may be interpreted in the light of reason and experience, *except as otherwise required by . . . the General Statutes . . . .*" (Emphasis added.)

consistent with § 51-14. Indeed, such a procedure for judicial rule making has been sanctioned by the legislature by statute since the mid-1800s; see *In re Appeal of Dattilo*, supra, 136 Conn. 490–92; and the legislature expressly has directed the Superior Court to promulgate numerous other procedural rules under the authority delegated pursuant to § 51-14.[17]

I also would point out that our state constitution, unlike those of many other states, does not confer express authority on the state's highest court to make rules of practice and procedure generally, including rules of evidence, or confer express rule-making authority specifically over all lower courts.[18] Indeed, if one

[17] See General Statutes § 45a-78 (probate court rules of practice and procedure); General Statutes § 46b-231 (rules of procedure for family support magistrate division); General Statutes § 47a-14h (rules for landlord-tenant summary process actions); General Statutes § 51-15 (rules of procedure for various civil actions and modification of rules of pleadings, practice and evidence for small claims actions); General Statutes § 52-191c (rules for precedence of actions involving terminally ill persons); General Statutes § 51-245a (rules concerning qualification of interpreters to assist jurors); General Statutes § 52-549n (rules for referring contract action to fact finder); General Statutes § 52-549u (rules for referring civil action to arbitrator); General Statutes §§ 54-82*l* and 54-82m (rules for speedy trial).

[18] See, e.g., Ala. Const., art. VI, § 150, amend. 328, § 6.11 ("[t]he supreme court shall make and promulgate rules governing the administration of all courts and rules governing practice and procedure in all courts"); *Schoenvogel* v. *Venator Group Retail, Inc.*, 895 So. 2d 225, 253 (Ala. 2004) (constitutional power to make rules of practice and procedure includes rules of evidence); Colo. Const., art. VI, § 21 ("[t]he supreme court shall make and promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases"); *Page* v. *Clark*, 197 Colo. 306, 318, 592 P.2d 792 (1979) (power to make rules of practice and procedure include procedural rules of evidence); Fla. Const., art. V, § 2 (a) ("[t]he supreme court shall adopt rules for the practice and procedure in all courts"); *In re Commitment of Cartwright*, 870 So. 2d 152, 159 (Fla. App. 2004) (constitutional authority to adopt rules of practice and procedure include procedural rules of evidence), cert. denied, 914 So. 2d 952 (Fla. 2005); Md. Const., art. IV, § 18 (a) ("[t]he Court of Appeals from time to time shall adopt rules and regulations concerning the practice and procedure in and the administration of the appellate courts and in the other courts of this [s]tate"); Md. Code Ann., Cts. & Jud. Proc. § 1-201 (a) (LexisNexis 2006) (construing constitutional authority to adopt

were to examine the various state constitutions to glean whether they reflect a view that the states' highest courts have inherent rule-making authority over trial courts, several states' constitutions would suggest to the contrary. In Georgia, where the state constitution vests the legislature with ultimate authority over rule making, but vests the Supreme Court with authority to adopt rules not inconsistent with law, that court's rules are not effective until the rules are approved by the lower court that would be subject to the rules. See Ga. Const., art. VI, § 1, paras. 1 and 9; *Bell* v. *Austin*, 278 Ga. 844, 846, 607 S.E.2d 569 (2005). In California, the state constitution vests rule-making authority in a judicial council, whose voting members consist of the Chief Justice and one other judge of the Supreme Court, three judges of the Court of Appeal and ten judges of the Superior Court. Cal. Const., art. VI, § 6. That scheme is notable in that the Superior Court judges constitute a majority of voting council members and thus necessarily could determine rules that would be binding on the Supreme Court.

Several other states' constitutions confer rule-making power on their highest court, but subject that power

rules of practice and procedure to include "regulation of the form and method of taking and the admissibility of evidence in all cases"); N.D. Const., art. VI, § 3 ("[t]he supreme court shall have authority to promulgate rules of procedure, including appellate procedure, to be followed by all the courts of this state"); *In re Interest of L.B.B.*, 707 N.W.2d 469, 473 (N.D. 2005) (Sandstrom, J., concurring) (constitutional power to make rules of practice and procedure includes rules of evidence); Penn. Const., art. V, § 10 (c) ("Supreme Court shall have the power to prescribe general rules governing practice, procedure and the conduct of all courts"); Penn. Rules of Evid. § 101 (b) (noting that rules of evidence are adopted by article five, § 10 [c], of Pennsylvania constitution); Utah Const., art. VIII, § 4 (expressly conferring authority to make rules of evidence); see also N.M. Const., art. VI, § 3 ("Supreme Court . . . shall have a superintending control over all inferior courts"); *Ammerman* v. *Hubbard Broadcasting, Inc.*, 89 N.M. 307, 312, 551 P.2d 1354 (1976) (constitutional grant of superintending authority confers power to make rules of practice and procedure, including rules of evidence).

to legislative oversight by either allowing the legislature to disapprove rules enacted by the court or requiring the court's rules to be consistent with the law.[19] In some states, in the absence of any express constitutional conferral of authority or when the constitution vests authority in the legislature, a state's legislature may, by statute, delegate its rule-making authority to the state's highest court.[20] Our legislature, of course, has addressed rule making, but has delegated authority to all of our courts. See General Statutes § 51-14 (a). Thus, given the absence of any express and exclusive constitutional grant of rule-making authority to *this* court, the variety of constitutional schemes for rule making and the delegation of authority under § 51-14,[21] I see nothing to indicate that a constitutional conflict would arise by construing the code, as written, to allow the judges of the Superior Court to make rules that bind this court. The mere fact that, predating our constitution, this court had set forth rules of evidence in the context of an adjudication simply demonstrates what is undisputed—

[19] See, e.g., Alaska Const., art. IV, § 15; La. Const., art. V, § 5; Mo. Const., art. V, § 5; Mont. Const., art. VII, § 2 (3); Neb. Const., art. V, § 25; Ohio Const., art. IV, § 5 (B); Va. Const., art. VI, § 5.

[20] See, e.g., Iowa Const., art. VI, § 14; Iowa Code Ann. §§ 602.4201 and 602.4202 (West 1996); Me. Rev. Stat. Ann. tit. 4, § 8 (2007); Miss. Code Ann. § 9-3-61 (1972); N.Y. Const., art. VI, § 30; N.Y. Jud. Ct. Acts §§ 211 and 214-a; Wash. Rev. Code § 2.04.190 (West 2004); see also Mass. Gen. Laws c. 213, § 3 (LexisNexis 1999) (authorizing lower courts to adopts rules, but subjecting rules to approval by Supreme Judicial Court).

[21] As one eminent legal scholar in this field explained with respect to congressional delegation of authority under a federal constitutional scheme substantially similar to Connecticut's judicial provision: "If delegation [of Congress' rule-making power] is possible, to whom may the power of rule-making be delegated? The delegee must be chosen in a way that makes institutional sense, that seems [to] meet in an historical framework, and that does no violence to our conception of separation of power theory and practice. . . . [I]t is obvious that the Supreme Court and individual courts could properly be delegated the responsibility of rule-making. So, too, could an assembly of judges such as the United States Judicial Conference or a committee or commission appointed by judges and approved by Congress." J. Weinstein, Reform of Court Rule-Making Procedures (1977) pp. 95–96.

that this court has authority to do so—it does not answer the question in dispute, that is, whether another judicial body can adopt rules that this court cannot overrule.

In his concurrence, Justice Palmer acknowledges that the code clearly precludes changes to the code except by the rule-making process under the aegis of the judges of the Superior Court, but posits that this limitation applies only to the Superior Court—despite express language in § 1-2 (b) that this limitation applies to *"any* court"—because a different conflict would arise if that section were deemed to bind the appellate courts. (Emphasis added.) Specifically, the concurrence concludes that such a result would be inconsistent with this court's *inherent* supervisory authority over the administration of justice.[22] I disagree.

Because "[o]ur supervisory powers are invoked only in the *rare* circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts"; (emphasis added) *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998); undoubtedly

---

[22] Unlike many other states, our constitution does not confer on this court general supervisory authority over the lower courts. See D. Pugh, C. Korbakes & J. Alfini et al., Judicial Rulemaking: A Compendium (1984) p. 36 ("[t]he judicial article of the Connecticut constitution, unlike that of most other states, does not specifically delineate the jurisdiction and powers of the courts comprising the judicial department"); see, e.g., Del. Const., art. IV, § 13 ("[t]he Chief Justice of the Supreme Court, or in case of his or her absence from the [s]tate, disqualification, incapacity, or if there be a vacancy in that office, the next qualified and available Justice who by seniority is next in rank to the Chief Justice shall be administrative head of all the courts in the [s]tate, and shall have general administrative and supervisory powers over all the courts"); La. Const., art. 5, § 5 (A) ("[t]he supreme court has general supervisory jurisdiction over all other courts"); Mo. Const., art. V., § 4 (1) ("[t]he supreme court shall have general superintending control over all courts and tribunals"); Mont. Const., art. VII, § 2 (2) ("[the supreme court] has general supervisory control over all other courts"); N.M. Const., art. VI, § 3 ("[t]he [s]upreme [c]ourt . . . shall have superintending control over all inferior courts"); Wis. Const., art. VII, § 3 (1) ("[t]he supreme court shall have superintending and administrative authority over all courts").

that would not afford a basis of free-floating authority to overrule code provisions for any reason that we deem proper. I agree, however, that this court's supervisory authority extends to the adoption of rules to guide the trial courts in both the civil and criminal context. Nonetheless, such authority is exercised in the *absence* of a rule, when there are *gaps* in a rule or *to supplement* procedures under a rule. See, e.g., *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997) (prescribing rule, in conjunction with existing rule of practice vesting trial court with discretion to allow jury to replay videotaped deposition testimony, that "it must be done in open court under the supervision of the trial judge and in the presence of the parties and their counsel"); *State* v. *Patterson*, 230 Conn. 385, 400, 645 A.2d 535 (1994) (prescribing rule, consistent with rules of practice, requiring trial judge to be present during voir dire in criminal cases but imposing further limitation not addressed in rule that neither party can waive this requirement); *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166 (setting forth procedure to address claim of racial discrimination in exercise of peremptory challenge pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986], in absence of procedural rules), cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). This court also has adopted such rules when a judicial gloss was required to save a law from constitutional infirmity; see, e.g., *Roth* v. *Weston*, 259 Conn. 202, 232, 789 A.2d 431 (2002); and has provided definitions to terms prescribed under existing law where there was none; see, e.g., *Ireland* v. *Ireland*, 246 Conn. 413, 432–33, 717 A.2d 676 (1998); powers that still are reserved to the appellate courts under the code. I am unaware of any case in which this court has determined that it has inherent authority to adopt a rule that contravenes an existing rule—adopted by statute, regulation or judicial rule making—when there is no

conflict with another law.[23] Indeed, this court previously has recognized the limits of its inherent supervisory authority when a conflict would arise with an existing rule. See *State* v. *Day*, 233 Conn. 813, 855–56, 661 A.2d 539 (1995) ("We need not explore in detail the specific holdings of [*McKaskle* v. *Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984)]. For our purposes here, it suffices to recognize that the United States Supreme Court has sanctioned a definition of the role of standby counsel that significantly exceeds the limits imposed by Practice Book § 964 [now § 44-5]. Exercising our inherent authority to safeguard the administration of justice in this state, we urge the standing committee on rules to consider the formulation of new standards that provide for a more active role for standby counsel, consistent with the relevant constitutional principles articulated in this opinion."); see also *State* v. *Sanabria*, supra, 192 Conn. 691 n.16 (noting that this court could have exercised its supervisory power to establish procedures required to give effect to constitutional provision for grand jury proceedings if both legislature and judges of Superior Court had failed to do so).

Finally, I would note that it is entirely appropriate for the judges of the Superior Court to have been given

---

[23] The United States Supreme Court case law cited by Justice Palmer in his concurring opinion is not to the contrary. In *Dickerson* v. *United States*, 530 U.S. 428, 437, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000), the Supreme Court noted its primacy over lower courts in prescribing rules of evidence that are *constitutionally* mandated. The code does not limit this court's authority to enforce constitutional mandates and therefore does not conflict with this principle. To the extent that nonconstitutional rules of evidence are implicated, unlike under Connecticut law, the United States Supreme Court specifically is vested with authority to adopt rules of evidence by an act of Congress, subject to congressional approval. Id.; see generally J. Weinstein, Reform of Court Rule-Making Procedures (1977) c. II. D., pp. 55–61 (entitled "Historical Origins of the Rule-Making Power of Federal Courts"). In *McNabb* v. *United States*, 318 U.S. 332, 341, 63 S. Ct. 608, 87 L. Ed. 819 (1943), the Supreme Court simply addressed the proposition that is not in dispute here—that the highest court of a jurisdiction has supervisory authority to adopt rules that can bind lower courts.

such authority. Rules of evidence are in fact rules guiding the process of a *trial*, not appellate procedure. Moreover, it may be many years since some appellate court judges have presided over trials, and some appellate judges may have had little time as trial advocates or as trial court judges before their appointment to the appellate bench.[24] Trial court judges are in the best position to discern the practical problems that eviden-

---

[24] Indeed, some United States Supreme Court justices have raised such concerns with respect to that court's role in the approval of rules of procedure. See Order re Rules of Criminal Procedure, 323 U.S. 821, 821–22 (1944) (Frankfurter, J.) ("That the federal courts have power, or may be empowered, to make rules of procedure for the conduct of litigation has been settled for a century and a quarter . . . . And experience proves that justice profits if the responsibility for such rule-making be vested in a small, standing rule-making body rather than be left to legislation generated by particular controversies. . . . For the last fifty years the Justices have become necessarily removed from direct, day-to-day contact with trials in the district courts. To that extent they are largely denied the first-hand opportunities for realizing vividly what rules of procedure are best calculated to promote the largest measure of justice. These considerations are especially relevant to the formulation of rules for the conduct of criminal trials." [Citation omitted.]). Justices Black and Douglas suggested in their statement in opposition to the Supreme Court's submission of Rules of Civil Procedure to Congress for approval that Congress amend the law to substitute the Judicial Conference for the Supreme Court in the role of approving the rules. See Order re Rules of Civil Procedure, 374 U.S. 865 (1962). They noted that the court's participation was peripheral in that the conference and its committees did the actual drafting of the rules and complained that it was improper for that court to approve rules and then later preside over constitutional challenges to those rules in adjudications. Id., 869–70. A prominent legal scholar has voiced similar concerns. See J. Weinstein, Reform of Court Rule-Making Procedures (1977) p. 147 ("Suggested Changes in National Rule-Making Process . . . . The Supreme Court should not adopt rules for any court except itself. The lack of trial experience and the heavy work load of its members give it little expertise in most of the fields regulated by rule and prevent adequate study of the issues. Although its imprimatur has the advantage of bestowing prestige on the rules, it inhibits the Supreme Court and other courts from impartially construing the rules in accord with the Constitution, statutes, and appropriate federal-state relationships."). These statements further indicate that it would not violate some constitutional principle for the highest court of a jurisdiction to be limited to interpreting, and considering legal challenges to, a body of court rules promulgated by some other body than the highest court.

tiary issues give rise to and to offer practical solutions. Because evidentiary rules, other than those necessary to address constitutional concerns, often reflect a balancing of policy considerations, crafting them by way of a legislative type process through judicial rule making, guided by an advisory committee that includes members of the bar from various practice areas and evidentiary experts, makes eminently more sense than by way of an adjudicative process in which the courts have parties before it who do not advance necessarily the broader concerns implicated by a given rule. Accordingly, I disagree with the majority's conclusion in part I of its opinion that the appellate courts have authority to overrule a provision of the code. Sadly, the result in this case may motivate the legislature to follow through on previously contemplated action to bring the rules of evidence under the supervision of that body, which the majority acknowledges has authority to adopt rules of evidence that would bind this court.

## II

In light of my conclusion that this court has no authority to reconsider the liberal rule of admissibility for prior bad acts in sex crime cases, which was applied in accordance with the code in the present case, I turn to the question presented in the state's appeal as to whether the Appellate Court properly concluded that the first degree kidnapping statute, General Statutes § 53a-92 (a) (2), is unconstitutionally vague as applied to the facts of this case. On the basis of our decisions in *State* v. *Salamon*, supra, 287 Conn. 509, and *State* v. *Sanseverino*, supra, 287 Conn. 608, in which we altered our long-standing interpretation of the kidnapping statute, I disagree with the majority's decision to overrule *Sanseverino* to support its conclusion that the defendant in the present case is not entitled to a judgment of acquittal on his conviction for kidnapping in the first degree because "any insufficiency in proof was caused

by the subsequent change in the law under *Salamon*, rather than the government's failure to muster sufficient evidence." I conclude that, in the present case: (1) a sufficiency of the evidence analysis is appropriate, as it was in *Sanseverino* and *Salamon*; and (2) no reasonable jury could have found, on the basis of the evidence before it, the abduction necessary for a kidnapping because: (a) the restraint was only that necessary and incidental to the sexual assault; and (b) there was no evidence of force or intimidation.

A

I begin with my strong disagreement with the majority's decision to overrule our holding in *Sanseverino* that the defendant was entitled to a judgment of acquittal, which three members of the present majority joined less than two months ago, and with its decision to do so on a ground that was squarely presented to them in the dissent. Not only do I disagree with the majority's characterization and determinations regarding *Sanseverino*, but I am also troubled by its lack of respect for the principle of stare decisis in its willingness to cast aside precedent without persuasive justification. See *Vasquez* v. *Hillery*, 474 U.S. 254, 265–66, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) ("[Stare decisis] contributes to the integrity of our constitutional system of government, both in appearance and in fact. . . . [A]ny detours from the straight path of stare decisis in our past have occurred for articulable reasons, and only when the [c]ourt has felt obliged to bring its opinions into agreement with experience and with facts newly ascertained." [Internal quotation marks omitted.]); *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494, 923 A.2d 657 (2007) ("The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . It is the most important application of a theory of decisionmaking consistency in our legal

culture and it is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." [Internal quotation marks omitted.]). The majority's decision to overrule such recent precedent strikes at the very heart of these concerns.[25] As the following discussion demonstrates, the considerations that may outweigh strict adherence to stare decisis simply are not present.

In *Salamon*, the defendant had asked this court to reconsider and overrule a line of kidnapping decisions; see, e.g., *State* v. *Luurtsema*, 262 Conn. 179, 201–203, 811 A.2d 223 (2002); in which this court had held that no minimum period of restraint or degree of movement is necessary for that offense, even when the restraint is merely incidental to an underlying offense. While *Salamon* was pending before this court, we heard argument in *State* v. *Sanseverino*, supra, 287 Conn. 608, and released the decisions in the two cases concurrently, with *Salamon* as the lead case, and with the intention that the two cases would provide guidance to the bench and bar, as application of the framework adopted had yielded different results. See *State* v. *Salamon*, supra,

---

[25] I recognize that stare decisis concerns may not bear *directly* on whether to overrule *Sanseverino* because this court properly could take similar action in light of the state's timely motion for reconsideration that currently is pending before us. Such concerns do bear, however, on the *effect* of the majority's decision, which is to overrule sub silentio the framework set forth and applied in *Salamon*, because that case differs from *Sanseverino* only in that the application of the framework in *Salamon* yielded a result that the majority seeks in the present case—avoiding a judgment of acquittal. See *State* v. *Salamon*, supra, 287 Conn. 549–50 n.34 ("[In *Sanseverino*, we] concluded that, because no reasonable juror could find that the restraint [the defendant] had imposed on [the victim] was not incidental to the commission of the sexual assault against [the victim], [the defendant] was entitled to a judgment of acquittal on the kidnapping charge. See [*State* v. *Sanseverino*, supra, 287 Conn. 625]. In the present case, by contrast, we cannot say that the evidence requires the conclusion that the defendant restrained the victim solely for the purpose of assaulting her; indeed, a juror reasonably could find that the assaultive conduct in which the defendant engaged was merely incidental to his restraint of the victim.").

287 Conn. 549 n.34 (contrasting its holding with *Sanseverino*).

In *State* v. *Salamon*, supra, 287 Conn. 542, we concluded that the intent to prevent the victim's liberation required for an abduction—and thus a kidnapping— requires something more than the restraint necessary and incidental to the underlying crime. Although we reaffirmed our long-standing rule that no minimum period of restraint or degree of movement is necessary, we determined that "[t]he guiding principle is whether the [confinement or movement] was so much the part of another substantive crime that the substantive crime could not have been committed without such acts." (Internal quotation marks omitted.) Id., 546. We concluded that this determination is a question for the jury. Id., 547–48. Because we announced a new rule, the defendant would have been entitled to a retrial if we had viewed the case as solely implicating instructional error. The defendant in *Salamon*, however, had claimed that he was entitled to a judgment of acquittal under the new interpretation that he urged the court to adopt because, "in light of the evidence adduced at trial, no juror reasonably could conclude that the restraint imposed on the victim was not incidental to the restraint used in connection with the assault of the victim." Id., 548–49. Despite the fact that there was no doubt that the state had adduced sufficient evidence to convict the defendant under the law as it existed at the time of trial, we nevertheless conducted a sufficiency of the evidence analysis and examined in detail the specific evidence adduced at trial, concluding that a retrial was warranted because the facts were such that a reasonable jury could find a kidnapping under the new rule. Id., 549–50 ("On the basis of these facts, a juror reasonably could find that the defendant's restraint of the victim was not merely incidental to his assault of the victim. . . . In light of the evidence, moreover, a juror reason-

ably could find that the defendant pulled the victim to the ground primarily for the purpose of restraining her, and that he struck her and put his fingers in her mouth in an effort to subdue her and to prevent her from screaming for help so that she could not escape. In such circumstances, we cannot say that the defendant's restraint of the victim necessarily was incidental to his assault of the victim. Whether the defendant's conduct constituted a kidnapping, therefore, is a factual question for determination by a properly instructed jury."). This approach was consistent with our precedent requiring us to analyze a claim of sufficiency of the evidence prior to a claim of instructional error that would result in remanding the case for a new trial. See *State* v. *Padua*, 273 Conn. 138, 178–79, 869 A.2d 192 (2005) ("[i]nterests of judicial efficiency, sound appellate policy and fundamental fairness require a reviewing court to address a defendant's insufficiency of the evidence claim prior to remanding a matter for retrial because of trial error"); see also *State* v. *Sanseverino*, supra, 287 Conn. 651 n.9 (*Zarella, J.*, dissenting) ("it is well settled that we would resolve [a sufficiency of the evidence claim] prior to addressing any claims of trial error, including instructional impropriety, to avoid any double jeopardy issues").[26]

The defendant in *Sanseverino* did not expressly ask the court to reconsider the issues that were presented to us in *Salamon*, and instead claimed that the statute was void for vagueness as applied to the facts of his case. *State* v. *Sanseverino*, supra, 287 Conn. 618–19. Nonetheless, in addressing the considerations relevant to a void for vagueness challenge, namely, whether a person of ordinary intelligence could reasonably have

---

[26] I recognize that a successful double jeopardy claim necessarily would result in a judgment of acquittal because the constitution mandates such a result, whereas we applied that framework in *Salamon* and *Sanseverino* due more to jurisprudential concerns.

been on notice that his conduct was criminal; *State* v. *Koczur*, 287 Conn. 145, 156, 947 A.2d 282 (2008); the defendant had articulated concerns that went to the heart of our holding in *Salamon*. *State* v. *Sanseverino*, supra, 619. Specifically, the defendant contended that " 'the restraint imposed was wholly incidental to the commission of the sexual assault.' " Id.

Although the defendant had not raised a sufficiency of the evidence claim on appeal, he had preserved such a claim at trial via a posttrial motion for judgment of acquittal, and his arguments on appeal were directed at whether the facts of the incident would support such a kidnapping charge, and thus, necessarily, such a conviction. For these reasons, we eschewed the vagueness challenge and applied the analytical framework adopted in *Salamon*, evaluated the evidence under our well established test for sufficiency of the evidence[27] and concluded that "no reasonable jury could have convicted the defendant of a kidnapping in light of our holding in *Salamon*." Id., 625; see also *State* v. *Ritrovato*, 280 Conn. 36, 50, 905 A.2d 1079 (2006) (stating well established rule that "we must be mindful that [t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case"). Therefore, consistent with the interests of justice and judicial economy, we rendered a judgment of acquittal in *Sanseverino*, as it was clear that the state could not prevail on retrial under the new rule set forth in *Salamon*. In so doing, the *Sanseverino* majority rejected the dissent's view

[27] "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Martin*, 285 Conn. 135, 147, 939 A.2d 524 (2008).

that the case should be remanded for a new trial to give the state another opportunity to present more evidence on the incidental nature of the restraint. See *State* v. *Sanseverino*, supra, 287 Conn. 657–58 (*Zarella, J.*, dissenting). Indeed, the majority concluded, "[c]ontrary to the dissent's assertion that the state '*could have proffered*' additional evidence in the present case to support the kidnapping charges had it had knowledge of the rule announced in *Salamon*, we have found nothing in the record to indicate that there was any such evidence." Id., 625 n.16.[28]

Although it is unclear whether the majority distinguishes these two cases by virtue of the fact that the defendant in *Sanseverino* did not expressly raise a sufficiency of the evidence claim, a claim that if successful results in judgment of acquittal; *State* v. *Fernandez*, 198 Conn. 1, 21, 501 A.2d 1195 (1985); we did in fact apply a sufficiency analysis in that case. It is not without precedent under our jurisprudence[29] and that of other courts to reframe an issue raised to resolve the matter presented in a manner most consonant with the interests of justice and judicial economy.

---

[28] The correctness of this conclusion is supported by the fact that, when the state filed a postappeal motion in response to our statement that we would be willing to consider such a motion; *State* v. *Sanseverino*, supra, 287 Conn. 625 n.16; it has not represented that it has any additional evidence to proffer.

[29] Pursuant to our supervisory powers over the administration of justice and in the interests of judicial economy, appellate tribunals have discretion to construe the parties' claims and resolve issues in a way that is different from the formal heading or discussion that they are given in a brief. See, e.g., *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 276 Conn. 168, 191–92, 884 A.2d 981 (2005) ("Upon review of the record and the briefs of the parties, and after due consideration of the claims raised by the parties at oral argument, we conclude that the certified question is not an adequate statement of the multiple issues raised by this appeal. Consequently, it is necessary to reformulate and to expand the certified question to reflect more accurately the issues presented. See, e.g., *Stamford Hospital* v. *Vega*, 236 Conn. 646, 648 n.1, 674 A.2d 821 [1996] [this court may modify certified questions to render them more accurate in framing issues presented].").

Indeed, *United States* v. *Allen*, 127 F.3d 260, 262 (2d Cir. 1997), is instructive in this regard. In that case, the defendant had raised a claim of instructional error and a claim of void for vagueness on appeal regarding the scienter element of the federal extortion statute under which he was charged, but not a claim for insufficiency of the evidence. Id. The court concluded "that [the defendant's] vagueness argument is better framed as a challenge to the sufficiency of the evidence; that manifest injustice would result if we were to address [the defendant's] jury instruction argument without reaching the sufficiency issue; and that the evidence was insufficient to prove one of the elements of the offense beyond a reasonable doubt." Id. The court reasoned that "[t]he sufficiency of the evidence to satisfy the scienter requirement in a particular case is a threshold issue that obviates a vagueness challenge." Id., 264. Consistent with the procedural posture in *Sanseverino*, the court in *Allen* noted that, although the defendant had not raised such a claim on appeal, he had preserved it at trial by making a motion for judgment of acquittal. Id. The court concluded: "Manifest injustice would result here if we failed to consider the sufficiency of the evidence. First . . . [the defendant's] void-for-vagueness argument is closely related to the sufficiency challenge. . . . Second, even if we did not reach the sufficiency issue, we would have to vacate the verdict and remand for a new trial because the jury instructions were flawed for the reasons stated in [another] section . . . of this opinion. For us to do that in this case without addressing the looming issue of whether the evidence was sufficient to support the conviction could result in the futility of a second conviction that would have to be reversed in a second appeal. . . . Moreover, it strikes us as unjust to subject the defendant to a second trial if the evidence at the first trial was insufficient to convict." (Citation omitted.) Id.

These same propositions were applied in *Salamon* and *Sanseverino*, and they apply in the present case, in which there is also a void for vagueness claim. Whether the evidence is sufficient to support a conviction is a precondition to the need for and the success of a void for vagueness claim. Thus, in light of our reexamination of the evidentiary standard for kidnapping in *Salamon*, a sufficiency of the evidence analysis is an appropriate response to the contentions regarding void for vagueness that were advanced in both of these cases. In any given case, there may be an indication that either the evidence proffered could be sufficient under the new standard to warrant retrial or the record may reflect evidentiary gaps that the state possibly could fill on retrial that might establish a restraint that went beyond that which was incidental to the underlying offense. When it is manifest from the record, however, that remand necessarily would result in acquittal, it would work an injustice on the defendant and be contrary to the interests of judicial economy to order a retrial.

The majority's reliance on *United States* v. *Ellyson*, 326 F.3d 522, 529 (4th Cir. 2003), as support for its conclusion that retrial always is appropriate because a new rule renders a claim one of instructional error, is misplaced. In that case, wherein the offense at issue was possession of child pornography, the United States Supreme Court had applied a constitutional gloss to that possession statute in another case, decided after the trial of the defendant in *Ellyson* but while his appeal was pending, which required the state to prove a different element that necessarily would have required entirely different proof—i.e., that the image was that of an actual child, not a virtual image that "appears to be . . . a minor engaging in sexually explicit conduct." Id., 529–30.

The Fourth Circuit concluded that the trial court's instruction, although consistent with valid Circuit Court precedent at the time of trial, was erroneous in light of the new interpretation and that the verdict had to be set aside on that basis. Id., 530–31. That determination notwithstanding, the court analyzed the sufficiency of the evidence in order to determine whether the defendant was entitled to a judgment of acquittal. Id., 532–34. The court determined that the state constitutionally could retry the defendant because, at the time of trial, its evidence was sufficient to satisfy the then existing legal standard, and thus the double jeopardy clause did not present an obstacle to retrial. Id., 532–33. The court went further, however, and noted that there was evidence that satisfied the new legal standard as to the images of one child and other evidence as to the other images that arguably *could* satisfy the new standard. Id., 534–35. Thus, a new trial was appropriate.

The Fourth Circuit's analysis is entirely correct in that retrial is appropriate when a change in the law requires the state to proffer additional, critical evidence to prove its case. In *Ellyson*, the record made it manifest that there was an entirely new body of evidence that the state could put forth regarding whether some of the images involved actual children. See id. Thus, the court permitted the state to do more, when it was evident that there was more to do. These circumstances are analogous to the concerns about fairness to the state that have motivated this court to permit retrial because the evidence would have been sufficient to support a conviction but for an evidentiary error. See *State* v. *Gray*, 200 Conn. 523, 539, 512 A.2d 217 (concluding that defendant's confession was inadmissible but that retrial, as opposed to acquittal, was proper because evidence otherwise sufficient and, in light of exclusion of confession, state might have introduced evidence to replace it that otherwise would have been cumulative),

cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); accord *State* v. *Carey*, 228 Conn. 487, 496–98, 636 A.2d 840 (1994) (concluding evidentiary error entitled defendant to new probation revocation hearing but not acquittal because, but for error, evidence otherwise sufficient). In these cases, a new rule or an appellate ruling created an evidentiary gap that we could not presume that the state would be unable to fill on retrial.

It is equally apparent to me, however, that there are cases in which it is not appropriate to permit retrial when there is a new rule established or adopted. There are cases in which it is possible to discern that the state has told as complete a story as is relevant to the elements of the offense. Although in such cases double jeopardy would not bar a retrial, the question of what we may do constitutionally does not dictate what we should do in the interests of fairness to the defendant and judicial economy. See *Lockhart* v. *Nelson*, 488 U.S. 33, 39–42, 109 S. Ct. 285, 102 L. Ed. 2d 265 (1988) (double jeopardy does not bar retrial when reversal was based on evidentiary error and remaining evidence was sufficient to support conviction); *State* v. *Gray*, supra, 200 Conn. 539 (same). In *Sanseverino*, the kidnapping and the underlying crime of sexual assault clearly were part of a well-defined transaction of events. The victim walked into the room of her own accord, was sexually assaulted, and then left the room as soon as the defendant released her. *State* v. *Sanseverino*, supra, 287 Conn. 615. Because each step of that transaction, from the time the victim entered to the time she fled, was so well-defined by the evidence, it was clear that there was nothing further the state could have adduced from the victim, the only witness to the crime, that would have showed that there was restraint over and above that necessary to commit the crime of sexual assault. Id., 625 n.16. As the discussion in part II B of this dissent indicates, the same is true for the present case. I can

think of no reason, therefore, why any defendant should be relegated to a pretrial status on his kidnapping conviction while the state decides whether to reprosecute, when it is clear from the record that the defendant is entitled to a judgment of acquittal or a dismissal. Indeed, the majority's universal rule of retrial will no doubt give pause to trial judges as to whether to exercise their discretion to dismiss these cases for insufficient evidence pursuant to General Statutes § 54-56.[30] *State* v. *Kinchen*, 243 Conn. 690, 703, 707 A.2d 1255 (1998) ("a trial court is empowered to dismiss a case for insufficient cause under § 54-56 only in the most compelling of circumstances"). The defendants in these cases should not have to bear this burden.[31] *Salamon* and *Sanseverino* were intended to provide such guidance to the courts. Therefore, I disagree with the majority's conclusion that *Sanseverino* should be overruled, which in effect constitutes a sub silentio overruling of the framework we had applied in *Salamon* to determine whether acquittal or a new trial is proper.

B

In light of my conclusion that a sufficiency of the evidence analysis is appropriate in this context, I turn to its application to the facts in the present case. The

[30] General Statutes § 54-56 provides: "All courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial."

[31] The effect of the majority's conclusion that retrial in these cases is appropriate may, I fear, ultimately undermine one of the bases for our holding in *Salamon*, namely, that our previous interpretation of the kidnapping statute encouraged prosecutors "to include a kidnapping charge in any case involving a sexual assault or robbery." *State* v. *Salamon*, supra, 287 Conn. 544. If the evidence in *Sanseverino* and the present case is not expressly deemed to be insufficient, I foresee much of the same overcharging of the crime of kidnapping in the future.

following legal principles inform my conclusions. Section 53a-92 (a), pursuant to which the defendant was convicted, provides in relevant part: "A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ." " 'Abduct' " is defined as "to restrain a person with intent to prevent his liberation by either (A) secreting or holding him in a place where he is not likely to be found, or (B) using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2). As we previously have noted, abduction is the "sine qua non of the crime of kidnapping." *State* v. *Salamon*, supra, 287 Conn. 534. " 'Restrain,' " as used in these statutes, is defined as: "to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. . . . '[W]ithout consent' means, but is not limited to, (A) deception and (B) any means whatever, including acquiescence of the victim, if he is a child of less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement." General Statutes § 53a-91 (1).

We dealt with the intersection between restraint and abduction in *State* v. *Salamon*, supra, 287 Conn. 534–35, when we resolved an ambiguity between the intent necessary for a restraint and the intent necessary for an abduction. We concluded that the intent to prevent the victim's liberation necessary for an abduction requires something more than the restraint necessary and incidental to the underlying crime. Id., 542. "[A] defendant may be convicted of both kidnapping and another sub-

stantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." (Emphasis in original.) Id., 547–48.

The line at which restraint becomes more than that necessary and incidental to the underlying crime is exemplified by contrasting the factual scenarios in *Salamon* and *Sanseverino*. In *Salamon*, the defendant had approached the victim from behind as she was ascending a flight of stairs, grabbed her by the back of the neck, causing her to fall, and held her down by her hair as she struggled to break free. Id., 549. When the victim began to scream, the defendant punched her in the mouth and attempted to insert his fingers into her throat. Id. After being restrained for approximately five

minutes, the victim was able to free herself and flee for help. Id. Although it was unclear why the defendant had accosted and restrained the victim; id., 549 n.34; we concluded that a jury reasonably could have found that the defendant's five minute restraint of the victim was not merely incidental to, and therefore had independent significance from, his assault of the victim. Id., 549. Specifically, we concluded that a reasonable jury could find that the defendant had "pulled the victim to the ground primarily for the purpose of restraining her, and that he struck her and put his fingers in her mouth in an effort to subdue her and to prevent her from screaming for help so that she could not escape." Id. Accordingly, we remanded the case for a new trial. Id., 550.

In *State* v. *Sanseverino*, supra, 287 Conn. 625, which was the first case that had relied on the interpretation of the kidnapping statute set forth in *Salamon*, the defendant, the owner of a bakery, had followed the victim, one of his employees, after she walked into a storage room, pushed her up against a wall and sexually assaulted her. After he had ejaculated, the defendant released the victim and she was able to leave the room. Id. We reversed the defendant's kidnapping conviction and directed a judgment of acquittal because we determined that "no reasonable jury could have convicted the defendant of kidnapping in the first degree in light of our . . . holding in *Salamon*." Id.

In contrast to *Salamon*, *Sanseverino* represented the quintessential example of the discrete set of facts that our interpretation of the kidnapping statute in *Salamon* was meant to guard against. The defendant physically restrained the victim only for the brief period that the sexual assault took place and immediately thereafter released her and allowed her to leave the room. Id. There was simply no other evidence that the defendant intended to prevent the victim's liberation in some man-

ner independent of the assault. Id. Accordingly, we reversed the defendant's kidnapping conviction and remanded the case to the trial court with direction to render judgment of not guilty on that charge. Id., 641.

Again, applying *Salamon*'s analytical framework, I would conclude that the record in the present case illustrates the same discrete set of circumstances that warranted a judgment of acquittal in *Sanseverino*. No reasonable jury could find, under the proper legal standard, that there was sufficient evidence to establish that the defendant possessed the requisite intent for abduction because the defendant had restrained the victim no more than was necessary to accomplish the sexual assault. The defendant asked the victim to go to a room in the store, and she went. He closed the door, and *may* have locked it, but not in such a manner as to prevent the victim from leaving of her own volition.[32] He removed the victim's slacks and underpants and then vaginally penetrated her while she sat on a desk in the room. When the victim protested, the defendant let her leave the room and return to work. The only restraint applied to the victim occurred when the defendant removed her clothing and then during the actual act of penetration itself. As the victim testified, when the defendant penetrated her and "it hurt," she "said no . . . got off the desk . . . *was able to move*" and "went back to work." (Emphasis added.) This restraint was undoubtedly necessary and incidental to accomplishing the sexual assault itself. Cf. *State* v. *Sanseverino*, supra, 287 Conn. 625 ("The restraint occurred . . . when the defendant grabbed [the victim] from behind and pushed her against the wall, pin-

---

[32] The victim wavered in her testimony as to whether the defendant had locked the door. Her testimony, however, indicated that she had left the room unimpeded and without the defendant's assistance. Therefore, assuming that the door was locked, the only reasonable inference that could be drawn from the victim's testimony is that the door was locked from the *inside*. Thus, the locked door no more restrained the victim from leaving than if it merely had been closed.

ning her arms over her head with his arm and pressing his body against hers to keep her from moving. These actions were clearly undertaken solely for the purpose of allowing the defendant to initiate, and to keep [the victim] from moving away from, his sexual advances."). Thus, in accordance with the considerations that we set forth in *Salamon*: the restraint was solely directed at the purpose of accomplishing the sexual assault; it lasted only for the duration of the sexual assault; it was not for the purpose of preventing the victim from summoning assistance; and it did not increase the danger of harm to the victim.[33]

[33] Even if I were to speculate as to some theory that the state might advance on retrial, such as that the victim was deceived into going to the room where the assault occurred, that theory is not supported by the facts or by law. The victim's movement from the store office to the room where the assault occurred did not constitute a restraint, as there was no evidence that the defendant forced the victim to go there or used deception to trick her into going there. See General Statutes § 53a-91 (1). The victim testified that the defendant had told her to go to another room, which she could not identify despite the state's probing; she did not indicate that he had given her any reason as to why he wanted her to do so. The state adduced no evidence as to what she believed his purpose to be in directing her there or even whether employees generally or she in particular would enter that room. Thus, there is no evidence that the defendant lied or created a ruse to get the victim to go to the room. Cf. *State* v. *Smith*, 198 Conn. 147, 152, 502 A.2d 874 (1985) (defendant lied to victim when stating that he needed her to show him entrance to highway but that he would return her home afterward in order to "lure the victim into his control" and "[deceive her] into remaining with him"). After the victim entered the room, there is no evidence that the defendant restricted her from leaving or from moving, other than when he removed her slacks and underwear. Cf. *State* v. *Sanseverino*, supra, 287 Conn. 625 ("[t]he defendant released [the victim] immediately after he had ejaculated").

I note, however, that, even if the evidence had supported the conclusion that the defendant had "deceived" the victim into going to another room in the store and thereby established a restraint; General Statutes § 53a-91 (1) (A); that restraint still would not be of the substantial nature and character necessary to constitute an abduction. Because the defendant clearly could not sexually assault the victim out in the open aisle of the store in front of witnesses, to the extent that he restrained her by causing her to move to a room, the location of which the record reveals nothing about, this case is no different than if the defendant had ordered the victim into a nearby supply closet. Such restraint would have no independent criminal significance.

Therefore, I can see no principled way to distinguish the facts of the present case from those in *Sanseverino*. In both cases, the defendant employers followed the employee victims into a private room on the premises where they sexually assaulted the victims. Once the sexual assaults had progressed to a certain point, the defendants released the victims and allowed them to leave the room.

There is more to abduction, however, than merely considering whether the restraint was incidental to, rather than independent of, the underlying crime. In the present case, the state has failed to establish the other elements of an abduction, namely, that the defendant either had (1) secreted the victim "in a place where [s]he [was] not likely to be found"; General Statutes § 53a-91 (2) (A); or (2) held her by "using or threatening to use physical force or intimidation." General Statutes § 53a-91 (2) (B). It is starkly apparent that the state did not adduce evidence that the defendant secreted the victim in a place where she was not likely to be found, as she was in a room within the store itself. Cf. *State v. Suggs*, 209 Conn. 733, 759, 553 A.2d 1110 (1989) (defendant had secreted victim in place where she was not likely to be found when he sexually assaulted her at night in unlit field containing abandoned car and old railroad tracks, which was behind garage and fence).

Additionally, there is no evidence that reasonably supports a determination that there was force or intimidation of any kind. Although the victim protested verbally during the removal of her pants and the act of penetration, the defendant did not respond. The defendant did not threaten the victim verbally, nor did he strike her or pin her down. After the defendant vaginally penetrated the victim, she got off the desk and left the room with no impediment from the defendant. Thus, there is *no* evidence of physical force or intimidation to establish the abduction necessary for a kidnapping.

Cf. *State* v. *Burton*, 258 Conn. 153, 175–76, 778 A.2d 955 (2001) (force and intimidation established when defendant held car door shut so victim could not escape, thereby pinning her to seat, and ignored victim's "screams to stop the car and let her out"); *State* v. *Paolella*, 211 Conn. 672, 679, 561 A.2d 111 (1989) (force or intimidation necessary for abduction established when defendant forcibly prevented victim from leaving house, tied her up and threatened her with gun); *State* v. *Sinchak*, 47 Conn. App. 134, 139, 703 A.2d 790 (1997) (physical force and threat of intimidation established when defendant put gun to victim's head and threatened her), appeal dismissed, 247 Conn. 440, 721 A.2d 1193 (1999).

The facts that the defendant was an authority figure and the victim was of limited mental ability in and of themselves do not establish force or intimidation. A mere command from an employer reasonably cannot constitute the intimidation or threat necessary for an abduction. If that were the case, it would call into question the criminality of every situation in which an employee was forced to sit and withstand a reprimand by a supervisor. Moreover, abduction, unlike restraint and other provisions in the Penal Code involving an element of consent, does not take into account the age or mental ability of the victim when determining whether there has been force or intimidation in preventing a victim's liberation. Cf. General Statutes § 53a-91 (1) (B) (lack of consent involved in restraint includes acquiescence of incompetent person without permission of parent or guardian);[34] General Statutes § 53a-71 (a) (2) (person guilty of sexual assault in second degree

[34] I note that the information did not charge the defendant with the restraint of an incompetent or minor person. The jury also was not charged as to the portion of the restraint statute that takes into account the mental competence of the victim.

if victim is "mentally defective to the extent that such other person is unable to consent to such sexual intercourse"); General Statutes § 53a-73a (a) (1) (B) (person guilty of sexual assault in fourth degree if recipient of sexual contact is mentally defective or incapacitated to extent that they cannot consent). Even if a jury were to take into account the victim's mental capacity in its determination as to whether she had been intimidated, despite the absence of instructions from the trial court, the evidence belies a conclusion that she was so intimidated that she felt forced to stay in the room with the defendant. When she wanted to leave, she was able to do so, and the defendant neither said nor did anything to stop her. Thus, because of the glaring lack of evidence of any "abduction" in the present case, the judgment with respect to the defendant's conviction of kidnapping in the first degree should be reversed and the case should be remanded to the trial court to render a judgment of not guilty on that charge. Accordingly, I dissent from part I of the majority opinion as well.

In conclusion, I note that, in this case, my colleagues have disavowed recent positions taken by this court with respect to both the binding effect of the code and the circumstances under which judgment of acquittal is proper. Understandably, the bench and bar may be somewhat confused by this result, as am I. Like Shakespeare's Puck, I can only apologize to the audience and suggest that it also pretend that this has all been a bad dream.[35]

---

[35] "If we shadows have offended, Think but this, and all is mended, That you have but slumb'red here While these visions did appear. And this weak and idle theme, No more yielding but a dream, Gentles, do not reprehend. If you pardon, we will mend. And, as I am an honest Puck, If we have unearned luck Now to scape the serpent's tongue, We will make amends ere long; Else the Puck a liar call. So, good night unto you all. Give me your hands, if we be friends, And Robin shall restore amends." W. Shakespeare, A Midsummer Night's Dream, act 5, sc. 1.